IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| Plaintiff, | ) | Civil Action No. 98-897 L |
| v. | ) | Hon. Francis M. Allegra |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF**

Respectfully submitted,

Nancie G. Marzulla
Roger J. Marzulla
Defenders of Property Rights
1350 Connecticut Ave., N.W.
Suite 410
Washington, D.C. 20036
202-822-6770
202-822-6774 (facsimile)

Counsel for Plaintiff

Dated: April 19, 2005

**TABLE OF CONTENTS**


| | | |
|---|---|---|
| TABLE OF AUTHORITIES | | iii |
| QUESTION PRESENTED | | vi |
| PROCEDURAL HISTORY | | 1 |
| FACTUAL BACKGROUND | | 3 |
| | History of Family Farm | 3 |
| | Agriculture Soil Conservation Service's 1960's Drainage Plan | 4 |
| | Normal Farming Activities Exemption | 11 |
| | "Jurisdictional Wetlands" | 14 |
| | Underlying Enforcement Action | 16 |
| | Consent Decree | 19 |
| ARGUMENT | | 22 |
| I. | The Government's Action Resulted in the Physical Invasion of Mr. Brace's Property, Thus Requiring Just Compensation as a Taking *Per Se* | 22 |
| | A. Mr. Brace has Suffered a Physical Taking Analogous to the Takings in *Lorreto* and *Hendler* | 22 |
| | B. Mr. Brace has Suffered the Taking of a Flowage Easement | 25 |
| | C. Mr. Brace has Suffered the Uncompensated Taking of an Access Easement | 27 |
| | D. Mr. Brace has Suffered the Uncompensated Taking of a Conservation Easement | 28 |
| II. | The Government's Action Deprived the Murphy Farm of All Economically Beneficial Use, Entitling Mr. Brace to Just Compensation Under the Fifth Amendment | 33 |
| III. | Alternatively, the Defendant's Actions in This Case Constitute a Regulatory Taking Under the *Ad Hoc* | |

Test in *Penn Central* 40

A. This Court is not Precluded by "Law of the Case" from Examining All of the Relevant Facts in this Case 41

B. In 1975, Mr. Brace Reasonably Expected That His Property Could be Drained and Planted and Was Free of Federal Clean Water Act Regulation 43

C. The Character of Defendant's Action in This Case Supports a Regulatory Taking 50

D. Defendant's Action, Resulting in the Loss of Property Valued at $455,000, Had a Severe Economic Impact on Mr. Brace 51

IV. The Fair Market Value of the Property Taken from Mr. Brace Should Be Determined Based on a Highest and Best Use As a Residential Subdivision Development 52

A. The Highest and Best Use of the Murphy Farm is Residential Development 53

B. The Murphy Farm has a Value of $455,000 in the Before Condition 55

C. The Murphy Farm has "Scant" Value in the After Condition 57

D. The Court Should Not Adopt Mr. Silver's Appraisal 60

V. The Farmer's Operating Loan Rate, Compounded, Is the Appropriate Interest Rate To Provide Just Compensation in This Case 64

## Table of Authorities

**Constitutional Provisions**

U.S. Const. amend. V........................................................................................................ 22

**Cases**

*Ambase v. United States*, 58 Fed. Cl. 32 (2003)…………………………………………..44, 51
*Appolo Fuels, Inc. v. United States*, 381 F.3d 1338 (Fed. Cir 2004……………………………..48
*Armstrong v. United States*, 364 U.S. 40 (1960) ................................................................ 41, 51
*Augustine v. Principi*, 343 F.3d 1334 (Fed. Cir. 2003).............................................................. 41
*Avoyelle's Sportsmen League, Inc. v. Alexander*, 511 F. Supp. 278 (W.D. La. 1981)................ 44
*Barnes v. United States*, 538 F.2d 865 (Ct. F. Cl. 1976) .......................................................... 25
*Bass Enterprises Production Co. v. United States*, 54 Fed. Cl. 400 (2002) .......................... 37, 52
*Big Meadows Grazing Ass'n v. United States*, 344 F.3d 940 (9th Cir. 2003).............................. 31
*Board of County Supervisors of Prince William County v. United States*, 116 F.3d 454, (Fed. Cir. 1997) ........................................................................................................................... 53
*Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 537 U.S. 99 (2002) .............. 14, 46
*Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d 810 (9th Cir. 2001) ...... 14
*Bowles v. United States*, 31 Fed. Cl. 37 (1994) ......................................................................... 65
*Brown v. Legal Foundof Washington*, 538 U.S. 216 (2003)........................................................ 22
*C.W. Over & Sons, Inc. v. United States*, 48 Fed. Cl. 342 (2000) ............................................. 42
*Carabell v. United States Army Corps of Eng'rs*, 391 F.3d 704 (6th Cir. 2004).................. 17, 46
*Del-Rio Drilling Programs v. United States*, 146 F.3d 1358 (Fed. Cir. 1998)........................... 50
*Dolan v. City of Tigard*, 512 U.S. 374 (1994) ........................................................................... 30
*Fieldturf, Inc. v. Southwest Recreational Indus., Inc.*, 357 F.3d 1266 (Fed. Cir. 2004).............. 42
*Florida Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21 (1999)......................................... 44,50
*Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560 (Fed. Cir. 1994)............... 34, 49, 51
*Forest Properties, Inc. v. United States*, 177 F.3d 1360 (Fed. Cir. 1999).................................. 38
*Forest Properties, Inc. v. United States*, 39 Fed. Cl. 56, 67 (1997). .......................................... 51
*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991) ................................................... 23, 28
*Hudson v. Principi*, 260 F.3d 1357 (Fed. Cir. 2001) .................................................................. 43
*In re Needham*, 354 F.3d 340 (5th Cir. 2003)....................................................................... 17, 46
*Jamesbury Corp. v. Litton Indus. Products, Inc.*, 839 F.2d 1544 (Fed. Cir. 1998) ................ 42, 43
*Kaiser Aetna v. United States*, 444 U.S. 164, (1979)................................................................. 23
*Lakewood Assoc. v. Comm'r*, 109 T.C. 450 (1997)..................................................................... 15
*Lakewood Assoc. v. United States*, 45 Ct. Cl. 320 (1999) .......................................................... 15
*Litton Systems, Inc. v. Honeywell, Inc.*, 238 F.3d 1376 (Fed. Cir. 2001) .................................. 43
*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)............................... 25, 51
*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992).................................... 34
*Maritrans, Inc. v. United States*, 342 F.3d 1344 (Fed. Cir. 2003)............................. 34, 37, 41, 52
*McCandless v. United States*, 298 U.S. 342 (1936)..................................................................... 53
*McLennan v. United States*, 24 Cl. Ct. 102 (1991)...................................................................... 53
*Miller v. United States*, 620 F.2d 812 (Fed. Cir. 1980) ............................................................... 64
*Montana v. United States*, 33 Fed. Cl. 82, 86 (1995) ................................................................. 42
*Moore v. United States*, 61 Fed.Cl. 73 (2004) ............................................................................ 33

*National Min. Ass'n v. U.S. Army Corps of Engineers***,** 145 F.3d 1399 (C.A.D.C. 1998) ............ 13
*Natural Resources Defense Council v. Callaway*, 392 F. Supp. 685 (D.D.C. 1975) ............. 10, 45
*Nolan v. California Costal Commission*, 483 U.S. 825 (1987) .................................................. 29
*NRG Co. v. United States*, 31 Fed. Cl. 659 (1994) .................................................................... 64
*Olson v. United States*, 292 U.S. 246 (1934), ............................................................................ 54
*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) ................................................................ 41, 47
*Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354 (Fed. Cir. 2000)............................... 34
*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978) ............................................ 41
*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922)............................................................. 49
*Pettro v. United States*, 47 Fed. Cl. 136, 154 (2000).................................................................. 64
*Pitcairn v. United States*, 212 Ct. Cl. 168 (1976) ....................................................................... 65
*Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1871) ................................................................ 25
*Ridgeline, Inc. v United States*, 346 F.3d 1346 (2003) ......................................................... 23, 26
*Rockefeller Center Properties v. United States*, 32 Fed. Cl. 586 (1995)............................... 37, 52
*Schapiro v. Commissioner*, 61 T.C.M. (CCH) 2215 (1991) ......................................................... 33
*Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001)................................................................................................................ 17, 46
*Strasburg v. Commissioner*, T.C. Memo. 2000-94 (2000) ........................................................... 33
*Symington v. Commissioner*, 87 T.C. 892, 895 & n.5 (1986)...................................................... 33
*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) .......... 29
*Toro Co. v. White Consolidated Indus., Inc.*, 383 F.3d 1326, 1335 (Fed. Cir. 2004).................. 41
*United States v. 47.3096 Acres of Land*, 583 F.2d 270, 272 (6th Cir. 1978)............................... 56
*United States v. Brace*, 41 F.3d 117 (3d Cir. 1994)................................ 2, 6,13, 18, 19, 33, 39, 40
*United States v. Brace*, No. 90-229 (W.D. Pa. Dec. 16, 1993**)**.......................................... 2, 12, 16
*United States v. Cartwright*, 411 U.S. 546, 551 (1973)............................................................. 57
*United States v. Cumberland Farms of Connecticut, Inc.*, 647 F. Supp. 1166 (D. Mass. 1996).. 12
*United States v. General Motors Corp.*, 323 U.S. 373 (1945)......................................... 22, 27, 51
*United States v. Rapanos*, 376 F.3d 629 (6th Cir. 2004) ...................................................... 17, 46
*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985)........................... 10, 17, 46
*Walcek v. United States*, 49 Fed. Cl. 248 (2001) .................................................................. 37, 47
*Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411 (1994)........................................... 64, 66

**Statutes**

16 U.S.C. 3837, et seq................................................................................................................ 30
26 U.S.C.A. § 170 ................................................................................................................. 30, 32
33 U.S.C. § 1311..................................................................................................................... 1, 8, 9
33 U.S.C. § 1344................................................................................................................... 1, 9, 11
33 U.S.C. § 1362.......................................................................................................................... 9
Pub. L. 102-104, 105 Stat. 510 (1991)......................................................................................... 15
Pub. L. 95-217, § 67, 91 Stat. 1566 (Dec. 27, 1977) ................................................................... 11

**Regulations**

33 C.F.R. § 323.4(a)(1)(ii)........................................................................................................... 12
33 C.F.R. § 328.3 ..................................................................................................................... 10,11

40 C.F.R. § 122.2. .......... 10,11, 18
7 C.F.R. § 1467.12 .......... 31
7 C.F.R. § 1467.3 .......... 30, 31
7 C.F.R. §1647.1-18 .......... 30
7 C.F.R. §1647.4 .......... 31

**Other Authorities**

3 1977 Leg. History at 351 .......... 14
3 1977 Leg. History at 494 .......... 13
40 Fed. Reg. 31319 .......... 45
40 Fed. Reg. 31320 .......... 10, 11
42 Fed. Reg. 37121 .......... 45
42 Fed. Reg. 37122 .......... 9, 10
42 Fed. Reg. 37125 .......... 11
42 Fed. Reg. 37127 .......... 11
60 Fed. Reg. 28511 .......... 30
Corps of Engineers Wetlands Delineation Manual at 1 (1987) .......... 15
Federal Manual for Identifying and Delineating Jurisdictional Wetlands at 1 (1989). .......... 15
*Fee*, UNEARTHING THE DENOMINATOR IN REGULATORY TAKING CLAIMS, 61 U. Chi. L. Rev. 1535 .......... 37
Flournoy, SECTION 404 AT THRITY-SOMETHING: A PROGRAM IN SEARCH OF A POLICY, 55 Ala. L. Rev. 607 (2004) .......... 14
S. REP. NO. 102-80 .......... 16
Uniform Appraisal Standards for Federal Land Acquisitions *44 (2000)* .......... 56

## QUESTION PRESENTED

Is the Defendant liable for a physical, categorical or regulatory taking of the Murphy Farm or, alternatively, of the Murphy and Homestead farms?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| Plaintiff, | ) | Civil Action No. 98-897 L |
| v. | ) | Hon. Francis M. Allegra |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S POST-TRIAL BRIEF**

This is an action to recover damages for the taking of 58 acres of farmland, known as the Murphy Farm, in Erie, Pennsylvania. Trial of the matter took place in Washington, D.C. from January 11, 2005 to January 14, 2005, and a view of the subject property occurred on April 8, 2005. Final argument has been set for May 31, 2005, following the submission of the parties' post-trial briefs.

**Procedural History**

This action has its roots in an environmental enforcement suit brought by the Environmental Protection Agency against Robert Brace (Plaintiff here) for the discharge of a pollutant (topsoil) into navigable waters (the Murphy Farm) without a federal permit in violation of the federal Clean Water Act[1] (CWA). 33 U.S.C. § 1311(a); 33 U.S.C. § 1344(a). (*See* Pl.'s Ex. P21 (civil complaint alleging violation of the CWA).) The district court, after making findings of fact, entered judgment in favor of Mr. Brace, finding that Mr. Brace's activities were

[1] "The CWA prohibits the unpermitted discharge of any pollutant, such as dredge or fill material, by any person from any point source into waters of the United States. 33 U.S.C. §§ 1311(a) & 1344(a)."(Pl.'s Ex. P21 ¶8.) Specifically, section 301 of the CWA states, "Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful." Section 404 authorizes the Secretary of the Army, acting through the Chief of Engineers, to "issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."

exempt from the Clean Water Act's permit requirement "because they constitute: (a) normal farming activities; (b) upland soil and water conservation practices; and (c) maintenance of drainage ditches." (*United States v. Brace*, No. 90-229 (W.D. Pa. Dec. 16, 1993), Def.'s Ex. D5 (hereinafter "District Court Op.").) Without disturbing the District Court's findings of fact, the Third Circuit reversed, finding that Mr. Brace's "drainage activities on the thirty-acre wetland site were not exempt under the 'normal farming activities'" exception from the CWA permit requirement. *United States v. Brace*, 41 F.3d 117, 138 (3rd Cir. 1994). On remand the case was concluded by entry of a consent decree which permanently enjoined Mr. Brace from "discharging any pollutants (including dredged or fill material) into the approximately 30 acre wetland site," required the removal of the miles of drain and tons of topsoil which Mr. Brace had installed to make the land productive and mandated that "within thirty days after the entry of this Consent Decree, Defendants will record this Consent Decree in the applicable land records office." (Pl.'s Ex. P22 ¶¶ 3, 4, 6.)

On November 25, 1998, Plaintiff, Mr. Robert Brace, filed this action for the taking of his property without just compensation, in violation of the Fifth Amendment to the United States Constitution. A pre-trial conference was held on December 20, 2004. This Court conducted a trial on liability and damages from January 11-14, 2005, taking testimony from witnesses and accepting exhibits into evidence. On April 8, 2005 the court conducted a site visit to the Murphy Farm, the Homestead Farm, and the surrounding area. This Court has ordered the simultaneous filing of post trial briefs on April 19, 2005 and the filing of reply briefs on May 19, 2005.[2] Closing argument is set for May 31, 2005 at 10:00 a.m. in Washington, D.C.

---

[2] These dates were established by an order of April 12, 2005 extending the original filing dates of April 12, 2005 and May 12, 2005, respectively.

## Factual Background

### History of Family Farm

"Since at least the 1930's, Mr. Robert Brace's family has owned and farmed land located in Waterford Township, Erie County, Pennsylvania." (Jt. Stip. of Fact ¶ 1.) Mr. Brace's grandfather owned the Homestead Farm until it was lost during the depression because he was unable to work the property after suffering a stroke. (Tr. at 114, 117.) Mr. Brace's father bought the Homestead farm back two years later on production credit. (*Id.*) Mr. Brace's father bought the Murphy Farm, which was a working farm in its own right, in 1943. (Tr. at 115) ("The Murphy farm was a working farm in its entirety in the early 1900s, but it went by the wayside like so many other farms because it wasn't feasible to farm there anymore."); *see also* (Tr. at 120-21) ("that farm was a working farm in itself in the early 1900s. There was all kinds of tile lines that I tried to show the government when they came in there in '87…but when I did the blasting in there in '77, we opened up a lot of those tile lines.") "Mr. Brace grew up on this land and has been a farmer his entire life." (Jt. Stip. of Fact ¶ 1.)

The Murphy Farm, the subject property of this suit, is typical of other farms in Erie County. (Tr. at 66-72.) (Mr. Burawa identifying Mr. Brace's farms and discussing the county wide need for drainage tile.) "The soil in Erie County, Pennsylvania "requires continuous draining in order to be suitable for cultivation," "[e]xtensive underground drainage systems are typical and necessary aspects of farming in Erie County," and 'installation of such systems is a normal farming activity in order to make land suitable for farming."[3] (Adjudication, FOF ¶¶ 13,

[3] In accordance with the Court's oral order on January 11, 2005, Mr. Brace cites findings of fact recited by the Third Circuit opinion in the prior enforcement action, which the Court has deemed as established under the doctrine of collateral estoppel. Also, in accord with the Court's ruling, Mr. Brace also sets forth specific factual findings from the district court's opinion in the enforcement action that are critical to the case and should be adopted as collateral estoppel. At the beginning of trial, Mr. Brace filed a motion to deem as established certain facts previously determined in the prior environmental enforcement action which Defendant brought against Plaintiff, and which resulted in a final judgment and consent decree following an extensive trial and appeal. *See United States v. Brace*,

Def.'s Ex. D5.) As Mr. Joseph Burawa, former County Executive Director for the United States Department of Agriculture's Agricultural Stabilization and Conservation Service in Erie County, testified at trial, it was a common practice for the USDA to assist farmers in installing drainage or "tile underdrain" systems on farms in Erie County from the late 1960s to the 1980s: "[A]t that time, tile underdrain was probably the most popular and the most money that was put out into underground drainage systems." (Tr. at 66.) Mr. Joseph Burawa further testified that during his tenure at the ASCS, he worked with as many as 100 Erie County farmers in just one year who had applied for cost-sharing assistance to install such underdrain systems. (Tr. at 67.) ("There's tile put near on every farm in Erie County.")

**Agriculture Soil Conservation Service's 1960's Drainage Plan**

In the 1960's the United States Department of Agriculture Soil Conservation Service developed a drainage plan for Mr. Brace's father. (District Court Op. FOF ¶ 23; *see also* Tr. at 71-73; Pl.'s Ex. P1.) Like the drainage plans on numerous farms in Erie Country, the plan prepared by SCS for Mr. Brace's father was designed to drain fields in order to make them suitable for farming. (Def.'s Ex. D5; Tr. at 101.) (Mr. Burawa testifying, "During that era, I was aware of the fact that the government, through entitlements for tiling and diversions and conservation plans, there was money available for farmers to tile, to enhance their property, lower the water table if you will so they could actively farm that. Production agriculture.") Specifically, the Soil Conservation Service's plan was designed to drain fields on the Homestead farm labeled 3, 4, 6, 7, 8, 9, 10, and 11 in a southeasterly direction under South Hill Road and

---

41 F.3d 117 (3d Cir. 1994); (Pl.'s Ex. P22.) On January 11, 2004, the Court orally granted Mr. Brace's motion, stating: "I am going to take this [Third Circuit] opinion and treat the basic findings that are in here as ones which provide[] essentially a starting point for purposes of this litigation . . . ." (Tr. at 21.) The Court further held that it would view the opinion from the district court in the enforcement action as "having historical value," but not something it would "focus on for collateral estoppel," unless Mr. Brace identified specific findings from the district court opinion that should be "adopted via collateral estoppel." (Tr. at 24-25.) Because these district court findings were not reversed by the Third Circuit on appeal they should via collateral estoppel.

into an unnamed tributary located on the Murphy Farm in what was labeled field 14. (Pl.'s Ex. P1.)(annotating slope boundaries with short dashed lines) From there the unnamed tributary channeled the water drained from the Homestead Farm and water from the Murphy Farm in a westerly direction across the Murphy Farm and into the Elk Creek located in what was labeled field 13. (*Id.*) Elk Creek then flows in a northwesterly direction, under South Hill Road and onto the Homestead Farm before proceeding on to Lake Erie. (*Id.)*; s*ee also* (Pl.'s Ex. P18 at 20.)(indicating directions of flow) As designed, the flow of water across the Murphy Farm is an integral part of the Soil Conservation Service's plan because the Murphy Farm acts as the funnel through which the Homestead Farm drains. (*Id.*)

After obtaining the drainage plan, Mr. Brace's father set about implementing its recommendations. (Tr. at 123-24.) Mr. Brace's father excavated ditches on both the Homestead and Murphy Farm because "he wanted to try to get more productive pasture and row crop even at the time that he was doing corn and oats and hay augmenting his basic crops." (*Id.*) Mr. Brace's father also installed a diversion ditch that interconnected the drainage plans on the Murphy and Homestead farms. (Tr. at 309-11.) In addition to ditching, Mr. Brace's father renovated pasture land and cleared brush in accordance with the SCS plan. (Tr. at 310.)

In the spring of 1975, Mr. Brace purchased the subject 58 acre parcel, known as the Murphy Farm, from his parents, Charles and Mary Brace.[4] (Tr. at 115, 118, 141-42.); *see also* (Jt. Stip. of Fact ¶ 2.) Mr. Brace purchased the farm to keep it from going outside the family. (Tr. at 118.) While Mr. Brace's parents had used the Murphy Farm for the pasturing of horses and cows, by the time Mr. Brace purchased the property it had gotten to "where they couldn't make a living with 50 or 60 head of dairy cows."(Tr. at 118.) Accordingly, it was Mr. Brace's

[4] Mr. Brace's father deeded the property to him on December, 30 1975. (Jt. Stip. of Fact ¶ 2.)

intent to turn the farm into "effective and productive farming business." *United States v. Brace,* 41 F.3d 117, 120 (3rd Cir. 1994).

"At the time he purchased the property from his father, [Mr.] Brace obtained and utilized the soil and conservation plans that had been prepared for his father by the ASCS.[5]" *Id.* "The existing drainage system was in poor condition and not yet complete at the time of [Mr.] Brace's acquisition." *Id.* (*See also* Tr. at 122-125; District Court Op. FOF ¶ 23; Tr. at 71-73; Pl.'s Ex. P1.)

During the first two years Mr. Brace owned the Murphy Farm he began "preparing for row crops" in order to make it profitable. [6] (Tr. at 124.) This preparation was required because Mr. Brace's father had utilized the Murphy and Homestead farms for distinct farming operations. (Tr. at 118, 316-19)(Mr. Brace describing the distinct uses of the farms and testifying, "We had a separate farm. We didn't drive our dairy cows back and forth.") Specifically, Mr. Brace's father used the Homestead Farm for crop production and the Murphy Farm as a dairy operation. (*Id.*); *see also* (Pl.'s Ex. P1.)(detailing field uses) Describing his preparation Mr. Brace testified at trial, "I went in there and tore down fences and planned to make it more productive with better drainage, and that's where I got involved with the plan to go ahead and try to expand and make this ground very productive, as much as you could, because you cannot make a farmer unless you have good highly productive land. That's a necessity. It's a must…So, in 19 -- I believe it was 1975 is when I used three-and-a-half ton of dynamite to open those ditches up, and that's

[5] "The drainage system impacts the ability to produce crops on all parts of Brace's property." *United States v. Brace,* 41 F.3d 117, 120 (3rd Cir. 1994).

[6] "[Mr.] Brace utilized the existing drainage plan that had been implemented on the property that contains the site as part of his overall intention and design to establish a farming operation that would be interconnected and continuous throughout the property." (District Court Op. FOF ¶¶ 24.) "The drainage system included a design for channels and tiling to allow waters from adjoining croplands to be siphoned off and onto the site. In late 1976 and early 1977, [Mr.] Brace implemented the first stage of the interconnected plan that had been recommended by the [SCS] by reopening a channel to allow the water to flow in its natural direction. [Mr. Brace] also installed tiling material on the site consistent with the [SCS] recommendations." (District Court Op. FOF ¶ 26.)

why I've always said it was a consistent plan and it was a plan that worked together.[7]" (Tr. at 119.) In 1975, Mr. Brace also engaged in "ditching and draining" of the Murphy Farm. (Tr. at 125.) "As of 1977, the essential portions of [Mr.] Brace's improvements to the existing drainage system were intact and operating." *Brace*, 41 F.3d at 121.

In 1977, Mr. Brace contacted the United States Department of Agriculture's Agricultural Stabilization and Conservation Service (ASCS) for technical and financial assistance in further improving the drainage plan.[8] (*See* Pl.'s Ex. P2, P3, P4, P5); *see also* (Tr. at 72-75, 85-90, 28-129.) On March 7, 1977, Willie L. Ruffin, an ASCS District Conservationist, provided technical assistance in mapping out a drainage system entailing portions of both the Homestead and Murphy Farms. (Pl.'s Ex. P2; *see also* Tr. at 85.) When completed on July 14, 1977 that plan entailed the installation of 4920 feet of 4 inch underground drain tile, 50 units of 6 inch steel pipe and 880 feet of 6 inch underground drain tile. (Pl.'s Ex. P2 at 14 (R.R. Sheldon certifying installation on July 14, 1977).) In addition, some fill material was needed on the Murphy Farm to properly install the outlet. (*Id.* at 13, 16.)

---

[7] "The drainage system impacts the ability to produce crops on all parts of [Mr.] Brace's property." *Brace*, 41 F.3d at 120-21; (Tr. at 359-360.) "[W]ithout such a system, the property is not suitable for farming because of soil conditions." (District Court Op. FOF ¶¶ 24.)

[8] "In 1977, [Mr.] Brace decided to seek the advice and assistance of the [United States Department of Agriculture's] Agricultural Stabilization and Conservation Service (hereinafter 'ASCS') as part of his plan to develop an integrated farming operation on the property that includes the site."[8] (District Court Op. FOF ¶ 23) "Also, in 1977, [Mr.] Brace contacted the ASCS to inquire as to technical assistance and cost-sharing arrangements that might be available for the implementation of his plans. The ASCS visited the site prior to extending such assistance and thereafter provided such advice and assistance to [Mr.] Brace, continuing to do so up to 1985. The site and the farming activities conducted thereon were never concealed from the [United States Environmental Protection Agency], other departments of the federal government or state agencies." (District Court Op. FOF ¶ 27; *see also* Tr. at 72-75.) "In subsequent years, [Mr.] Brace maintained the system, consistent with his overall plans and as is necessary for typical farming activities in Erie County, as time, funds and equipment were available. (District Court Op. FOF ¶ 28.) "[Mr.] Brace's work in improving upon the interconnected drainage system progressed continuously from 1977 to 1987, as time, funds and equipment were available. If the necessary funds had been available to him in 1977, [Mr.] Brace would have expedited his farming plans and completed the project at that time. As a result of [Mr.] Brace's efforts, by the end of 1979 the site was dry, with the exception of times of excessive rainfall." *Brace*, 41 F.3d at 121.

On April 13, 1978, Willie L. Ruffin provided technical assistance on a second drainage system. (Pl.'s Ex. P3.) When completed on May 2, 1978 that system entailed the installation of 5050 feet of 4 inch underground drain tile and 30, 4 inch, steel pipe outlets. (*Id.*)

On March 20, 1979 the designated ASCS technician provided technical assistance mapping out a third drainage system. (Pl.'s Ex. P4.) When completed in July 1979 that system entailed the installation of 350 feet of 4 inch underground drain pipe and 650 feet of six inch under ground drain tile. (*Id.*) In addition, 825 feet of sod waterway had been constructed. (*Id.*)

In July 1984, as part of the emergency conservation assistance program the ASCS requested and Mr. Brace conducted maintenance on a portion of the drainage system located on the Murphy Farm. (Pl.'s Ex. P5); *see also* (Tr. at 90, 342, 374-75.) As Mr. Brace testified at trial, "The Murphy farm had the drainage that, you know, they asked us to clean out there on the main ditch for $1,008 I believe it was, and the rest of that, there was some sod waterways we put in on the main farm, and again, that was their idea to having interconnecting for the two farms so they interconnected together for a natural flow of water off of both the Murphy and the Homestead farms." (Tr. at 129.) Mr. Burawa testified that the ASCS provided funding for this maintenance as well as earlier cost-sharing for the drainage projects. (Tr. at 84-90)(Mr. Burawa describing ASCS various projects on Mr. Brace's farms and testifying, "we like to start as many practice as we could on a lot of different farms which we did, and we only had so much money that Congress allocated under the Agriculture Conservation Program, so we would put a limit on it, usually about $5,000. So farmers would get so they would do some every year and we would spend some every year, and I'm sure part of this was to go ahead and put in for more assistance.")

"In 1986 and 1987, [Mr.] Brace paid for excavation in the site and the burying of plastic tubing or 'drainage tile' in an effort to drain the site. Throughout the 1980s, [Mr.] Brace used appropriate equipment to remove unconsolidated soil, pebbles, silt, and growth which were impeding water flow. Farmers in the area typically engaged in such practices." *Brace*, 41 F.3d at 121. His drainage and soil preparation completed, "[Mr.] Brace began growing crops on the site in 1986 and 1987." *Brace*, 41 F.3d at 121.

**Clean Water Act**

The Clean Water Act, which was passed in 1972, prohibited the "discharge of any pollutant by any person" into "navigable waters" without a permit. 33 U.S.C. §§ 1311(a), 1344(a). The "Secretary of the Army, acting through the Chief of Engineers," was delegated authority to issue permits for "fill," while the EPA retained permit authority for other pollutants. *Id.* The Clean Water Act defined "navigable waters" as "waters of the United States, including the territorial seas" and did not mention wetlands at all. 33 U.S.C. § 1362(7). On April 3, 1974 the Army Corps of Engineers published regulations implementing the Clean Water Act. *See* 42 Fed. Reg. 37122, 37122-33. These regulations limited the application of the Clean Water Act to "waters that are subject to the ebb and flow of the tide shoreward to their mean high water mark (mean higher water mark on the West Coast) and/or waters that are presently used, were used in the past, or are susceptible to use to transport interstate or foreign commerce." *Id.* at 37123. Those regulations did not purport to extend the Corps' jurisdiction to encompass wetlands. *Id.*

Accordingly, in the spring of 1975 when Mr. Brace purchased the Murphy Farm from his parents, the Corps of Engineer's regulations did not extend the jurisdiction of the Clean Water Act over the Murphy Farm and did not prohibit Mr. Brace from implementing the Soil

Conservation Service drainage plan. *See* 42 Fed. Reg. 37122, 37122-33 (discussing the progression of Clean Water Act and the regulatory expansion from the "high water mark" to jurisdictional wetlands.); *see also United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121,123-24 (1985)(discussing the regulatory expansion of "navigable waters" under the Clean Water Act).

As of 1975, the United States Department of Agriculture's Agricultural Stabilization and Conservation Service, like the Army Corps of Engineers, understood that the Murphy Farm was not subject to Clean Water Act permitting requirements. (Tr. at 66-7.) As Mr. Joseph Burawa testified at trial, as of 1975, the ASCS did not view the Clean Water Act as imposing any restrictions on the assistance provided to farmers in the practices under its agricultural conservation programs, such as the installation of underground drainage systems. (Tr. at 76.) ("Interpretation in our office was that farmers were exempt from the Act at that time, and so we just done things like we always done.")

As a result of a court order, on July 25, 1975 the Army Corps of Engineers published interim final regulations extending the jurisdiction of the Clean Water Act "over discharges of dredge and fill material to many areas that [had] never before been subject to Federal permits or to this form of water quality protection. [9]" 40 Fed. Reg. 31320 (July 25, 1975). Still, these regulations arguably did not apply to the Brace property because they narrowly defined "navigable waters" to include only those freshwater wetlands that were actually[10] "*periodically inundated* and *normally characterized* by the prevalence of vegetation that requires saturated soil

[9] The Army Corps of Engineers published this expansion in response to the United States District Court for the District of Columbia's ruling in *NRDC v. Callaway*, 392 F. Supp 685 (D.D.C. 1975). 40 Fed. Reg. 31320 (July 25, 1975).

[10] The Corps would later remove the requirement that the wetlands actually have the required characteristics by changing the definition to include those areas that, under normal circumstances, possess the required characteristics. *See* 42 Fed. Reg. 37,122 (July 19, 1977); 33 CFR § 328.3; 40 C.F.R. § 122.2.(emphasis added.)

conditions *for growth and reproduction*. [11]" Moreover, the Corps' 1975 interim regulations were subject to change before they became final. [12]

On July 19, 1977, the Corps adopted final regulations implementing a number of proposed changes. 42 Fed. Reg. 37125. These changes further expanded the jurisdiction of the Clean Water Act by replacing the term "navigable waters" with "waters of the United States" and modifying the underlying definition. [13] 42 Fed. Reg. 37127. *See also* 42 Fed. Reg. 37,122 (July 19, 1977); *also* 33 C.F.R. § 328.3; 40 C.F.R..§ 122.2.[14]

**Normal Farming Activities Exemption**

Simultaneous with the Corps' promulgation of its new regulations, in 1977 Congress also amended the Clean Water Act to exempt "normal farming activities" on "established farming operations" from the Section 404 permit requirement. Pub. L. 95-217, § 67, 91 Stat. 1566 (Dec. 27, 1977) (codified at 33 U.S.C. §§ 1344(f)(1)(A) ("normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, harvesting for the production of food, fiber and forest products or upland soil and water conservation practices"); 1344(f)(2)

---

[11] These interim final regulations administratively defined "navigable waters" to include:

> [C]oastal waters, wetlands, mudflats, swamps, and similar areas; freshwater lakes, rivers, and streams that re sued, were used in the past, or are susceptible to use to transport interstate commerce, including all tributaries to these waters; interstate waters, certain specified intrastate waters the pollution of which would affect interstate commerce; and freshwater wetlands, including marshes, shallows, swamps, and similar areas that are contiguous or adjacent to the above described lakes, rivers, and streams, and that are *periodically inundated* and *normally characterized* by the prevalence of vegetation that requires saturated soil conditions *for growth and reproduction*.

*Id.* at 37124. (emphasis added).

[12] "To further refine the program the Corps will again need the help of the public and of State and Federal agencies in identifying activities and bodies of water that can be excluded from Section 404 program without adverse impact…their will be an additional comment period of 90 days in order that the public can comment further on any of the provisions." 40 Fed. Reg. 31320 (1975).

[13] These changes adopted the following definition of wetlands:

> Those areas that are inundated or saturated by surface or ground water at a *frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.* Wetlands generally include swamps, marshes, bogs, and similar areas.

42 Fed. Reg. 37,122 (July 19, 1977); 33 CFR § 328.3; 40 C.F.R. § 122.2.(emphasis added.)

("Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.").) By this exception, "Congress sought to calm fear that the decision in *N.R.D.C., Inc. v. Callaway* would result in an unlimited expansion of the Corps' jurisdiction by providing for the specific exclusion of certain activities from regulation by permit." *United States v. Cumberland Farms of Connecticut, Inc.*, 647 F. Supp. 1166, 1175 (D. Mass. 1996).

Based on this "normal farming activities" exemption the ASCS and Mr. Brace continued to believe that Mr. Brace's activities were exempt from the permit requirements of the CWA. (Tr. at 77, 373-74.) As Mr. Joseph Burawa testified at trial, after the 1977 regulatory expansion of the Clean Water Act's jurisdiction, that also added an exemption for "normal farming activities," it continued to be ASCS's policy up until at least 1984 that the Clean Water Act imposed no restrictions on the drainage activities that ASCS assisted farmers in implementing on their properties. (Tr. at 77.) Specifically, Mr. Burawa testified, "Interpretation in our office was that farmers were exempt from the Act at that time, and so we just done things like we always done." (*Id.*)

Debate over the breadth of the "normal farming activities" exemption, as implemented by 33 C.F.R. § 323.4(a)(1)(ii)[15], existed until at least 1994. Compare *United States v. Brace*, No. 90-229 (W.D. Pa. Dec. 16, 1993), holding that Mr. Brace's activities were "normal farming

---

[15] Under Corps regulations "normal farming activity" "must be part of an established (i.e., on-going) farming . . . operation and must be in accordance with the definitions in § 323.4(a)(1)(iii) . . . . Activities which bring an area into farming . . . use are not part of an established operation. An operation ceases to be established when the area on which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operations." 33 C.F.R. § 323.4(a)(1)(ii).

activities" and part of an "established farming operation" by considering the "activities" in light of local practice and the parcel as a whole to determine whether the activities were part of and "established farming operation", with *United States v. Brace*, 41 F.3d 117 (3d Cir. 1994), holding that Mr. Brace's activities were not "normal farming activities" or part of an "established farming operation" by focusing on the Corps' definition of "normal" rather than local practice and considering only the wetland site rather than the parcel as a whole when determining whether the activities were part of an "established farming operation." *See also National Min. Ass'n v. U.S. Army Corps of Engineers***,** 145 F.3d 1399 (C.A.D.C. 1998)("Congress added the subsection in 1977, apparently in response to the broad construction of "discharge" in the 1977 regulations.").

The legislative history of the 1977 amendment adding the "normal farming activities" exemption reveals not only the source of the debate but also a congressional intent for a broad interpretation of the exemption. As Senator Jennings Randolph explained:

> One of the most controversial of [the issues in the 1977 Amendments to the Act] relates to the regulation of disposal of dredge and fill material, resulting from a judicial decision as to the authority and responsibility of the Army Corps of Engineers under section 404 of the 1972 act. That decision resulted in widespread concern that many activities usually considered routine would be prohibited or made extremely difficult because of the complex regulatory procedure set up by the corps unless there was a new statement of congressional intent.

3 1977 Leg. History at 494. Congressman Roberts explained that the 1977 Amendments were designed to obviate that concern by creating express exemptions for normal farming activities like plowing. Specifically, Congressman Roberts stated, "we will now have for the first time statutory recognition that normal farming, ranching and silviculture activities do not belong in this permit program. These exemptions

reemphasize that Congress never intended these activities to be considered discharges of dredged or fill material." 3 1977 Leg. History at 351.

Despite this clear legislative intent the debate continues because the Supreme Court was unable to resolve it. *See Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 537 U.S. 99 (2002)(affirming, by an equally divided court, a Ninth Circuit decision turning on the disputed definitions of "normal farming activity" and "established farming operation"). In *Borden Ranch P'ship v. United States Army Corps of Eng'rs*, 261 F.3d 810(9th Cir. 2001), the appellant asserted that its deep ripping of a wetland was exempt as a "normal farming activity" occurring as part of an "established farming operation." The Ninth Circuit disagreed holding that while a farmer is free to switch from one wetland crop to another he may not convert ranch land to orchards and vineyards because even normal plowing can violate the CWA where it brings land into a use to which it was not previously subjected. *Id.* The Supreme Court affirmed because it was unable to reach an agreement on the definition of "normal farming activities" and "established farming operation." *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 537 U.S. 99 (2002). *See also* Flournoy, SECTION 404 AT THRITY-SOMETHING: A PROGRAM IN SEARCH OF A POLICY, 55 Ala. L. Rev. 607 (2004).

**"Jurisdictional Wetlands"**

Moreover, the ongoing debate regarding the definition of "jurisdictional wetland" continues to create significant turmoil. This debate is epitomized by Congress' appropriations rider prohibiting the use of the Federal Manual for Identifying and Delineating Jurisdictional Wetlands (1989).[16] *See* Pub. L. 102-104, 105 Stat. 510 (1991).

[16] The Energy and Water Development Appropriations Act of 1992, Pub. L. 102-104, 105 Stat. 510 (1991) provides:

In 1987, the Army Corps of Engineers published its Wetlands Delineation Manual which sets forth "a multi-parameter approach to identify[ing] and delineat[ing] wetlands for purposes of Section 404 of the Clean Water Act." Corps of Engineers Wetlands Delineation Manual at 1 (1987). According to the Corps, "[t]he purpose of this manual is to provide users with guidelines and methods to determine whether an area is a wetland for purposes of Section 404 of the Act." *Id*. at 5. Replacing the 1987 manual, in 1989, the Corps, together with the EPA and other federal agencies, adopted the "Federal Manual for Identifying and Delineating Jurisdictional Wetlands," the use of which was prohibited by PL 102-104. The 1989 Manual states: "The purpose of this manual is to provide users with mandatory technical criteria . . . to determine whether an area is jurisdictional wetland or not, and to delineate the upper boundary of these wetlands." Federal Manual for Identifying and Delineating Jurisdictional Wetlands at 1 (1989).

Congress prohibited the use of the 1989 manual because it significantly expanded the Corps' wetland jurisdiction without appropriate notice and comment rulemaking. Indeed, as Judge Horn noted, "[t]he 1989 Manual, as compared to the 1987 Manual, expanded the definition of wetlands." *Lakewood Assoc. v. United States*, 45 Ct. Cl. 320, 323 (1999); *see also Lakewood Assoc. v. Comm'r*, 109 T.C. 450, 453 (1997) (stating that the adoption of the 1989 manual "substantially increas[ed] the area of land considered to be protected wetlands and over which the Corps asserted jurisdiction"), *aff'd*, 173 F.3d 850 (4th Cir. 1998).

Further, in a Report submitted to the Senate by the Senate Committee on Appropriations regarding the Energy and Water Development Appropriations bill, the Committee stated:

---

> None of the funds in this Act shall be used to identify or delineate any land as a 'water of the united States' under the Federal Manual for Identifying and Delineating Jurisdictional Wetlands that was adopted in January 1989 (1989 Manual) or any subsequent manual not adopted in accordance with the requirements for notice and public comment of the rule-making process of the Administrative Procedure Act.

> Despite the importance and mandatory use of [the 1989 manual], it was not subjected to the rule making process of the Administrative Procedure Act, which would have given landowners and the public notice and opportunity to be heard on the changes made. Nor was it submitted to the Congress for consideration or debate. The Committee believes this was a serious mistake. . . . Because the Committee believes that landowners, at the minimum, were entitled to notice and opportunity to be heard before these mandatory changes were implemented, the Committee has included language prohibiting the Corps from using any funds made available in this act to delineate any land as a 'water of the United States' under the 1989 delineation manual or any subsequent manual not adopted in accordance with the rulemaking process of the Administrative Procedure Act.

S. REP. NO. 102-80, at 54-55 (1991).

**Underlying Enforcement Action**

The impact of this debate on wetlands delineations is evident in the varying acreages alleged throughout the enforcement action underlying this case. (Tr. at 77.) When "[t]he United States [through its Environmental Protection Agency and the U.S. Army Corps of Engineers] became aware of [Mr.] Brace's activities in 1987, *Brace*, 41 F.3d at 121, David Putnam, an Acting Field Supervisor with the U.S. Fish & Wildlife Service (FWS) initiated an enforcement campaign by alleging in a letter to Jim Peabody of the Army Corps of Engineers that Mr. Brace could be held responsible for affecting "over *200 acres* of wetlands." (Pl.'s Ex. P6.) (emphasis added) In contrast, on July 17, 1987, Edward W. Perry, also an Acting Field Supervisor with the FWS, wrote a letter to Mr. Brace, stating that "[b]iologists from this and other offices observed filling activities in about *130 acres* of wetlands on your property on several occasions since May 1987." (Pl.'s Ex. P10 (emphasis added).) The district court, however, found that only 30 acres were actually jurisdictional wetlands. *United States v. Brace*, No. 90-229 (W.D. Pa. Dec. 16, 1993).

Indeed, the extent to which Congress intended CWA jurisdiction to reach remains the subject of extensive litigation. *See, e.g., United States v. Riverside Bayview Homes, Inc.*, 474

U.S. 121 (1985) (finding that because "neither the imposition of the permit requirement itself nor the denial of a permit necessarily constitutes a taking…the Court of Appeals erred in concluding that a narrow reading of the Corps' regulatory jurisdiction over wetlands was 'necessary' to avoid 'a serious taking problem'" and holding that Congress acquiesced to the Corps' administrative construction"); *but see Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (concluding "that respondents have failed to make the necessary showing that the failure of the 1977 House bill demonstrates Congress' acquiescence to the Corps' regulations or the "Migratory Bird Rule," which, of course, did not first appear until 1986."); Compare *In re Needham*, 354 F.3d 340, 345-47 (5th Cir. 2003)(requiring a "significant nexus" to navigable waters for CWA jurisdiction to attach), with *United States v. Rapanos*, 376 F.3d 629 (6th Cir. 2004)(requiring only a "hydrologic connection" to navigable water for CWA jurisdiction to attach); *see also Carabell v. United States Army Corps of Eng'rs*, 391 F.3d 704 (6th 2004)(rejecting argument that definition of "adjacent waters" did not include water separated by a manmade berm).

"During 1987 and 1988, the United States [through the EPA and the Corps] issued three orders to [Mr.] Brace, directing him, inter alia, to refrain from further disturbing the site" and to restore the wetlands on his property. . . . In October of 1988, [Mr.] Brace received an administrative complaint in connection with his farming activities on the site. [Mr.] Brace requested a hearing to contest the complaint, believing that his activities were exempt from any and all permit requirements. Prior to the hearing, the complaint was dismissed." *Brace*, 41 F.3d at 121; (*see also* Pl.'s Exs. P9, P12, P13, P16.) Those orders and related correspondence threatened a range of civil penalties and possible criminal prosecution. (Pl.'s Exs. P6, P9, P10, P12, P13, P16.)

The tension between agencies regarding wetlands, in this example between the Department of Agriculture and the EPA, is demonstrated by the fact that, "In the summer of 1988, Brace approached the ASCS in order to gain the status of 'commenced conversion from wetlands' prior to December 23, 1985 with respect to the site. . . . The ASCS granted the status to the site, finding that [Mr.] Brace's on-going farming activities had commenced prior to December of 1985, which would enable [Mr.] Brace to complete the conversion and produce an agricultural commodity without losing USDA benefits." *Brace*, 41 F.3d at 121; *see also* (Pl.'s Exs. P14, P15.)

In 1990, the EPA filed an enforcement action against Mr. Brace in the United States District Court for the Western District of Pennsylvania, seeking civil penalties. (Pl.'s Ex. P21.) "In April 1990, as a cautionary measure, [Mr.] Brace approached the Army Corps of Engineers ('COE') in an effort to obtain an after-the-fact permit to conduct his farming activities on the site, despite his belief that the activities were and are exempt from permit requirements of the CWA. The United States Environmental Protection Agency ('EPA') requested that the COE not review an application from [Mr.] Brace for an after-the-fact permit. [Mr.] Brace was advised that because the matter was then in litigation, the government would not act on his request for a permit." *Brace*, 41 F.3d at 121.

In 1993, the district court entered judgment in favor of Mr. Brace, finding that his activities were exempt from the permitting requirements of Section 404 of the Clean Water Act because they were normal farming activities on an established farming operation. (Dist. Ct. Op. at 13.)

On appeal, the United States Court of Appeals for the Third Circuit reversed, holding that the district court incorrectly interpreted the exemption and that Mr. Brace's

activities did not constitute normal farming practices on an established farming operation. Specifically, the Third Circuit held that:

> In determining that Brace's activities fell within [normal farming activities], the district court relied on facts that are irrelevant to the inquiry required by the applicable law. The district court appears to have based its conclusion on a casual observation that what Brace did was "normal" activity for a farmer in Erie County, rather than on the application of the regulatory construction accorded the statutory term "normal farming activities" by the agencies charged with the implementation of the statute…The district court misinterpreted the meaning of the "established farming operation" requirement. The district court believed it was appropriate to examine the relationship of the site in question to the rest of the land owned by the same property-owner in determining whether land was being brought into farming use … We cannot agree with this interpretation of the statute's requirement. The regulations provide that, "activities which bring an area into farming . . . use are not part of an established operation." The regulations do not specify the precise area to which we should look in determining whether there is an established farming operation. There are no minimum limits placed on the "area" being brought into farming use. Thus, we read the regulations to provide that an exemption is available only to activities that are part of an "established farming operation" at the site. A proper "contextual review of its total activities" only requires us to analyze whether such activities are "established and continuing" on the thirty-acre wetland site itself.

*United States v. Brace*, 41 F.3d 117 (3d Cir. 1994), *cert. denied,* 515 U.S. 1158 (1995)(internal citations omitted).

**Consent Decree**

After Mr. Brace’s petition for writ of certiorari was denied by the United States Supreme Court, the case was remanded to the district court, and Mr. Brace, having no remaining remedy available to challenge the EPA’s charges, was forced to involuntarily enter into a consent decree. (Tr. at 133.) (“Q Would you describe that decision to enter into a consent decree with the government as voluntary? A No, it was sure not. I mean, I tried and tried and tried to work the problem out, but, at this time, I was forced into doing something and trying to stay out of any more major problems than they already had me in.”) The consent decree “enjoined

permanently" Mr. Brace from undertaking any further activity on the 30 acres that might be considered "discharging any pollutants (including dredged or fill material)." (Pl.'s Ex. P22 ¶ 3.) The Consent Decree also ordered Mr. Brace to "perform restoration" in accordance with a Wetlands Restoration Plan, made part of the Consent Decree, and to pay a civil penalty of $10,000. (Pl.'s Ex. P22 ¶¶ 4, 5.) Mr. Brace was also required to record the Consent Decree in the land records office and provide a copy of the decree to any proposed buyer of his property; under the Consent Decree, "[a] transfer of interest in the said property will not relieve Defendants of any responsibility in this Consent Decree, unless the United States, Defendants, and the transferee agree to allow the transferee to assume such responsibility." (Pl.'s Ex. P22 ¶¶ 6, 7.)

The Wetlands Restoration Plan required Mr. Brace to destroy 20 years of work. (Tr. at 134.) (Mr. Brace describing the physical alterations required by the Consent Decree and testifying that it was "the worst devastating situation that I ever had in my life to destroy something that I had worked for 20 years to work on and try to improve.") The "restoration plan" required Mr. Brace to excavate six trenches on the property and rip out drainage tile. (*Id.*) The "restoration plan" further required Mr. Brace to fill in two surface ditches on the property. (*Id.*) Under the "restoration plan," Mr. Brace was also required to install a "check dam" in "unnamed Tributary A," to be constructed of concrete, gabions or compacted rock. (Pl.'s Ex. P22 Ex. A.) ("In order to restore the hydrology to the area, the drainage tile system currently located in the wetlands is to be disabled, surface ditches filled in, and a check dam constructed.") All of this work was to be completed, if feasible, within 90 days, or in any event, no later than one year after entry of the Consent Decree. (*Id*.) The property was subject to inspection by government agents until the restoration was considered completed by the EPA. (*Id*.) ("The site will be

inspected at the completion of the trench work and again at the completion of the restoration work.)

Mr. Brace fully complied with the Consent Decree, in which he "had to tear out several miles . . . of tile line, took the excavator down to both sites and had to go four feet deep and intersect any tile lines that were in there, . . . and then . . . put riprap in and bring the water table up and excavate and fill that back over to make [the] tile lines all quit functioning and [the] drainage system quit." (Tr. at 133-34.) The property now floods regularly and is completely unusable for farming or pasturing of cows. (Tr. at 136, 358-360.)

Under the authority of the Consent Decree, Mr. Lewis Steckler of the ASCS physically entered and inspected the property on December 23 and 24, 1996, and on December 24, 1996 concluded that the "overall project [was] completed according to the plan." (Pl.'s Exs. P23, P24.)

Today, as the Court saw on its April 8, 2005 view of the property, the restoration plan has transformed the once productive farmland into a wetland. The site now provides habitat for a variety of species including beavers that have expanded the restoration of the wetlands by building dams. The check dam Mr. Brace was required to install under the consent decree is still functioning. Water flowing southeast from the Homestead Farm onto the Murphy Farm and then northwest back onto the Homestead farm completely fills the culverts placed under South Hill as part of the Soil Conservation Services drainage plan. On the north side of South Hill Road, where the water pools up waiting to flow through those culverts, the areas annotated on Defense Exhibit 36 as farmed wetlands are once again inundated with ground and surface water.

## ARGUMENT

### I. The Government's Action Resulted in the Physical Invasion of Mr. Brace's Property, Thus Requiring Just Compensation as a Taking *Per Se*

The government's physical occupation of the Murphy Farm constitutes a taking for which just compensation is due under the Fifth Amendment. Specifically, under the authority of the Clean Water Act and backed by the contempt power of the district court, the government required that Mr. Brace: (1) "restore" his land by removing miles of drainage tile and excavating tons of topsoil; (2) install a "check dam" to cause the land to flood; (3) allow federal officials to come upon his property to inspect the restoration work; and, (4) execute and record an instrument creating a conservation easement over 30 acres of Mr. Brace's land. (Pl.'s Ex. P22.)

The unambiguous language of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. When the government, exercising its supreme power of eminent domain, physically takes land, the Constitution guarantees payment of just compensation for the land taken. As the Supreme Court has unequivocally indicated:

> When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, *United States v. Pewee Coal Co., 341 U.S. 114, 115 (1951)*, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. *United States v. General Motors Corp., 323 U.S. 373 (1945), United States v. Petty Motor Co., 327 U.S. 372 (1946).* Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants, *Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982);* or when its planes use private airspace to approach a government airport, *United States v. Causby, 328 U.S. 256 (1946)*, it is required to pay for that share no matter how small.

*Brown v. Legal Foundof Washingon*, 538 U.S. 216, 233-34 (2003).

"A permanent and exclusive physical occupation of private land by or on the authority of the government is one incontestable case for compensation under the Takings clause. However, a permanent occupation need not exclude the property owner to be a compensable taking. Nor must the occupation be continuous." *Ridgeline, Inc. v United States*, 346 F.3d 1346 (2003).

A physical invasion of the property by the government gives rise to a claim for just compensation because:

> The Government does not have the right to declare itself a co-tenant-in-possession with a property owner. Among a citizen's--including a property owner's--most cherished rights is the right to be let alone. *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting); *see generally* Warren & Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890).
>
> In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession--the right to *exclude* strangers, or for that matter friends, but especially the Government. *See, e.g., Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); *In re Etter*, 756 F.2d 852, 859 (Fed.Cir.) ("The essence of all property is the right to exclude...."); *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed.Cir. 1983).

*Hendler v. United States*, 952 F.2d 1364, 1374-75 (Fed. Cir. 1991) (parallel and other citations omitted). Stated simply, "It is well established that the government may not take an easement without just compensation." *Ridgeline, Inc. v United States*, 346 F.3d 1346, 1352 (2003). *See also Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 (1979) ("even if the Government physically invades only an easement in property, it must nonetheless pay just compensation").

In *Hendler v. United States*, property owners brought action against the EPA alleging that EPA's entry onto their land, installation of groundwater wells and monitoring activities were a "taking" of property under the Fifth Amendment. *Id.* The Federal Circuit overruled the denial of the plaintiffs' motion for summary judgment on the issue of a physical taking. The court held that the EPA's installation of monitoring wells constituted a physical taking stating, "There is nothing temporary about the wells the Government installed on the plaintiff's property… these surveillance wells are at least as 'permanent' in this sense as the CATV equipment in Loretto, which comprised only a few cables attached by screws and nails and a box attached by bolts." *Id.* (*citing Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). In reaching its

conclusion the Federal Circuit "emphasize[d] that the issue is not whether the Government had the right to impose itself and its activities on the plaintiffs" and stated "[a] physical occupation of private property by the government which is adjudged to be of a permanent nature is a taking, and that is true without regard to whether the action achieves an important public benefit or has only a minimal economic impact on the owner." *Id.* The Federal Circuit cautioned that, "The intruder who enters clothed in the robes of authority in broad daylight commits no less an invasion of these rights than if he sneaks in the night wearing a burglar's mask. In some ways, entry by authorities is more to be feared, since the citizen's right to defend against the intrusion may seem less clear." *Id.* at 1375.

**A. Mr. Brace has Suffered a Physical Taking Analogous to the Takings in *Lorreto* and *Hendler***

The government ordered excavation of trenches, destruction of drainage tile, filling of two drainage ditches and installation of a check dam, and the resulting flooding, are classic physical invasion of property that are analogous to the physical invasion of the plaintiffs' property in *Hendler* and *Loretto*. Under the consent decree Mr. Brace has suffered permanent physical occupation of the Murphy Farm by the placement of a "check dam" in "unnamed Tributary A". (Pl.'s Ex. P22 Ex. A). In addition, under the consent decree two surface ditches on the Murphy Farm have been physically occupied by fill material. (*Id.*); *see also* (Tr. at 609-610.) The trial testimony of Mr. Jeffery D. Lapp, Program Manager United States Environmental Protection Agency, a defense witness, confirms the permanent nature of these occupations. (Tr. at 656-59.) Combined these requirements resulted in another physical occupation because the direct, natural, or probable result of this destruction of an integral part of the Soil Conservation Service designed drainage plan was the invasion of the Murphy Farm by both ground and surface

water. (Tr. at 136, 358-360.) (Mr. Brace describing surface and ground water inundation.)

Like the wells in *Hendler* and the CATV equipment in *Lorreto*, the "check dam" and fill material used to plug surface ditches constitute physical takings because, as the Supreme Court has made clear, even a minor physical alteration of property constitutes a physical invasion sufficient to give rise to a claim for just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419, 435 (1982). "The historical rule that a permanent physical occupation of another's property is a taking has more than tradition to commend it. Such an appropriation is perhaps the most serious form of invasion of an owner's property interests. To borrow a metaphor, *cf. Andrus v. Allard*, 444 U.S. 51, 65-66 (1979), the government does not simply take a single "strand" from the "bundle" of property rights: it chops through the bundle, taking a slice of every strand." *Id.*

**B. Mr. Brace has Suffered the Taking of a Flowage Easement**

The flooding caused by these "restoration measures" is also a physical taking because "[g]enerally speaking, property may be taken by the invasion of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action." *Barnes v. United States*, 538 F.2d 865, 870 (Ct. F. Cl. 1976). "A constitutional taking resulting from such flooding is not limited to instances of obvious overflowing of a river's banks. The just compensation clause of the Fifth Amendment has been found likewise applicable in cases of percolation or rising ground water." *Id.*; *see also Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1871)("[W]here real estate is actually invaded by superinduced additions of water, earth, sand, or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution.").

In *Ridgeline, Inc. v United States*, the property owner asserted that the additional water

flow caused by the development of a United States Postal Service facility constituted a taking by the Government of a water flowage easement. *Ridgeline, Inc. v United States*, 346 F.3d 1346, 1352 (2003). Although the district court properly determined that no taking occurred due to permanent and exclusive physical occupation by the Government, the Federal Circuit found that the district court failed to address the property owner's principal issue of whether the increased water runoff constituted a taking of a flowage easement by inverse condemnation. *Id.*

In this case the restoration plan has succeeded, and has even extended flooding beyond the jurisdictional wetland boundaries. The restoration plan ordered by the government was intended to restore 30 acres delineated as wetlands to its 1984 condition. (Tr. at 675.) That plan, however, has caused significant ground water inundation outside the areas delineated by the government as wetlands. (Tr. 136, 359-60.) The ground water inundation caused by the disruption of the Soil Conservation Service designed drainage plan has rendered portions of the farm unsuitable for farming because water that once drained off the property is now retained on it. (*Id.*) That water is flowing into areas in quantities that it had not prior to the "restoration plan." (*Id.*) Moreover, the restoration plan created a lake on the Murphy Farm where one had never existed. This Court need look no further than the aerial photos submitted by both parties for evidence of this taking. (*See, e.g.*, Pl.'s Ex. P1, P34.) Conspicuously absent from those photos is any indication that a lake or pond existed on the Murphy Farm prior to the "restoration plan." Similarly, while the 1960's SCS drainage plan suggests that a pond could be created on the Murphy Farm the field by field description of the Murphy Farm does not indicate that either a lake or pond existed in the 1960's. (Pl.'s Ex. P1.) However, as this Court observed on April 8, 2005 a lake now covers a significant portion of the Murphy Farm. The outlet of the lake created by the government ordered restoration plan is roughly located at the point where Unnamed

Tributary A flows into Elk Creek. The lake itself extends south across the southern boundary of the Murphy Farm onto the adjoining property. Accordingly, like the development in Ridgeline, the restoration plan in this case has physically taken a flowage easement on the Murphy Farm.

**C. Mr. Brace has Suffered the Uncompensated Taking of an Access Easement**

Mr. Brace suffered yet another physical invasion by reason of the government's 18-month unilateral right to come upon his property. Specifically, the Consent Decree provides, "In addition to any other legal authority, representatives of the Untied States will have the authority for a period of eighteen (18) months after entry of this Consent Decree, at reasonable times and with proper identification, to enter upon the property affected by this Consent Decree for the purposes of monitoring and measuring compliance with this Consent Decree." (Pl.'s Ex. P22 ¶9.)

In *United States v. General Motors Corp.*, 323 U.S. 373 (1945), the Supreme Court found a taking where the government, as a subtenant in a warehouse building leased by the plaintiff, terminated the plaintiff's occupancy for temporary, one year, wartime use. The Court noted that under the Fifth Amendment a property "interest may comprise the group of rights for which the shorthand term is "a fee simple" or it may be the interest known as an "estate or tenancy for years," as in the present instance. The constitutional provision is addressed to every sort of interest the citizen may possess….The right to occupy, for a day, a month, a year, or a series of years, in and of itself and without reference to the actual use, needs, or collateral arrangements of the occupier, has a value." *Id.*

The Federal Circuit addressed this form of physical invasion in *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991). In *Hendler* the EPA issued an order mandating that EPA

officials and other authorized personnel, including state officials, were to have access to the plaintiffs' property. Subsequently, government agents regularly came onto the property. The Federal Circuit noted that the evidence reflected a situation in which the government "behaved as if it had acquired an easement not unlike that claimed in *Kaiser Aetna*. Pursuant to the easement, the Government at its convenience drove equipment upon plaintiffs' land…Kaiser Aetna and Nollan would seem to leave little doubt that such activities, even though intermittent, is not 'temporary.' It is the taking of the plaintiffs' right to exclude, for the duration of the period…." *Id.* at 1378.

The government engaged in an analogous physical taking in this case. Under the Consent Decree, government agents were allowed to enter the Murphy Farm to ensure compliance, and to bring the court's contempt power into play to force Mr. Brace to physically alter his land and refrain from returning it to productive use. (Pl.'s Ex. P22 ¶¶ 9, 12; Pl's. Ex. P23, P24.) The consent decree specifically ordered that the government would have access to the farm for 18 months. (*Id.*) In order to confirm the progress and completion of the restoration plan, government agents physically invaded the Murphy Farm on December 23, 1996 and December 24, 1996. (*Id.*)

**D. Mr. Brace has Suffered the Uncompensated Taking of a Conservation Easement**

The fourth type of physical taking which occurred in this case is the taking of a legal interest in the land itself in the form of a recorded conservation easement over the 30 acres delineated as jurisdictional wetlands.

As the Supreme Court recently stated, **"**When the government physically takes

possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 321-22 (2002) (citations omitted).

The coerced recordation of the consent decree in this case constitutes a physical taking of a conservation easement by the Defendant. The Supreme Court addressed the physical taking of an easement in *Nolan v. California Costal Commission,* 483 U.S. 825 (1987). The Court stated, "Had California simply required the Nollans to make an easement across their beach front available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking." *Id.* at 831. Similarly, had the United States simply required Mr. Brace to convey a conservation easement for the 30 acres of wetlands on the Murphy Farm, rather than conditioning the settlement of the enforcement action on his agreeing to do so, there would be no doubt there was a taking. This conclusion is dictated by the nature of the government's encumbrance of Mr. Brace's property. Specifically, this result is dictated because a conservation easement is an interest in land rather than a mere restriction on its use. *See Id.* (discussing the distinction between and interest in and restriction on property).

Addressing an argument in *Nolan* that an easement merely constituted a restriction on use the court stated, "To say that the appropriation of a public easement across a landowner's premises does not constitute the taking of a property interest but rather (as Justice Brennan contends) 'a mere restriction on its use" is to use words in a manner that deprives them of their ordinary meaning." *Id.* at 831 (internal citation omitted). In *Dolan v. City of Tigard*, the Supreme Court, addressing a flowage easement, reiterated its position in *Nollan* stating, "the

conditions imposed were not simply a limitation on the use petitioner might make of her own parcel, but a requirement that she deed portions of the property to the city…The difference to petitioner, of course, is the loss of her ability to exclude others. As we have noted, this right to exclude others is "one of the most essential sticks in the bundle of rights that are commonly characterized as property." 512 U.S. 374, 385 (1994). This condition constituted a taking regardless of how laudable the states goals because "[a] strong public desire to improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id.*

Like the easements in *Nollan* and *Dolan*, conservation easements are an interest in real property. *See* 7 CFR § 1467.3 (defining wetlands conservation easements as "a reserved interest easement which is an interest in land"); 26 U.S.C.A. § 170(h)(1)(defining a qualified conservation contribution under the internal revenue code as an interest in real property).

The United States has explicitly recognized that permanent and non-permanent conservation easements are an interest in land through its establishment of the Wetland Reserve Program (WRP). *See* 16 U.S.C. 3837, et seq; 7 CFR §1647.1-18. "Under the WRP, the Secretary of Agriculture is authorized to purchase easements from owners of eligible land who voluntarily agree to restore and protect farmed wetlands or converted wetlands and eligible adjacent acres.[17]" 60 Fed. Reg. 28511. Land eligible under the WRP includes land granted the status of **"**commenced conversion from wetlands" prior to December 23, 1985. 7 CFR §1647.4. Ironically, having been granted such a designation, the wetlands at issue in this case were eligible under the WRP. *Brace*, 41 F.3d at 121; (*see also* Pl.'s Exs. P14, P15.)

[17] "The Department of Agriculture Reorganization Act of 1994, authorized the establishment of the Natural Resources Conservation service (NRCS) and transferred responsibility for the WRP from the Consolidated Farm Service Agency to the NRCS, formerly the Soil Conservation Service (SCS)." 60 FR 28511-02.

The WRP defines a conservation easement as "reserved interest easement which is an interest in land defined and delineated in a deed whereby the landowner conveys all rights, title, and interests in a property to the grantee, but the landowner retains those rights, title, and interests in the property which are specifically reserved to the landowner in the easement deed." 7 CFR § 1467.3. Under WRP easements, landowners convey, in exchange for compensation, all interest in a property reserving only "record title, the right of quiet enjoyment, the right to prevent trespass and control public access, the right to undeveloped recreational uses, and the right to subsurface resources." *See, e.g., Big Meadows Grazing Ass'n v. United States*, 344 F.3d 940 (9th Cir. 2003). The government obtains the right to unilaterally implement a wetlands restoration program. *Id.* Moreover, where the easement itself includes an agreement to implement a restoration plan, the government does not need the consent of the landowner prior to the implementation of the restoration plan. *Id.* Finally, modifications to the restoration plan require the agreement of the parties. 7 C.F.R. § 1467.12.

The Consent Decree in this case involuntarily conveys precisely the same interest to the government. While Mr. Brace retains record title, the right of quiet enjoyment, the right to prevent trespass and control public access, the government has the right to unilaterally dictate the implementation of a restoration plan and prohibit development. Further, under the Consent Decree Mr. Brace must obtain the agreement of the government to modify the plan. (Pl.'s Ex 22 ¶12.) Accordingly, the Consent Decree in this case constitutes a conservation easement analogous to the bargained for conservation easements under the WRP and is therefore a real interest in property.

The Internal Revenue Code also recognizes that conservation easements are an interest in property. 26 U.S.C.A. § 170(f), (h) (West 2000)**;** *see also* 26 CFR § 1.170A-14. Under section

170 of the Internal Revenue Code conservation easements are known as "qualified conservation contributions." 26 U.S.C.A. § 170(f), (h) (West 2000). These types of charitable contributions are an exception to the rule under section 170(f)(3)(A) that contributions of partial interest in property may not be fully deducted. *See* 26 U.S.C.A. § 107(f)(3)(B)(iii). Rather, conservation easements, if they meet the requirements for a "qualified conservation contribution" under section 170(h) of the Internal Revenue Code can be fully deducted up to their fair market value, limited to thirty percent of the donor's adjusted gross income (but, any unused portion can carry forward for five years).

Section 170(h)(1) defines a "qualified conservation contribution" as "a contribution -- (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." 26 U.S.C.A. § 170(h)(1). A "qualified real property interest" is any one of the following: "(A) the entire interest of the donor other than a qualified mineral interest, (B) a remainder interest, and (C) a restriction (granted in perpetuity) on the use which may be made of real property." 26 U.S.C.A. § 170(h)(2). A "qualified charitable organization" is defined under various other provisions of the Internal Revenue Code. 26 U.S.C.A. § 170(h)(3).

The restrictions imposed on the 30 acres of the Murphy Farm covered by the Consent Decree satisfy the definition of a "qualified real property interest" under 26 U.S.C.A. § 170(h)(2)(C). The Consent Decree provides that Mr. Brace and his successors are permanently enjoined from engaging in any activity that violates the CWA. (Pl.'s Ex. P22.) That provision is a restriction (granted in perpetuity) on the use which may be made of real property because it prohibits, for conservation purposes, the development or alteration of the site. Accordingly, the through the Consent Decree the government has taken a conservation easement that is a real property interest.

The accepted method for determining fair market value of a conservation easement, under both the WRP and the Internal Revenue Code, is the "before and after" method-- subtracting the value of the property after the conservation easement from the value of the property before the conservation easement. *See* Treas. Regs. § 1.170A-14(h)(3);[18] 60 FR 28511. This is of course the same formula for determining just compensation for the taking of an interest in real property under the Fifth Amendment. *Moore v. United States***,** 61 Fed.Cl. 73 (2004).

## II. The Government's Action Deprived the Murphy Farm of All Economically Beneficial Use, Entitling Mr. Brace to Just Compensation Under the Fifth Amendment

Prior to the execution of the "Restoration Plan" and the other mandates of the consent decree, Mr. Brace was able to raise corn, cabbage and other crops on the Murphy Farm. (Tr. 130-31.) As "restored", about half the farm is inundated with water and the remainder is so configured that it is unusable for agriculture or any other economic use. (Tr. at 136, 358-360) Indeed, prior to the "restoration" "Mr. Brace's father used the site for pasturing of cows and horses, and [Mr.] Brace's brother used the site for pasturing cows until 1976," a use now unavailable to Mr. Brace. *United States v. Brace*, 41 F.3d 117, 138 (3rd Cir. 1994). The Supreme Court has made clear that, in cases such as the present one, "when the owner of real property has been called upon to sacrifice all economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992).

Total deprivations of use are, for Fifth Amendment purposes, treated as "categorical" takings just like physical occupations because "total deprivation of beneficial use is, from the

[18] Numerous cases have held that the proper method for determining the fair market value of a conservation easement is the "before and after method." *See Strasburg v. Commissioner*, T.C. Memo. 2000-94 (2000); *Browning v. Commissioner*, 109 T.C. 303, 314-15 (1997); *Schapiro v. Commissioner*, 61 T.C.M. (CCH) 2215 (1991); *Symington v. Commissioner*, 87 T.C. 892, 895 & n.5 (1986).

landowner's point of view, the equivalent of a physical appropriation." *Id*. at 1017. As the Federal Circuit has stated compensation is required, "whether the taking is by physical occupation for the public to use as a park, or by regulatory imposition to preserve the property as a wetland so that it may be used by the public for ground water recharge and other ecological purposes." *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560, 1569 (Fed. Cir. 1994); *See also Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1357 (Fed. Cir. 2000)(holding that takings occur when "*all* economically viable use, i.e., all economic value has been taken by the regulatory imposition."). "A categorical taking is distinct from a taking 'that is the consequence of a regulatory imposition that prohibits or restricts only some of the use that would otherwise be available to the property owner but leaves the property owner with substantial economic use.'" *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003) (citation omitted).

In this case all use of the 30 out of 58 acres of the Murphy Farm is explicitly restricted by the consent decree and, moreover, most of those 30 acres are inundated with water. Under the consent decree, the owner of the 30 acres, whether it be Mr. Brace or a subsequent owner, is "enjoined permanently" from undertaking any further activity on the 30 acres that might be considered "discharging any pollutants (including dredged or fill material)." (Pl.'s Ex. P22 ¶ 3.) In short, the 30 acres must remain economically idle.

As to the remaining 28 acres of the Murphy Farm, it consists of two non-contiguous parcels, each of which is unusable, separately or together, for any economic purpose. Neither can be economically farmed. (Tr. at 868.) Moreover, the first parcel cannot be accessed without transgressing the wetlands. (Tr. at 733, 773, 867.) (testimony of George Silver); *see also* (Pl.'s

Ex. P32.) ("access to it would have to be across an area already restricted by government regulation")

Although the remaining 12-acre parcel might at first blush appear adaptable to construction of a home, it is steeply sloped with highly erodable soils and as the court observed during the site visit a natural gas well is located in the middle of it. Anyone constructing or living in a home on the site would also run the risk of violating the existing consent decree, as the deposit of any fill (e.g. runoff from the home, driveway or garden into the 30 acres) would be contempt of court. (Tr. at 683.) ("THE COURT: So a person could conduct an activity, do so innocently, but if the effect looks like somebody else would be doing to in fact accomplish a filling of the wetlands, they could find themselves running across an enforcement action, correct? THE WITNESS: Correct.") As Defendant's witness, Jeffrey Lapp, EPA Program Manager, testified at trial, even the run-off of sediment from the 28 acres onto the 30 acres could be considered a violation of the Clean Water Act (Tr. at 666-69, 680-84.) A reasonable buyer contemplating building a single family residence simply will not purchase such an impaired parcel, particularly given the abundance of other land available for development. (Tr. at 394-96.) (Mr. Lignelli testifying that, "Given the uncertainty as to how to develop the 28 acres, I've concluded that it's of scant value in that somebody would want a deep discount to take on such a project.") Thus, any activity on the 28 acres could potentially lead to a violation of the Consent Decree by causing a discharge of pollutants on the 30 acres. (*Id*.); *see also* **(**Pl.'s Ex. P32.) ("Mr. Brace has asked my opinion about the development potential of the approximate 20 acres of his property that the government has not restricted him from using. . . . [A]pproximately 12 acres, lies roughly at the mid point of his frontage along South Hill Road. . . . Considering that this acreage is bordered on three sides by what has been delegated as wetlands by government

agencies, I believe that development would be nearly (if not totally) impossible, and be in compliance with existing regulations.")

Moreover, the Consent Decree states, "A transfer of interest in the said property will not relieve Defendants of any responsibility in this Consent Decree, unless the United States, Defendants, and the transferee agree to allow the transferee to assume such responsibility." (Pl.'s Ex.22 ¶7.) In addition, the Consent Decree permanently enjoins Mr. Brace or his successors from engaging in any activity that might violate Section 301 of the CWA. (*Id.* at ¶3.) One of the effects of this second provision is to heighten the risk that an innocent mistake will be viewed as a violation of the CWA.[19] (Tr. at 683-84.) Because a reasonable seller would not transfer the property without transferring liability, fair market value is reduced by the consent decree because any buyer would expect to be compensated for regulatory risk. (Tr. 394, 95.) Given the restrictions that have taken all economically beneficial use from the property, this regulatory risk negates even nominal value.

Given the lack of economically beneficial use and the impact of the Consent Decree, Mr. Lignelli found that the Murphy Farm in its current condition has "scant" value. (Tr. at 381, 465-66.) Prior to the restoration plan As Mr. Lignelli testified at trial, the value of the 58-acre Murphy Farm was $455,000 before the taking. (Tr. at 380-81, 393-94; Pl.'s Ex. P31.) This is not a case where the economic impact was a mere diminution in value. *See, e.g., Rockefeller Center*

[19] THE COURT: So a person could conduct an activity, do so innocently, but if the effect looks like somebody else would be doing to in fact accomplish a filling of the wetlands, they could find themselves running across an enforcement action, correct?
THE WITNESS: Correct. And I assume that would have to be fairly large scale. I mean, it would be fairly difficult to pick up erosion on the field, you know, except at the time it happened.
THE COURT: Let me ask you this. In the case of a consent decree, the impact of making a mistake is enhanced, right, because if in fact you are viewed in violation of the Clean Water Act and you don't have a consent decree out there, you are not worrying about the potential of being viewed in violation of a court order.
THE WITNESS: Right.
(Tr. at 683-84.)

*Properties v. United States*, 32 Fed. Cl. 586, 594 (1995) (holding 4.3% loss did not support a taking), *Maritrans*, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (holding 13.1% diminution did not support a taking), *Bass Enterprises Production Co. v. United States*, 54 Fed. Cl. 400, 401 (2002) (holding 5% decrease did not support a taking). Rather, as explained above, the government's action has deprived Mr. Brace of all economically viable use of the entire 58-acre tract. The loss of $455,000 is a 100 percent loss of the value of the Murphy Farm. Accordingly, under the standard set forth in *Lucas*, this was a categorical taking by the Defendant, mandating just compensation for the property taken.

Despite the fact that the Murphy and Homestead farms are separated by a road, constitute distinct tax parcels, utilized for different crops and were enumerated separately in the deed, Defendant may contend that this court should ignore the fact that the Murphy Farm is an entirely separate parcel of land from the Homestead Farm. Stated simply, "the problem is defining the appropriate denominator in the regulatory taking 'equation.'" *Fee*, UNEARTHING THE DENOMINATOR IN REGULATORY TAKING CLAIMS, 61 U. Chi. L. Rev. 1535. As this Court noted in another wetlands case, this calculus provides incentive for the parties to define the 'parcel as whole' differently. *Walcek v. United States*, 49 Fed. Cl. 248, 259 (2001) ("Given this, it should come as little surprise that defendant argues that the Property, in its entirety, constitutes this "parcel as a whole," while plaintiffs assert that only the wetlands portion of the Property, for which the permit application was actually submitted, should be considered.") Given this incentive the government may contend that the "relevant parcel" in this case includes both the Homestead and the Murphy farms in order to set up the argument that it is free to take the Murphy Farm so long as it leaves Mr. Brace the Homestead Farm.

This argument, however, flies in the face of the limited guidance the Court has provided.

Specifically, that "relevant parcel" precedent "displays a flexible approach, designed to account for factual nuances." *Forest Properties, Inc. v. U.S.*, 177 F.3d 1360 (Fed. Cir. 1999). Accordingly the government position fails because the question is not what parcel supports the desired outcome but what facts support a particular parcel and in this case the facts support the relevant parcel being the Murphy Farm.

Mr. Brace is not asserting that the relevant parcel is limited to the 30 acres designated as wetlands and covered by the consent decree. Similarly, there is no suggestion much less any evidence that he has engaged in creative real estate transaction to narrow the scope of the relevant parcel. Nor has Mr. Brace attempted to narrow the scope of the parcel by asserting that the relevant parcel is limited to particular numbered fields. Rather, Mr. Brace asserts that the relevant parcel is what it has always been.

Specifically, the relevant parcel for a categorical takings analysis in this case is the 58-acre Murphy Farm. At all times Mr. Brace has considered the Homestead Farm and Murphy Farm distinct parcels rather than part of an integrated business plan.(Tr. at 115.) ("There were two farms.") In addition, the deed conveying those parcels from his parents enumerates them as distinct parcels. (Df.'s Ex. D11 Ex. A.) The Homestead and Murphy farms are, to this day, physically separated by South Hill Road. (Pl.'s Ex. 34.)

More importantly, the Murphy and Homestead Farms have remained two distinct operations rather than one integrated Homestead/Murphy farming operation. While Mr. Brace's parents had used the Murphy Farm for the pasturing of horses and cows, by the time Mr. Brace purchased the property it had gotten to "where they couldn't make a living with 50 or 60 head of dairy cows."(Tr. at 118.) Accordingly, it was his intent to turn the farm into "effective and productive farming business." *United States v. Brace*, 41 F.3d 117, 120 (3rd Cir. 1994).

During the first two years Mr. Brace owned the Murphy Farm he began "preparing for row crops" in order to make it profitable.[20] (Tr. at 124.) This preparation was required because Mr. Brace's father had utilized the Murphy and Homestead farms for distinct farming operations. (Tr. at 118, 316-19.) (Mr. Brace describing the distinct uses of the farms and testifying, "We had a separate farm. We didn't drive our dairy cows back and forth.") Specifically, Mr. Brace's father used the Homestead Farm for crop production and the Murphy Farm as dairy. (*Id.*); *see also* (Pl.'s Ex. P1.)(detailing field uses)

The Third Circuit found that the Murphy and Homestead Farms are not an integrated operation. Specifically, the Third Circuit held that it the district court misinterpreted the meaning of the "established farming operation" requirement because it examined the relationship of the site in question to the rest of the land owned by the same property-owner in determining whether land was being brought into farming use. The Court stated:

> We cannot agree with this interpretation of the statute's requirement. The regulations provide that, "activities which bring an area into farming . . . use are not part of an established operation." The regulations do not specify the precise area to which we should look in determining whether there is an established farming operation. There are no minimum limits placed on the "area" being brought into farming use. Thus, we read the regulations to provide that an exemption is available only to activities that are part of an "established farming operation" at the site. A proper "contextual review of its total activities" only requires us to analyze whether such activities are "established and continuing" on the thirty-acre wetland site itself.

[20] "[Mr.] Brace utilized the existing drainage plan that had been implemented on the property that contains the site as part of his overall intention and design to establish a farming operation that would be interconnected and continuous throughout the property." (District Court Op. FOF ¶¶ 24.) "The drainage system included a design for channels and tiling to allow waters from adjoining croplands to be siphoned off and onto the site. In late 1976 and early 1977, [Mr.] Brace implemented the first stage of the interconnected plan that had been recommended by the [SCS] by reopening a channel to allow the water to flow in its natural direction. [Mr. Brace] also installed tiling material on the site consistent with the [SCS] recommendations." (District Court Op. FOF ¶ 26.)

*United States v. Brace*, 41 F.3d 117 (3d Cir. 1994), *cert. denied*, 515 U.S. 1158 (1995)(internal citations omitted). Accordingly, the fact that the Murphy Farm had not been integrated with the Homestead Farm has already been established.

The government should not be allowed to engage in the type of historic revision that has raised concerns about the use of the denominator calculus in takings cases. Specifically, ignoring 80 years of history the government now seeks to combine the Murphy and Homestead farms into a single parcel in what amounts to a thinly veiled attempt to avoid liability by broadly defining the relevant parcel.

## III. Alternatively, the Defendant's Actions in This Case Constitute a Regulatory Taking Under the *Ad Hoc* Test in *Penn Central*

Alternatively, even if this Court does not find a categorical taking (either physical or "total deprivation"), Mr. Brace is entitled to recover just compensation under the *ad hoc Penn Central* test. Mr. Brace is entitled to compensation under this test because the three factors generally looked to in the *Penn Central* test weigh in favor of a cognizable taking. Specifically, the character of the government's action in this case was more invasive than required, assuming *arguendo* that the action did not deprive the Murphy Farm of all economic value it certainly came close and Mr. Brace possessed reasonable investment backed expectations that were eviscerated by the government's action.

The Federal Circuit has defined the proper approach to a non-categorical regulatory taking claim: "When a taking is determined to be non-categorical, the court must embark on a fact-based inquiry in which it applies the standard promulgated by the Supreme Court in *Penn Central* to evaluate whether the governmental action at issue constituted a cognizable taking of the property interest at issue." *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003). The *Penn Central* analysis involves "several factors that have particular significance."

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Those factors are the character of the governmental action at issue, the economic impact of the action on the claimant, and the extent to which the action has interfered with the claimant's distinct, investment-backed expectations. *Id*.

This is not to say that the Court may consider only those factors, or that all three must weigh in either a plaintiff's or defendant's favor to prevail. *See id.* ("[T]his Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons."); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring) ("The Takings Clause requires careful examination and weighing of all the relevant circumstances in this context. The court below therefore must consider on remand the array of relevant factors under *Penn Central* before deciding whether any compensation is due.").

Ultimately, the purpose of the *ad hoc* inquiry, as in other inverse condemnation cases, is to ensure that plaintiffs are not forced "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

### A. This Court is not Precluded by "Law of the Case" from Examining All of the Relevant Facts in this Case

The law of the case doctrine only precludes parties from relitigating issues that have been "actually decided." *Toro Co. v. White Consolidated Indus., Inc.*, 383 F.3d 1326, 1335 (Fed. Cir. 2004); *Augustine v. Principi*, 343 F.3d 1334 (Fed. Cir. 2003) ("A necessary predicate to application of law of the case is, therefore, that the legal issue in question has actually been decided.") (citing *United States v. United States Smelting, Ref. & Mining Co.*, 339 U.S. 186, 199

(1950) ("[I]t requires a final judgment to sustain the application of the rule of the law of the case.")).

The Federal Circuit has held that denials of summary judgment, like denials of motions to dismiss, are interlocutory and until final judgment is entered, do not become law of the case nor preclude reconsideration of the issues presented on summary judgment. *See Fieldturf, Inc. v. Southwest Recreational Indus., Inc.*, 357 F.3d 1266, 1268 (Fed. Cir. 2004) ("A motion to dismiss denied by the order of a single judge, however, does not become the law of the case."); *see also C.W. Over & Sons, Inc. v. United States*, 48 Fed. Cl. 342, 347 (2000) ("Denial of a previous summary judgment motion does not prevent a subsequent grant of summary judgment by the same court. 'The law of the case doctrine does not affect the power of a court to reconsider its interlocutory decisions. The court may change any interlocutory decision up until the entry of final judgment.'").

The Federal Circuit explained:

> With respect to a non-appealable denial of summary judgment, the law of the case is not a limit on the court's jurisdiction, but a rule of practice which may be departed from in the sound discretion of the district court. The first judge always has the power to change a ruling; further reflection may allow a better informed ruling in accordance with the conscience of the court. *A fortiori*, if the first judge can change his mind after denying summary judgment, and change his ruling, a second judge should have and does have the power to do so as well.

*Jamesbury Corp. v. Litton Indus. Products, Inc.***,** 839 F.2d 1544, 1550 (Fed. Cir. 1998), *overruled on other grounds*, *A.C. Aukerman Co. v. R.L. Chaides Const. Co*., 960 F.2d 1020 (Fed. Cir.1992).

Even where applicable, the law of the case doctrine is not a binding rule, but rather is a discretionary and prudential judicial tool. *See Montana v. United States*, 33 Fed. Cl. 82, 86 (1995) ("'A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance.'") (quoting *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 816

(1988) ("Second, the law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'") (citation omitted)).

> It is well-accepted that the application of the law of the case doctrine is discretionary. It is also well-established that the law of the case doctrine is a rule of practice and not a limit on a court's power, and that "law of the case should not be applied woodenly in a way inconsistent with substantial justice."

*Hudson v. Principi*, 260 F.3d 1357, 1363-64 (Fed. Cir. 2001) (citations omitted); *Jamesbury Corp. v. Litton Indus. Products, Inc.***,** 839 F.2d 1544, 1550 (Fed. Cir. 1998) ("At the trial level however, the law of the case is 'little more than a management practice to permit logical progression toward judgment.' Orderly and efficient case administration suggests that questions once decided not be subject to continued argument, but the court has the power to reconsider its decisions until a judgment is entered.").

Courts refuse to apply the law of the case doctrine where to do so would work a manifest injustice:

> Courts have articulated several circumstances where the law of the case doctrine does not apply. One basis upon which the courts will revisit a previously settled issue is when the previous decision was "clearly erroneous and would work a manifest injustice."

*Hudson*, 260 F.3d at 1363-64 (citations omitted); *Litton Systems, Inc. v. Honeywell, Inc.*, 238 F.3d 1376, 1380 (Fed. Cir. 2001) ("The law of the case is a discretionary judicial doctrine that precludes reconsideration of an issue decided at an earlier stage of litigation unless exceptional circumstances exist. One such circumstance is when controlling authority has since made a contrary decision of law applicable to the issue or when the prior decision was clearly wrong and would work a substantial injustice.") (citation omitted).

### B. In 1975, Mr. Brace Reasonably Expected That His Property Could be Drained and Planted and Was Free of Federal Clean Water Act Regulation

Mr. Brace's expectations in the spring of 1975 when he purchased the Murphy Farm are the expectations that are relevant Fifth Amendment purposes. See *Florida Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21, 41 (1999)(citations omitted); *see also Ambase v. United States*, 58 Fed. Cl. 32, 51 (2003) ("The manner in which the concept should be understood is that investment-backed expectations always depend on the underlying restrictions at the time of purchase. For example, in buying land zoned single family-residential, a property owner has no legitimate investment-backed expectation that he can dig a coal mine. However, the owner does have an investment-backed expectation that he can build a single family home.)

The fact that Mr. Brace's land was not subject to Clean Water Act regulation at the time he purchased it, but only years later after the government was ordered to include wetland within its regulatory program, is dispositive of this case. At the time Mr. Brace contracted to purchase the subject property in the Spring of 1975, it was not subject to the Clean Water Act's regulatory regime. From the date of the Clean Water Act's enactment in 1972 through the time of Mr. Brace's purchase of the subject property, the Corps of Engineers had interpreted the Act to cover only waters which were in fact navigable, and not to cover any land (including wetlands). *Avoyelle's Sportsmen League, Inc. v. Alexander*, 511 F. Supp. 278, 287-88 (W.D. La. 1981) ("The Corps consistently interpreted the term "waters of the United States" to cover only those waters which are subject to the ebb and flow of the tide or were, or could be made navigable in fact."), *rev'd in part on other grounds*, 715 F.2d 897 (5th Cir. 1983). In fact, at the time of Mr. Brace's purchase in late March or early April 1975, the Justice Department was defending the Corps' regulations against a challenge brought by conservation groups, arguing that Congress did not intend that wetlands be regulated under the Clean Water Act. Only in response to an adverse judgment in *Natural Resources Defense Council v. Callaway*, 392 F. Supp. 685, 686

(D.D.C. 1975), did the Army Corps of Engineers promulgate interim regulations on July 25, 1975 for the first time mentioning non-navigable wetlands, and those interim regulations were open to public comment and revision until they were made final on July 19, 1977. *See* 40 Fed. Reg. 31319; 42 Fed. Reg. 37121.

The United States Department of Agriculture's ASCS, like Mr. Brace and the hundreds of farmers in Erie County who continued to install drainage facilities in their wetlands with the help of the ASCS, did not believe the final regulations applied to farmland because, contemporaneously with the adoption of those regulations, Congress passed the "normal farming activities" exemption that ASCS believed encompassed Mr. Brace's activities. (Tr. at 77.) They interpreted this "normal farming activities" exemption and the Corps regulations to exempt assistance provided to farmers in the practices under its agricultural conservation programs, such as the installation of underground drainage systems. (Tr. at 76.) ("Interpretation in our office was that farmers were exempt from the Act at that time, and so we just done things like we always done.") According to Mr. Joseph Burawa, after the Corps and the EPA amended their regulations in 1977 to cover wetlands and to add an exemption for normal farming activities and up to at least 1984, it continued to be ASCS's policy that the Clean Water Act imposed no restrictions on the drainage activities that ASCS assisted farmers in implementing on their properties. (Tr. at 77.)

The United States District Court for the Western District of Pennsylvania concurred with the ASCS. Specifically, the district court compared Mr. Brace's activities to local farming practice and determined that those practices constituted "normal farming activities." The court also looked at the Murphy Farm as a whole and determined that Mr. Brace's activities were part of an "established farming operation." Only when the Third Circuit decided the governments

appeal was it determined that the exemption did not apply in this case. Moreover, uncertainty persists regarding the definition of "normal farming activities" because the Supreme Court was not able to reach an agreement on that issue in *Borden Ranch Partnership v. U.S. Army Corps of Engineers*, 537 U.S. 99 (2002)(affirming, by an equally divided court, a Ninth Circuit decision turning on the disputed definitions of "normal farming activity" and "established farming operation").

Indeed, the extent to which Congress intended CWA jurisdiction to reach remains the subject of extensive litigation. *See, e.g., United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121 (1985) (finding that because "neither the imposition of the permit requirement itself nor the denial of a permit necessarily constitutes a taking…the Court of Appeals erred in concluding that a narrow reading of the Corps' regulatory jurisdiction over wetlands was "necessary" to avoid "a serious taking problem" and holding that "Congress acquiesced in the administrative construction"); *but see Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (concluding "that respondents have failed to make the necessary showing that the failure of the 1977 House bill demonstrates Congress' acquiescence to the Corps' regulations or the "Migratory Bird Rule," which, of course, did not first appear until 1986."); Compare *In re Needham*, 354 F.3d 340, 345-47 (5th Cir. 2003)(requiring a "significant nexus" to navigable waters for CWA jurisdiction to attach), with *United States v. Rapanos*, 376 F.3d 629 (6th Cir. 2004)(requiring only a "hydrologic connection" to navigable water for CWA jurisdiction to attach); *see also Carabell v. United States Army Corps of Eng'rs*, 391 F.3d 704 (6th 2004)(rejecting argument that definition of "adjacent waters" did not include water separated by a manmade berm).

Thus, the regulatory regime in effect at the time Mr. Brace purchased the Murphy Farm

did not extend Clean Water Act jurisdiction to his property. To hold (as Defendant contends) that Mr. Brace should have disregarded the operative legal regime at the time of his purchase, and instead should have foreseen that the federal regulations would be first struck down, then repromulgated to encompass his property, is to stand the concept of reasonable expectations on its head. *See Walcek v. United States*, 49 Fed. C. 248 (2001)(stating "It does not seem reasonable to impute to plaintiffs…an interpretation of the Clean Water Act that the Corps itself initially eschewed and did not adopt until at least 1975 (and arguably 1977).").

The proposition that the mere enactment of a regulatory scheme is sufficient to extinguish reasonable expectations for all future use of property is a proposition flatly rejected by the Supreme Court in *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001) ("Were we to accept the State's rule, the post enactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.").

This is not to say that the regulatory regime in place at the time Mr. Brace purchased the Murphy Farm is irrelevant; to the contrary, the fact that the Corps' had no clean CWA jurisdiction over the 30 acres is determinative of the reasonableness of his expectations at the time of purchase. As the Federal Circuit recently stated:

> We concluded that *Palazzolo* did not reject the principle that "the regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations." Likewise, we conclude that Appolo's reasonable investment-backed expectations are shaped by the regulatory regime in place as of the date it purchased the leases at issue.

*Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (citation omitted).

Mr. Brace knew at the time of purchase that the Murphy Farm was not subject to federal regulation. (Tr. at 124, 374.) He also reasonably expected he could use the drainage plan created by his father and the SCS to make the subject property more productive for growing crops and could rely upon such plan in purchasing the property to use in his farming operations. (Tr. at 124-31.) He was encouraged in this reasonable belief by ASCS's financial and technical assistance in accomplishing the drainage installation, and by the failure of any government agency to challenge his, or any other Erie County farmer's, drainage of wetlands to make way for crop production. In fact it was not until 1987, that Mr. Brace had any indication that the use he reasonably expected to put the Murphy Farm to was regulated. (Tr. at 131.) As the Federal Circuit has stated:

> The manner in which the concept should be understood is that investment-backed expectations always depend on the underlying restrictions at the time of purchase. For example, in buying land zoned single family-residential, a property owner has no legitimate investment-backed expectation that he can dig a coal mine. However, the owner does have an investment-backed expectation that he can build a single family home.

*Ambase Corp. v. United States*, 58 Fed. Cl. 32, 51 (2003).

In purchasing the 58 acres, Mr. Brace reasonably relied on the regulations promulgated by the Corps of Engineers, which excluded his property, the congressional exemption of "normal farming activities, the USDA's assistance to his father in creating a drainage plan for the property, and the USDA's assistance in implementing the drainage plan. (Tr. at 124-31.) Mr. Brace expended approximately $30,000 in installing the drainage plan; he spent approximately 12 years preparing the land to grow crops. (*Id.*; Pl.'s. Exs. 2-5.) Had the government told Mr. Brace that he could not implement the drainage plan (and therefore, be able to grow crops or otherwise develop the property) without running afoul of the Clean Water Act, he may not have purchased the property.

The government is certainly free to change its mind about the interpretation of statutes such as the CWA, and to extend jurisdiction where it had previously not existed. However, the balance struck by the Framers in the Fifth Amendment is that the cost of this change must be borne by the public as a whole, rather than singling out Mr. Brace to bear the entire burden of providing wetlands for the public good. As the Supreme Court has stated:

> The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation … When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States…The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking … We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.

*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922).

As the Federal Circuit has stated:

> Marketplace decisions should be made under the working assumption that the Government will neither prejudice private citizens, unfairly shifting the burden of a public good onto a few people, nor act arbitrarily or capriciously, that is, will not act to disappoint reasonable investment-backed expectations. The Government, in a word, must act fairly and reasonably, so that private parties can pursue their interests.

*Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560, 1571 (Fed. Cir. 1994). The federal government should not be allowed to encourage Mr. Brace to engage in creating and implementing a drainage plan for his property, on which he relied by expending considerable labor and sums of money, and then, subsequently argue that Mr. Brace had no reasonable investment-backed expectations.

**C. The Character of Defendant's Action in This Case Supports a Regulatory Taking**

Although Mr. Brace must concede the lawfulness of the government's actions in order to maintain this suit, *Del-Rio Drilling Programs v. United States*, 146 F.3d 1358 (Fed. Cir. 1998), as this Court explained in examining the character of the government's action in *Florida Rock Industries v. United States*, 45 Fed. Cl. 21 (Fed. Cl. 1999), this hardly resolves the takings analysis:

> There is little dispute that the purpose of the regulatory action of permit denial was to enhance the water and ecological system of the United States and south Florida in particular by preserving more wetlands. It was to benefit the public, not prevent Florida Rock from doing any harm. . . . Unlike the traditional nuisance case where the government prevents what the citizen had no right to do under the common law, here the activity was perfectly permissible until the permit was denied. Florida Rock's activity posed no health or safety risk. The government made a permissible policy choice that this land should benefit the public's supply of wetlands.

*Id*. at 40. Despite the legitimacy of the government's decision to regulate Florida Rock's property as wetland, the court held the government liable for a taking:

> The final prong of the *Penn Central* test, the character of the government action, does not here argue against a taking, but rather for one; to benefit the public. Florida Rock's bundle of property rights was severely diminished: "the government, under the guise of regulation, cannot take from a property owner the core economic value of the property, leaving the owner with a mere shell of shambled expectations." Although it is true that not every strand in the bundle was cut, the thin handful which remains little resembles the full sheaf once held by Florida Rock. It strains the court's sense of logic to suggest this well-pruned parcel is still whole. Florida Rock's property, post-regulation, is different in kind, not merely degree, from its pre-regulation property, and this argues for a compensable taking. The government might as well have physically occupied the

> property, leaving Florida Rock the option of visiting its land for recreation, or selling it.

*Id*. at 41-42 (citations omitted).

"[T]his factor generally prompts inquiries as to whether or not the Government's action is analogous to a physical invasion of its property, with compensation being more likely in such instances." *Forest Properties, Inc. v. United States*, 39 Fed. Cl. 56, 67 (1997).

For many of the same reasons supporting a finding of a categorical taking in this case, the "character of the government action" inquiry weighs heavily in favor of a taking. In this case, pursuant to the Consent Decree, the government physically occupied Mr. Brace's property since Mr. Brace was forced to allow government agents to come upon his property. (Pl.'s Ex. P22 ¶9, Ex. A ¶3.) Furthermore, under the Consent Decree, Mr. Brace was forced to hand over a portion of his record title to his property, (Pl.'s Ex. P22 ¶6), divesting him of the essential rights "to possess, use and dispose" of the property. *Loretto v. TelePrompter Manhattan CATV Corp*., 458 U.S. 419, 435 (1982); *see also United States v. General Motors*, 323 U.S. 373, 378 (1945). Such a *per se* taking is akin to a physical occupation. *See Florida Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21, 42 (Fed. Cl. 1999) ("The government might as well have physically occupied the property, leaving Florida Rock the option of visiting its land for recreation, or selling it."). The nature of the government's action outweighs any legitimate interest that the government may have in regulating wetlands under the Clean Water Act. In sum, the Defendant's actions forced Mr. Brace alone to bear a burden that "in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

### D. Defendant's Action, Resulting in the Loss of Property Valued at $455,000, Had a Severe Economic Impact on Mr. Brace

Another factor the Court must look at in a regulatory taking case is whether Defendant's action has caused a substantial economic impact on the property owner. *See Florida Rock*

*Industries, Inc. v. United States*, 18 F.3d 1560, 1570 (Fed. Cir. 1994) (holding that determination regarding economic impact involves "the difficult task of resolving when a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking'"). In this case the economic impact inquiry weighs in favor a taking because the government's action resulted in the loss of all beneficial use of the Murphy Farm.

Here, the relevant parcel for the takings analysis is the 58-acre Murphy Farm tract. As Mr. Lignelli testified at trial, the value of the 58-acre Murphy Farm was $455,000 before the taking. (Tr. at 380-81, 393-94; Pl.'s Ex. P31.) The evidence at trial also showed that the Murphy Farm has "scant" or no economic value after the taking. (Tr. at 381, 394-97.) (testimony of James Lignelli); (Pl.'s Ex. P32.) This is not a case where the economic impact was a mere diminution in value. *See, e.g.*, *Rockefeller Center Properties v. United States*, 32 Fed. Cl. 586, 594 (1995) (holding 4.3% loss did not support a taking), *Maritrans*, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (holding 13.1% diminution did not support a taking), *Bass Enterprises Production Co. v. United States*, 54 Fed. Cl. 400, 401 (2002) (holding 5% decrease did not support a taking). Rather, as explained above, the government's action has deprived Mr. Brace of all economically viable use of the entire 58-acre tract. The loss of $455,000 is a 100 percent loss of the value of the relevant parcel, and thus, constitutes a severe economic impact on Mr. Brace.

For the same reasons discussed above in section II, the Court should reject the government's contention that it may take the Murphy Farm, so long as it leaves Mr. Brace part of the Homestead Farm[21].

## IV. The Fair Market Value of the Property Taken from Mr. Brace Should Be Determined Based on a Highest and Best Use As a Residential Subdivision Development

[21] As the Court saw on its site visit, water now backs up from the Murphy Farm onto the Homstead Farm, inundating it and making acres of it unfarmable because there is not longer an unimpeded outlet through the Murphy Farm.

Mr. Brace's appraiser testified that the fair market value of the Murphy Farm was $455,000 in the "before" condition and "scant" in the "after." Accordingly, just compensation in this case is $455,000 plus interest from the date of the taking. The Court should accept Mr. Lignelli's appraisal rather than Mr. Silvers because, unlike Mr. Silver's, it accurately appraises the relevant parcel based on a proper determination of the parcel's highest and best use.

**A. The Highest and Best Use of the Murphy Farm is Residential Development**

Just compensation under the Fifth Amendment is based on what the property taken could command in the open market in light of the highest and most profitable use to which it might reasonably be put in the near future. *See Board of County Supervisors of Prince William County v. United States*, 116 F.3d 454, 457-58 (Fed. Cir. 1997) ("As compensation for the condemnation, the County is entitled to the value that the 16.05 acres would command in the open market in light of the highest and most profitable use to which the acreage might reasonably be devoted in the near future.") (citing *Olson v. United States*, 292 U.S. 246, 255 (1934); *McCandless v. United States*, 298 U.S. 342, 345-46 (1936) ("The rule is well settled that, in condemnation cases, the most profitable use to which the land can probably be put in the reasonably near future may be shown and considered as bearing upon the market value . . . .").

Highest and best use has been defined by this Court as:

> A reasonable and probable use that supports the highest present value as defined as of the effective date of appraisal. Alternatively, that use from among reasonably probable and legal alternative uses found to be physically possible, appropriately supported, financially feasible, and which results in highest land value.

*McLennan v. United States*, 24 Cl. Ct. 102, 108 (1991) (quoting Real Estate Appraisal Terminology, (Rev.Ed.), pp. 126-27), *aff'd*, 994 F.2d 839 (Fed. Cir. 1993).

In proposing a highest and best use, a plaintiff bears the burden of establishing that the property could "reasonably" and "probably" be put to that use in the near future, from the point of view of a hypothetical and willing buyer in the market place. Indeed, the United States Supreme Court in *Olson v. United States*, 292 U.S. 246, 256 (1934), held that land need not be valued at its existing use (the subject land was vacant in its "before" condition), but may be valued at the "highest and most profitable use for which the land is adaptable and needed or likely to be needed in the reasonably near future." That proposed use is then considered, "not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value" of the property. *Id*.

Mr. Lignelli determined that the highest and best use for the Murphy Farm was residential development. (Pl.'s Ex. P31.) Mr. Lignelli based his "highest and best use" determination on interviews with real estate brokers and developers, as well as market research and analysis. (Tr. at 382-84; Pl.'s Ex. P31 at 3.) As Mr. Lignelli testified at trial:

> As of the date of the appraisal, September 1996, there was an abundance of data that indicated that Waterford Township and the township to the south, Washington Township, and the township to the west, were experiencing rapid growth. Between 1980 and 2000, according to the census, Waterford Township was one of the two fastest growing townships, if not the fastest growing township, in Erie County. That confirmed the trend that had begun in the 1980s where the population was pushing to the south away from Erie County. The data also indicates that the City of Erie, the largest population center of Erie County, which is also the economic base of the county, was losing population, so it was in decline. In the 1980s the place to be where the growth was, was to the west . . . That trend slowed and instead the population was going to the south. Now, the three realtors indicated to me that the reason was that you have double-earning households, meaning the husband and wife were working and they all don't work in the same place. So Waterford Township and Washington Township presented a compromise location for two working people, on who had worked north in the Erie metropolitan area within five to 10 miles to the north, and in the Needville/Edinboro areas located to the south . . . Therefore, my point is that evidence existed in 1996, namely if one were to [review] the January 1995 report prepared by Adams, Graney & Associates with assistance by the Erie County

> Planning Commission, that Waterford Township was the fastest growing municipality and would be attractive to developers of single-family subdivisions.

(Tr. at 386-88; Pl.'s Ex. P31 at 27.) ("Market data and analysis . . . indicates that adequate demand exists for single family dwellings and single family lots available for single family residential development . . . [S]everal attributes of Waterford Township indicate there is an available market for residential development."); *see also* (*Id*. at 27-28.) (stating that Waterford Township "represents one of the fastest growing municipalities in Erie County" and that it would represent "an attractive municipality for residential development")

Mr. Silver's statistical data supports this conclusion. Specifically, his report indicates that from 1990-2000, Waterford township's population increased 14%, while Erie County's population only increased 1.9. (Def.'s Ex 12 at 7.) In addition, his report indicates that housing units increased by 23.4%. (*Id.*) Moreover, he indicated that it was probably true that these statistics suggest an increased demand for smaller household development. (Tr. at 851.)

Mr. Lignelli also testified at trial that the Murphy Farm, in particular, had a highest and best use of residential development, specifically a 125-lot subdivision.

> Q Your report also indicates the conclusion that the Murphy farm, in particular, meets the four tests of highest and best use for residential subdivision development. Would you explain why you concluded that the Murphy farm, in particular, had that highest and best use?
> Did he answer the four elements? The following answer seems non-responsive.
> A A residual technique which is outlined in the report indicates that there is adequate demand to absorb the 125-lots over 12 years. Adopting the conservatism convention, I concluded that only six lots would be sold the first year since this was an initial market penetration . . . Then everybody else jumps on the bandwagon, so to speak, and then you cascade the sale of lots which I thought would average about 12 per year, which is consistent with what the three realtors indicated, namely, what Dawn & Chapman and Terry Ray indicated. Terry Ray was the listing agent for Hamlet Farms just four miles to the north, so he has personal history in selling lots there. Again, they were consistent to say that the demand was pushing southward from the southern portion of Summit Township into Waterford Township to the south . . .

(Tr. at 388-89.)

### B. The Murphy Farm has a Value of $455,000 in the Before Condition

According to the federal government's publication, *Uniform Appraisal Standards for Federal Land Acquisitions*, also known as the "Yellow Book," the development approach

> is a method of appraising undeveloped acreage having the highest and best use for subdivision into lots. This approach consists of estimating a final sale price for the total number of lots into which the property could best be divided and then deducting all costs of development, including the developer's anticipated profit. The remaining sum, the residual, is said to represent the market value of the raw land.

*Uniform Appraisal Standards for Federal Land Acquisitions* 44 (2000). The approach is appropriate when it is shown "that the property was 'needed or likely to be needed in the reasonably near future' for residential subdivision" and is "particularly applicable in instances wherein the land being appraised has a highest and best use for subdivision purposes . . . ." *Id*. at 45. The Sixth Circuit has also held:

> [A] lot method appraisal can be admitted in appropriate cases if the proponent offers credible evidence of the costs of subdivision e.g., the expense of clearing and improving the land, surveying and dividing it into lots, advertising and selling, holding it, and paying taxes and interest until all lots are sold. See United States v. 100 Acres, 468 F.2d 1261, 1266 (9th Cir. 1972). Cf. United States v. 478.34 Acres, 578 F.2d 156, 159 (6th Cir. 1978). Juries in condemnation cases should be permitted to consider any factors "that might fairly be brought forward and given substantial weight in bargaining between an owner willing to sell and a purchaser desiring to buy." United States v. 1,291.83 Acres, 411 F.2d 1081, 1084 (6th Cir. 1969). The potential value of land if subdivided could well be considered by a willing buyer and a willing seller where subdivision is a reasonable possibility and the costs of subdivision are not speculative or uncertain. See id. at 1086-87.

*United States v. 47.3096 Acres of Land*, 583 F.2d 270, 272 (6th Cir. 1978).

Accordingly, having determined that the highest and best use for the Murphy Farm is single family residential development, Mr. Lignelli chose to use the development or residual method of valuation over the comparable sales method because "it was predicated upon more exact data than merely analyzing and compare[ing] bulk sales of land because there are too many

variants, . . . which cannot be reflected or captured . . . .” (Tr. at 393.) Mr. Lignelli’s valuation using the subdivision method was based on a 125-lot conceptual residential subdivision, prepared by a professional land surveyor, as well as based on analysis of nine residential subdivisions located in nearby townships. (Pl.’s Ex. P31 at 32-46.) He also prepared a 12-year cash flow analysis of the conceptual 125 lot subdivision, reflecting an absorption rate derived from the comparable subdivisions in nearby townships and a discount rate of 17 percent, and taking into consideration the various costs that would be associated with the development, such as installing a sewerage treatment plant, constructing roadways and utility lines, and others. (*Id*. at 48-58; *see also* Tr. at 390-91.) Mr. Lignelli also relied upon interviews with knowledgeable persons in the Erie, Pennsylvania area in concluding that a purchaser could obtain all the necessary approvals and permits for the residential subdivision. (Tr. at 460-63.) He concluded that the value of the property in the “before” condition was $455,000. (Tr. at 381, 393-94; Pl.’s Ex. P31 at 58.)

**C. The Murphy Farm has “Scant” Value in the After Condition**

Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973).

In this case all use of the 30 out of 58 acres of the Murphy Farm is explicitly restricted by the consent decree and, moreover, most of those 30 acres are inundated with water. Under the consent decree, the owner of the 30 acres, whether it be Mr. Brace or a subsequent owner, is “enjoined permanently” from undertaking any further activity on the 30 acres that might be considered “discharging any pollutants (including dredged or fill material).” (Pl.’s Ex. P22 ¶ 3.)

In short, the 30 acres must remain economically idle.

As to the remaining 28 acres of the Murphy Farm, it consists of two non-contiguous parcels, each of which is unusable, separately or together, for any economic purpose. Neither can be economically farmed (Tr. at 868.) (Mr. Lapp, defendants appraiser, testifying that neither could be farmed at a profit.) Moreover, the first parcel cannot be accessed without transgressing the wetlands. (Tr. at 733, 773, 867.) (testimony of George Silver); *see also* (Pl.'s Ex. P32) ("access to it would have to be across an area already restricted by government regulation")

Although the remaining 12-acre parcel might at first blush appear adaptable to construction of a home, it is steeply sloped with highly erodable soils and as the court observed during the site visit a natural gas well is located in the middle of it. Anyone constructing or living in a home on the site would also run the risk of violating the existing consent decree, as the deposit of any fill (e.g. runoff from the home, driveway or garden into the 30 acres) would be contempt of court. (Tr. at 683.) ("THE COURT: So a person could conduct an activity, do so innocently, but if the effect looks like somebody else would be doing to in fact accomplish a filling of the wetlands, they could find themselves running across an enforcement action, correct? THE WITNESS: Correct.") As Defendant's witness, Jeffrey Lapp, EPA Program Manager, testified at trial, even the run-off of sediment from the 28 acres onto the 30 acres could be considered a violation of the Clean Water Act (Tr. at 666-69, 680-84.) A reasonable buyer contemplating building a single-family residence simply will not purchase such an impaired parcel, particularly given the abundance of other land available for development. (Tr. at 394-96.) (Mr. Lignelli testifying that, "Given the uncertainty as to how to develop the 28 acres, I've concluded that it's of scant value in that somebody would want a deep discount to take on such a project.") Thus, any activity on the 28 acres could potentially lead to a violation of the Consent

Decree by causing a discharge of pollutants on the 30 acres. (*Id.*; *see also* Pl.'s Ex. P32 ("Mr. Brace has asked my opinion about the development potential of the approximate 20 acres of his property that the government has not restricted him from using. . . . [A]pproximately 12 acres, lies roughly at the mid point of his frontage along South Hill Road. . . . Considering that this acreage is bordered on three sides by what has been delegated as wetlands by government agencies, I believe that development would be nearly (if not totally) impossible, and be in compliance with existing regulations.").

Given the lack of economically beneficial use and the impact of the Consent Decree, Mr. Lignelli found that the Murphy Farm in its current condition has "scant" value. (Tr. at 381, 465-66.) Moreover, the risk and stigma caused by the Consent Decree negate even nominal value. Accordingly, considering both the lack of economically beneficial use and the impact of the Consent Decree, Mr. Lignelli determined that the 58-acre Murphy Farm essentially has no value since the majority of the property (30 acres in the heart of the property) was subject to a Consent Decree, permanently enjoining any activity on the property, and since the remaining portions of the property would also be undevelopable due to risk associated with the Consent Decree's continuing restrictions. (Tr. at 394-97; *see also* Pl.'s Ex. P32.)

Moreover, the Consent Decree states, "A transfer of interest in the said property will not relieve Defendants of any responsibility in this Consent Decree, unless the United States, Defendants, and the transferee agree to allow the transferee to assume such responsibility." (Pl.'s Ex.22 ¶7) In addition, the Consent Decree permanently enjoins Mr. Brace or his successors from engaging in any activity that might violate Section 301 of the CWA. (*Id.* at ¶3.) One of the effects of this second provision is to heighten the risk that an innocent mistake will be viewed as

a violation of the CWA.[22] (Tr. at 683-84.) Because a reasonable seller would not transfer the property without transferring liability, fair market value is reduced by the consent decree because any buyer would expect to be compensated for regulatory risk. (Tr. 394-95.) Given the restrictions that have taken all economically beneficial use from the property, this regulatory risk negates even nominal value.

**D. The Court Should Not Adopt Mr. Silver's Appraisal**

This court should not adopt Mr. Silver's appraisal because he: (1) lacked relevant experience; (2) based his appraisal on the wrong highest and best use; and, (2) based his final conclusion on flawed data and methodology.

Mr. Silver, an agricultural appraisal specialist from Burlington, Vermont, testified at trial, he had never appraised a property in Erie County, Pennsylvania, nor western Pennsylvania, prior to this case. (Tr. at 828.) Mr. Silver specializes in the appraisal of agricultural properties and "rarely" appraises single family residential developments. (Tr. at 831.) Indeed, Mr. Silver holds a Bachelor of Arts degree in Agriculture Economics and a Master of Arts in Resource Economics (essentially the same as Agriculture Economics). (Def.'s Ex. D12 at A-40).

As part of the materials provided to Mr. Silver at the inception of his appraisal assignment, he was informed that he would be appraising a certain type of agricultural property "a cabbage farm." (Tr. at 831.) Not surprisingly, this "agricultural and rural resource" appraiser

[22] THE COURT: So a person could conduct an activity, do so innocently, but if the effect looks like somebody else would be doing to in fact accomplish a filling of the wetlands, they could find themselves running across an enforcement action, correct?
THE WITNESS: Correct. And I assume that would have to be fairly large scale. I mean, it would be fairly difficult to pick up erosion on the field, you know, except at the time it happened.
THE COURT: Let me ask you this. In the case of a consent decree, the impact of making a mistake is enhanced, right, because if in fact you are viewed in violation of the Clean Water Act and you don't have a consent decree out there, you are not worrying about the potential of being viewed in violation of a court order.
THE WITNESS: Right.
(Tr. at 683-84.)

from Vermont prejudged the highest and best use of Mr. Brace's property as a diversified cash crop farm. This is confirmed by the fact that before he had even visited Mr. Brace's property, he had begun researching sales of agricultural properties. (Tr. at 833-35.)

Mr. Silver's decision to base his appraisal on an agricultural use is undermined by his own report. Specifically, his report indicates that from 1990-2000, Waterford township's population increased 14%, while Erie County's population only increased 1.9. (Def.'s Ex. D12 at 7.) In addition, his report indicates that housing units grew by 23.4%. (*Id.*) These facts suggest that Mr. Silver ignored evidence of significant demand for residential development while making his decision on highest and best use.

Moreover, his report is fundamentally flawed because rather than determining the highest and best use in the absence of the Consent Decree his report specifically indicates that the highest and best use is limited by the Consent Decree. (*Id.* at 27.) Unlike Mr. Lignelli, Defendant's appraiser, Mr. Silver, did not appraise Mr. Brace's property[23] for its highest and best, *i.e*., most profitable, use possible in the near future but rather appraised it for use as a cash crop farming operation, a recent actual use of the property. (*See* Def.'s Ex. D12 at 30) ("In more recent years, the property has been used as a diversified cash crop farm.")

In addition to lacking relevant experience and utilizing the wrong highest and best use, Mr. Silver's underlying data was inadequate. Alarmingly, his report concedes that there is a significant possibility that the appraiser does not possess all significant information regarding the property. (*Id*. at xiv.) For example Mr. Silver did not actually interview any realtors or developers in the Erie, Pennsylvania area to determine whether residential development would have been a feasible highest and best use of Mr. Brace's property. (Tr. at 848-49.)

---

[23] Indeed, Mr. Silver did not separately appraise the Murphy Farm at all, but elected to combine the Murphy and Homestead Farms and provide an appraisal of a combine 134.33 acres. (CITE)

Mr. Silver's final determination of fair market value of Mr. Brace's property at $355,000 in the "before" condition was also based on non-comparable sales that were not verified. (Def.'s Ex. D12 at 38.) ("Recent sales of agricultural property, specifically diversified cash crop farms, which could be deemed to have very close comparability to the subject property, could not be found in the market . . .") Mr. Silver looked at sales of not only cash crop operations, but also dairy farms and beef breeding operations and "a number of rural residences with additional agricultural acreage." (*Id*.) Furthermore, his comparable properties were significantly larger than the usable property on the Murphy Farm, varying in acreage size from 98 acres to 421 acres in size. (*Id*. at 39-40.) In addition, as he admitted on cross he included 7 acres in his appraisal of the Brace properties that he should not have included because they had been sold off. (Tr. 837-840.)

While disturbing, this statement is not surprising given Mr. Silver's reluctance to actually gather information. Mr. Silver also failed to verify all the sales of his comparable properties by interviewing the sellers or purchases of the properties, the brokers who handled the sales, or anyone who would have knowledge of whether the sale was actually at arms-length or instead required seller financing, was between related parties, or was a distressed sale. (Tr. at 841-43.) ("A I talked to some of the property owners. . . . I talked to the financial agency, the bank . . . . Q . . . Did you know these people? A No Q You just walked in and they gave you all this information about transactions they have handled? A That's correct.") (emphasis added); (*See Id*. at 844.) ("Q And how would you know the purpose for which someone has purchased a parcel of property if you haven't verified the sale? A. Well, you can see what they have done with it too by personal observation."); *see also* (Def.'s Ex. D12 at SD-3.) (stating that for Sale No. IA-1, the "Conditions of Sale" were "Reported to be at arms length"); (*Id*. at IA-2.) (stating that for Sale

No. IA-2, the "Conditions of Sale" were "Sold in competitive situation, assumed to be at arms length.") According to the government's Yellow Book, "[a]ll comparable sales used shall be confirmed by the buyer, seller, broker or other person having knowledge of the price, terms, and conditions of sale." *Uniform Appraisal Standards for Federal Land Acquisition* 20 (2000). Rather than perform the fields work mandated by the government's own appraisal standard, Mr. Silver relied heavily on research obtained from property records listed on the Internet. (Tr. at 845-47.)

Compounding the inadequacy of his underlying data, Mr. Silver's methodology was suspect. First, he appraised the wrong parcel in order to avoid the inevitable conclusion that the Murphy Farm had lost all value due to the consent decree. Mr. Silver concedes that the remaining 28 acres of the Murphy Farm is not economically viable for farming. (Tr. at 868.) Mr. Silver, however, contends that when combined with the Homestead Farm to comprise a 134.33 acres parcel the Murphy Farm, in the "after" condition, could still be used for diversified cash cropping. He takes this position despite the Consent Decree "restoring" 30 acres to wetlands and permanently enjoining any activity that could be construed as "discharging pollutants" in those wetlands. (Def.'s Ex. D12 at 73.) ("After the proposed restoration, the subject property contains approximately 134.33 acres of land. With the exception of the conversion of drained wetland cropland to wetlands, the subject property remains the same as previously described in the analysis of the total property prior to the restoration.") Thus, he valued the land in the "after" condition at $350,000, leaving only a difference of $5,000 for just compensation. (*Id*. at 85, 87.)

Mr. Silver's analysis is flawed because it ignores several critical changes that have, in fact, occurred on both parcels. First and most importantly, the "restoration" has flooded more

than 30 acres on the Murphy farm, not to mention – acres on the homestead farm, making them unusable for any purpose—including farming. Moreover, the configuration of the remaining two fragments makes them unusable as discussed above in section II.

## V. The Farmer's Operating Loan Rate, Compounded, Is the Appropriate Interest Rate To Provide Just Compensation in This Case

This Court has held that to satisfy the Fifth Amendment's command of just compensation, a damages award must include interest for delay in payment from the date of the taking to the date of payment.[24] *See NRG Co. v. United States*, 31 Fed. Cl. 659 (1994) ("[T]he courts have recognized that to be "just," the compensation award must include not only the value of the property on the date of the taking, but also compensation for any significant delay in the government's payment of the award to the property owner."); *see also Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 414 (1994) ("Full compensation, then, requires that a [property owner] whose award has been delayed be compensated for his inability to utilize his money.") (citing *ITT Corp. v. United States*, 17 Cl. Ct. 199, 240 (1989)). The proper rate of interest to achieve just compensation is a question of fact to be determined within the "sound discretion" of the Court. *See Pettro v. United States*, 47 Fed. Cl. 136, 154 (2000) (citing *Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988)).

In *Miller v. United States*, 620 F.2d 812 (Fed. Cir. 1980), the Federal Circuit eschewed the application of fixed or uniform interest rates in takings cases. In *Miller*, the Federal Circuit reversed the trial court's application of a fixed statutory rate, finding "a 6-percent rate of interest is neither reasonable nor judicially acceptable under the circumstances of plaintiffs' case." *Id.* at 400. Recognizing that its decision went against the "strong judicial policy in favor of the establishment of a uniform rate of interest applicable to condemnation cases in order to avoid

---

[24] Should the Court find for Mr. Brace, the plaintiff will seek leave to submit evidence supporting its position on the appropriate interest rate.

discrimination among litigants," the *Miller* Court nevertheless held that "[t]he present plaintiffs cannot be penalized because most other redwood park condemnees did not pursue the interest issue." *Id.* at 402.

*Miller* recognized that various statutes included rates of interest for certain purposes, but made clear that "[i]t does not rest with Congress to say what compensation shall be paid, or even what shall be the rule of compensation." *Id.* at 400. The court has the discretion to use a statutory rate of interest after an examination of the facts and circumstances of a particular takings case only "if such rate is reasonable and judicially acceptable." *Id.* Accordingly, in *Miller*, the court rejected a statutory interest rate of six percent and applied a 12 percent interest rate as appropriate for the plaintiffs. *Id* at 405.

As this Court said in *Pitcairn v. United States*, 212 Ct. Cl. 168 (1976):

> The just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner and not of the condemnor. In other words, just compensation in the constitutional sense is what the owner has lost, and not what the condemnor has gained. The yield on a series of hypothetical Government bonds is not relevant in ascertaining the injury plaintiff has suffered. It measures compensation only according to the point of view of the taker without reference to that of the owner since he is hardly likely to be able to borrow money at the rates the Government can.

*Id*. at 193 (citations omitted).

In this case, had Mr. Brace been paid on the date of take, the money would have been used to decrease his operating costs for his farm. Therefore, the appropriate interest rate is the operating loan rate, or the rate which farmers borrow money to operate their farms. *See Kansas v. Colorado*, 533 U.S. 1, 13 (2001) ("[T]he economic consequences of Colorado's breach could best be remedied by an interest award that mirrors the cost of any additional borrowing the farmers may have been forced to undertake in order to compensate for lost revenue.").

Furthermore, Mr. Brace is entitled to compounded interest from the date of taking.

*Bowles v. United States*, 31 Fed. Cl. 37 (1994) ("[B]ecause of the long delay since the date of taking in this case, the award of compound interest is not only proper, but its denial would effectively undercut the protections of the fifth amendment [sic] to our Constitution."); *Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 415-416 (1994) ("Income-producing property would generate an income stream that would be available for continual reinvestment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities that plaintiffs lost when the government took their property.").

Respectfully submitted,

s/ Nancie G. Marzulla

Nancie G. Marzulla
Defenders of Property Rights
1350 Connecticut Ave., N.W.
Suite 410
Washington, D.C. 20036
202-822-6770
202-822-6774 (facsimile)

Counsel for Plaintiff

Dated: April 19, 2005