**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 98-897 L |
| | ) | |
| THE UNITED STATES, | ) | Hon. Francis M. Allegra |
| | ) | |
| Defendant. | ) | |
| | ) | |

# DEFENDANT'S OPENING POST-TRIAL MEMORANDUM

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources Division

SUSAN V. COOK (FLORENTINE), Sr. Atty
SYDNEY F. COOK, Trial Attorney
Natural Resources Section
Environment & Natural Resource Division
United States Department of Justice
Post Office Box 663
Washington, D.C. 20044-0663
202-305-0470; FAX: 202-514-8164
Email: susan.cook@usdoj.gov

Attorneys for Defendant

April 21, 2005.

# TABLE OF CONTENTS


INTRODUCTION . . . . . . 1

FACTUAL BACKGROUND . . . . . . 4

ARGUMENT . . . . . . 6

I. PLAINTIFF'S SUIT FOR A TAKING BASED ON THE APPLICATION OF CLEAN WATER ACT RESTRICTIONS TO HIS PROPERTY IS NOT TIMELY . . . . . . 6

II. PLAINTIFF HAS NOT ESTABLISHED A PHYSICAL TAKING . . . . . . 8

A. The Consent Decree Regulates Use and Does Not Constitute A Physical Occupation . . . . . . 8

B. Lewis Steckler's Entry to Observe Plaintiff's Compliance with the Restoration Plan was a Transitory Presence That Does Not Rise to the Level of a Physical Taking . . . . . . 10

C. The Reservation of a Right Of Entry To Monitor Compliance With The Consent Decree Did Not Constitute A Physical Taking . . . . . . 12

III. THE RELEVANT PARCEL IS THE 134 ACRES CONVEYED BY A SINGLE DEED AND USED AS PART OF A COMMON PLAN . . . . . . 12

IV. PLAINTIFF CANNOT ESTABLISH A CATEGORICAL TAKING . . . . . . 14

A. Compared Against the 134-Acre Relevant Parcel, Plaintiff Cannot Establish a Categorical Taking . . . . . . 15

B. Even If There Relevant Parcel is Considered to be only the 65 Acre Murphy Farm Tract, There Has Been No Categorical Taking Because there Exists Other Economic Uses . . . . . . 16

V. PLAINTIFF CANNOT ESTABLISH A REGULATORY TAKING . . . . . . 18

A. Plaintiff Cannot Establish That He Possessed Reasonable Expectations That He Could Drain the Murphy Farm Tract Without Complying with the Clean Water Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

1. Plaintiff Cannot Establish That He Had Reasonable Investment-Backed Expectations In Draining the Wetlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

2. It Is That The Enactment of The Clean Water Act, And Not Subsequent Agency Regulations, Which Informs A Plaintiff's Reasonable Investment-Backed Expectations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3. The Wetland Character of the Property Was Clear . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

4. Agricultural Assistance Provided by Government Agencies Cannot, As A Matter of Law, Create Reasonable Investment-Backed Expectations That Protected Wetlands Could Be Drained . . . . . . . . . . . . . . . . . . . . 25

B. The Character Of The Government Action Weighs In Favor Of The United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C. Weighing The Economic Impact Of The Regulatory Restriction On The Plaintiff Also Compels A Finding That There Has Been No Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1. In Order to Establish a Taking, a Plaintiff Must Show More Than Just a Loss of Some Value in the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

2. The Value Lost Must Be Measured In Reference To Fair Market Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

3. Here, Defendant's Evidence Establish There Was Insufficient Economic Impact to Establish a Taking . . . . . . . . . 32

4. Plaintiff's Own Evidence Established that the Murphy Farm Tract Retained Significant Value in Its "After" Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5. Plaintiff's Determination of Highest and Best Use Was Not Supported by Evidence That Such a Use

was Legally Permissible . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VI. INTEREST ON ANY JUST COMPENSATION AWARD SHOULD BE CALCULATED AT THE RATE PROVIDED IN THE DECLARATION OF TAKING ACT . . . . . . . . . . . . . . . . . . . . . . . . . . 39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

Appolo Fuels, Inc. v. United States,
381 F.3d 1338 (Fed. Cir. 2004) . . . . . . . . . . 13, 14, 24

Avenal v. United States,
100 F.3d 933 (Fed. Cir. 1996) . . . . . . . . . . 18

Bass Enterprises Production Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 28, 29

Board of County Sup'rs of Prince William County, Va. v. United States,
116 F.3d 454 (Fed. Cir. 1997) . . . . . . . . . . 31

Boise Cascade v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 9, 10, 11

Brace v. United States,
48 Fed. Cl. 272 (2000) . . . . . . . . . . 14

Catawba Indian Tribe v. United States,
982 F.2d 1564 (Fed. Cir. 1993) . . . . . . . . . . 23

Century Wrecker Corp. v. E.R. Buske Mfg. Co.,
913 F. Supp. 1256 (N.D. Iowa 1996) . . . . . . . . . . 40

Ciampitti v. United States,
22 Cl. Ct. 310 (1991) . . . . . . . . . . 13, 15, 20

City National Bank of Miami v. United States,
33 Fed. Cl. 224 (1995) . . . . . . . . . . 36

City of Oakland v. Oakland Raiders,
646 P.2d 835 (Cal. 1982) . . . . . . . . . . 42

Cloverport Sand & Gravel Co., Inc. v. United States,
6 Cl. Ct. 178 (1984) . . . . . . . . . . 31

Concrete Pipe & Prods. of California, Inc. v. Construction Laborers
Pension Trust for So. Calif.,
508 U.S. 602 (1993) . . . . . . . . . . 20, 30

Creppel v. United States,
41 F.3d 627 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Datascope Corp. v. SMEC, Inc.,
879 F.2d 820 (Fed. Cir. 1989), cert. denied, 493 U.S. 1024 (1990) . . . . . . . . . . . . . . . . 43

Deltona Corp. v. United States,
657 F.2d 1184 (Ct. Cl. 1981), cert. denied, 455 U.S. 1712 (1982) . . . . . . . . 15, 24, 29, 31

Dufau v. United States,
22 Cl. Ct. 156 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Federal Crop Ins. Corp. v. Merrill,
332 U.S. 384 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Florida Rock Indus., Inc. v. United States,
791 F.2d 893 (Fed, Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

Forest Properties, Inc. v. United States,
39 Fed. Cl. 56 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir.), cert. denied, 528 U.S. 951 (1999) . . . . . . . . . . . . . . . . . 12, 13

General Motors Corp. v. Devex Corp.,
461 U.S. 648 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Good v. United States,
39 Fed. Cl. 81 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Good v. United States,
189 F.3d 1355 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Flowers Mill Assocs. v. United States,
23 Cl. Ct. 182 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Hanson v. Office of Personnel Management,
833 F.2d 1568 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Hendler v. United States,
175 F.3d 1379 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hendler v. United States,
952 F.2d 1364 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Hurley v. Kincaid,
285 U.S. 95 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Jentgen v. United States,
657 F.2d 1210 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 31

Kirby Forest Indus. v. United States,
467 U.S. 1 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Leonard v. Commissioner,
94 F.3d 523 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Liriano v. Hobart Corp.,
960 F. Supp. 43 (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Loretto v. Teleprompter Manhattan CATV Corp.,
458 U.S. 419 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Loveladies Harbor, Inc. v. United States,
21 Cl. Ct. 153 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Loveladies Harbor, Inc. v. United States,
28 F.3d 1171 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

MacDonald, Sommer & Frates v. Yolo County,
477 U.S. 340 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

McLennan v. United States,
24 Cl. Ct. 102 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

Maritrans Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 33

Marshall v. Department of Water & Power,
219 Cal. App. 3d 1124 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Mitchell v. United States,
267 U.S. 341 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Natural Resources Defense Council v. Callaway,

392 F. Supp. 685 (D.D.C. 1975) . . . . . . . . . . 23, 23

NRG Co. v. United States,
31 Fed. Cl. 659 (1994) . . . . . . . . . . 43

Omnia Commercial Co. v. United States,
261 U.S. 502 (1923) . . . . . . . . . . 40

Palazzolo v. Rhode Island,
533 U.S. 606 (2001) . . . . . . . . . . 17, 27, 29, 34

Penn Central Transp. Co. v. City of New York,
438 U.S. 104 (1978) . . . . . . . . . . 18, 20, 29, 31

Pennsylvania Coal Co. v. Mahon,
260 U.S. 393 (1922) . . . . . . . . . . 18, 30

Rith Energy, Inc. v. United States,
270 F.3d 1347 (Fed. Cir. 2001) . . . . . . . . . . 33, 34

Rose Acre Farms, Inc. v. United States,
373 F.3d 1177 (Fed. Cir. 2004) . . . . . . . . . . 31

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984) . . . . . . . . . . 19, 20, 23

Schultz v. United States,
5 Cl. Ct. 412 (1984) . . . . . . . . . . 42

Seaboard Air Line Ry. Co. v. United States,
261 U.S. 299 (1923) . . . . . . . . . . 39, 40

Snowbank Enterprises, Inc. v. United States,
6 Cl. Ct. 476 (1984) . . . . . . . . . . 31, 35

Stephenson v. United States,
33 Fed. Cl. 63 (1994) . . . . . . . . . . 32

Sun Enterprises, Ltd. v. Train,
394 F. Supp. 211 (S.D.N.Y. 1975) . . . . . . . . . . 22, 23

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . 7, 8

Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Tefel v. Reno,
180 F.3d 1286 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Walcek v. United States,
303 F.3d 1349 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 32

Westchester County Park Commission v. United States,
143 F.2d 688 (2d Cir. 1944), cert. denied, 323 U.S. 726 (1944) . . . . . . . . . . . . . . . . . . 36

United States v. 50.8 Acres of Land,
149 F. Supp. 749 (E.D.N.Y. 1957), aff'd, 259 F.2d 41 (2nd Cir. 1958) . . . . . . . . . . . . . 36

United States v. 564.54 Acres of Land,
441 U.S. 506 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Ashland Oil & Transp. Co.,
364 F. Supp. 349 (W.D. Ky. 1973), aff'd, 504 F.2d 1317 (6th Cir. 1974) . . . . . . . . 22, 23

United States v. Brace,
41 F.3d 117 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 24

United States v. Brace,
No. 90-229 (W.D. Pa. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Certain Land in Baltimore County, State of Md.,
209 F. Supp. 50 (D. Md. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Delano Park Homes,
146 F.2d 473 (2d Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Griffin,
782 F.2d 1393 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

United States v. Miller,
317 U.S. 369 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. New River Collieries Co.,
262 U.S. 341 (1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

United States v. Reynolds,
397 U.S. 14 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

United States v. Virginia Electric & Power Co.,
365 U.S. 624 (1961) . . . . . . . . . . 31

Yuba Goldfields, Inc. v. United States,
723 F.2d 884 (Fed. Cir. 1983) . . . . . . . . . . 42

Zacharin v. United States,
213 F.3d 1366 (2000) . . . . . . . . . . 27

**STATUTES**

Clean Water Act,
33 U.S.C. § 1311 . . . . . . . . . . 21
33 U.S.C. § 1344 . . . . . . . . . . 21
33 U.S.C. § 1362(6) . . . . . . . . . . 21

Declaration of Taking Act,
40 U.S.C. § 258a et seq., . . . . . . . . . . 41
40 U.S.C. § 258e-1 . . . . . . . . . . 42

Rivers and Harbors Appropriation Act of 1899,
33 U.S.C. §§ 401-403 . . . . . . . . . . 21

**REGULATIONS**

39 Fed. Reg. 12,115 (1974) . . . . . . . . . . 21

**LEGISLATIVE MATERIALS**

S. Rep. No. 1236 (1972), reprinted in 1972 U.S. Code Cong. &
Ad. News 3822 . . . . . . . . . . 21

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 98-897 L |
| THE UNITED STATES, | ) | Hon. Francis M. Allegra |
| Defendant. | ) | |

**DEFENDANT'S OPENING POST-TRIAL MEMORANDUM**

## INTRODUCTION

Plaintiff Robert Brace is a farmer who owns approximately 600 acres of real property being farmed as part of a single unified operation. Plaintiff alleges that because of the entry of a Consent Decree, which prohibited the dredging and filling of 30 acres of wetlands on the Murphy Farm tract, he has been denied all economically viable use of that property located in Waterford Township, Erie County, Pennsylvania. This tract[1] is part of a larger parcel acquired by plaintiff on December 30, 1975 in a single deed.

The remaining acreage of the Murphy Farm tract, as well as the Homestead Farm tract, acquired by plaintiff in the same deed, were unaffected by the Consent Decree and can be used by plaintiff for any purpose consistent with applicable state or local restrictions. Indeed, a portion of the Murphy tract consists of uplands not within the jurisdiction of the U.S. Army

[1] The 65 acre tract which contains the regulated 30 acres is referred to herein as the Murphy Farm tract. The Murphy Farm tract and the Homestead Farm tract together make up the Deeded Property, which is approximately 134 acres, and was acquired by plaintiff in December, 1975 by purchase from his parents.

Corps of Engineers ("Corps") which have been actively and productively farmed in the past. A gas well located on the Murphy Farm tract also produces income, and the wetland portion of the tract can continued to be used for pasture, its historical use.

In 1985-87, plaintiff began dredge and fill operations in the 30 acres of wetlands located on the Murphy Farm tract in an effort to convert the wetlands to land suitable for growing row crops. When these activities, which occurred without benefit of a Clean Water Act Section 404 permit, came to the attention of the United States in 1987, plaintiff was issued cease and desist orders issued by the Environmental Protection Agency ("EPA") and the Corps. Plaintiff was ordered to cease maintenance and operation of the drainage system on the 30 acres of wetlands and to restore the wetlands to their prior condition.

In this action, plaintiff first asserts a claim of a physical taking. However, the nature of the governmental action at issue here clearly involves a restriction on use, not a physical occupation. Further, to the extent government agents entered the property to oversee the restoration, he was specifically invited to do so by the plaintiff himself. Finally, even if the agent's presence had not been consensual, the transitory nature of the presence does not under relevant caselaw rise to the level of a physical taking.

Plaintiff also asserts a claim for a categorical regulatory taking of his property. To the contrary, the 30 acres of regulated wetlands remain available for their historical use as pasture. The non-wetland acreage of the Murphy Farm tract is in no way regulated by the Consent Decree at issue. Indeed, the evidence was undisputed that the upland areas of the Murphy tract have been farmed as recently as 2003. Were the areas not being farmed, plaintiff's appraiser testified that the property had significant post-Decree economic value as a single homesite. In addition, a

gas well on the tract also continues to provide economic value. Regardless of the size of the relevant parcel, which plaintiff claims is only the Murphy tract and which defendant asserts also includes the Homestead Farm tract, the existence of these other economic uses prevents plaintiff from being able to successfully assert a categorical takings claim.

Plaintiff also cannot establish a regulatory taking of the restricted 30 acres. Because he purchased the property well after the enactment of the Clean Water Act in 1972, plaintiff cannot establish that he possesses a reasonable investment-backed expectation in being able to drain his wetland acreage. The estoppel-like arguments advanced by plaintiff are factually incorrect and legally irrelevant. Mr. Brace has never been provided either technical or financial assistance for the purpose of draining the Murphy Farm tract. More importantly, plaintiff's argument is legally defective; the relevant time period for determining whether plaintiff's investment-backed expectations were reasonable is when plaintiff acquired the property, not at some later point in time.

Similarly, the character of the government action here weighs in favor of the defendant. Plaintiff's argument incorrectly limits the "character of the government action" to an analysis of whether the government's regulation was designed to proscribe a nuisance, which conflicts with recent Federal Circuit jurisprudence.

Finally, plaintiff's claim of a taking also fails because the application of the Consent Decree to this property did not result in sufficient economic impact to establish a taking. For the same factual reasons that doom plaintiff's categorical takings claim, plaintiff's claim of the denial of all meaningful economic use must be rejected.

**FACTUAL BACKGROUND**

Robert Brace and his wife, in varying capacities, are the owners of a number of tracts of land totaling approximately 600 acres located in Erie County, Pennsylvania. Among these 600 acres is an approximately 134 acre parcel of land which Robert Brace purchased from Mr. Brace's parents, Charles and Mary Brace, in December 1975. D11(A); hereinafter, the "Deeded Property." The Deeded Property lies along Greenley Road, and is bisected into northern and southern tracts by South Hill Road. The portion of the Deeded Property located to the north of South Hill Road, approximately 69 acres, has been referred to as the "Homestead Farm tract." The portion of the Deeded Property located to the south of South Hill Road, which includes the thirty-acre wetland area at issue in this litigation, has been referred to as the "Murphy Farm tract," comprised of approximately 65 acres.[2] See P1 at 7.

In 1961, the Soil Conservation Service ("SCS"), part of the U.S. Department of Agriculture, developed a "Soil and Water Conservation Plan" for plaintiff's father, Charles Brace. P1; Trial Transcript [hereinafter "Tr."] 704-06. This plan covered the entire farm, and identified which crops were appropriate for particular fields within the farm as well as which fields could be improved by the installation of drainage. P1 at 6, 8. After purchasing the property in 1975, in 1977-79, Robert Brace obtained certain technical and financial assistance from agencies within the U.S. Department of Agriculture (U.S.D.A.). However, at no time did

---

[2]According to the Tax Assessor records, the size of the Murphy Farm tract is 65 acres. See D12 at Vol. I, A-8. Mr. Brace testified that the Murphy Farm tract was 58 acres but offered no written document in support. However, even if the Murphy Farm tract is considered to be only 58 acres, plaintiff cannot establish that the regulatory restriction on the wetland site denied all or substantially all economically viable use of its property. See Section V.C infra. The Consent Decree at issue here affected only 30 acres. P22 at ¶ 3.

any government representative ever provide plaintiff with technical or financial assistance for the purpose of draining any portion of the Murphy Farm tract. Tr. 706.

Between 1985 and 1987, Brace, without obtaining a Clean Water Act permit, discharged dredged and fill material onto the 30 acre wetland site. United States v. Brace, 41 F.3d 117, 121 (3d Cir. 1994). In 1987, the United States became aware of plaintiff's activities, and in 1987 and 1988 issued three orders directing plaintiff to cease maintenance and operation of the drainage system on the property and to restore portions of the property to its prior wetland condition. P9, P13, P16.

During the summer 1988, after receiving the Cease and Desist Orders, plaintiff contacted the Agricultural Stabilization and Conservation Service ("ASCS") and requested that his property be granted the status of "commenced conversion from wetlands" prior to December 23, 1985. P15; Brace, 41 F.3d at 121. Eventually, the ASCS granted "commenced conversion" status as to a number of plaintiff's fields, including fields on the Homestead Farm tract, but not including any fields located within the wetland area of the Murphy Farm tract. P15.

In 1990, the United States filed an enforcement action against plaintiff in the U.S. District Court for the Western District of Pennsylvania. Brace, 41 F.3d at 119, 121. In 1993, the district court entered judgment in favor of Brace on the ground that plaintiff's activities were exempt from the permitting requirements of Section 404 of the Clean Water Act. Id. at 120, 122. On appeal, the United States Court of Appeals for the Third Circuit reversed the district court and held that the court incorrectly applied the requirements of the Clean Water Act permit exemption provisions. Id. at 120. The case was remanded to the district court and the parties entered into a Consent Decree which permanently enjoined the plaintiff from further violations

of the Clean Water Act and ordered restoration of the affected 30 wetland acres. P22 at ¶¶ 3, 4. Plaintiff complied with the Consent Decree and this lawsuit followed.

Trial in this matter was held January 11-14, 2005.

## ARGUMENT

### I. <u>PLAINTIFF'S SUIT FOR A TAKING BASED ON THE APPLICATION OF CLEAN WATER ACT RESTRICTIONS TO HIS PROPERTY IS NOT TIMELY.</u>

Plaintiff has chosen to focus on the Consent Decree as the governmental act which caused the taking. <u>See</u> Complaint, ¶ 4, 17. The choice may have been motivated in part on the practical need to ensure compliance with the statute of limitations. Because plaintiff's complaint was not filed until November 25, 1998, plaintiff has to establish that his cause of action accrued no earlier than November 25, 1992.

However, the Consent Decree at issue here imposed no new requirements over and above the Clean Water Act. The Clean Water Act was the source for the issuance of the Consent Decree, and accordingly could not substantively exceed the scope of its authorizing act. More significantly, the essential Clean Water Act restriction that was imposed here – that you cannot dredge and fill jurisdictional wetlands without a permit and that if you have done so, you can be required to restore them, were first imposed on the Murphy Farm tract in 1987 when the first administrative order was issued. P9.

This is supported by plaintiff's allegation in the complaint that he "has been prevented from using at least thirty acres of the Subject Property for any economically viable use from July 15, 1987. . . ." <u>Compare</u> Complaint, ¶ 18, <u>with</u> D9. This allegation reflects plaintiff's correct legal understanding that his use of the 30 acres of wetlands on the Murphy Farm tract was first

restricted in 1987, and continued to be restricted throughout the enforcement of the District Court enforcement action.

While a question might arise as to whether, despite the issuance of an administrative order, the possibility still existed that permission to fill the wetlands might be granted, see Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 801 (Fed. Cir. 1993). Here, however, the possibility that Mr. Brace might ultimately obtain a permit was firmly removed in 1990, when the Corps declined to allow plaintiff to submit an after the fact permit application. P19, P20. Accordingly, plaintiff's cause of action to complain about the application of the requirements of the Clean Water Act to his property accrued no later than 1990, more than six years prior to the filing of the complaint herein.

Here, plaintiff presented no evidence which establish that the Consent Decree imposed burdens different from those imposed by the Clean Water Act itself.[3] To the contrary, defendant's testimony established that the restrictions imposed upon the Murphy tract by the Consent Decree were co-extensive with those imposed by the Clean Water Act. Tr. 619, 871-72.

Nor does the fact that, on appeal, the application of the Clean Water Act to plaintiff's property might have been ruled to be improper prevent the cause of action from accruing in the first place. Had the government's assertion been found to be improper, the governmental restriction would have been lifted, and Brace would have been free to continue his efforts to farm

---

[3] Nor is the fact that the restoration requirements in the admin order are not identical to those in the Consent Decree determinative. While the details of how best to restore the property may have changed slightly, the legal prohibition against dredging and filling jurisdictional wetlands remained the same. It is that prohibition which constitutes the governmental action restricting plaintiff's use of his property. That prohibition has remained unchanged from when the right to restrict plaintiff's use of his property was first asserted in 1987.

the wetland tract. However, the fact that the litigation might have ultimately been resolved in his favor, leaving him free to drain the wetland tract, does not delay the accrual of the cause of action in the first instance. Instead, the resolution of the litigation in favor of Brace would have had the legal effect of changing an already-accrued claim for a permanent taking into one for a temporary taking. Cf. Tabb Lakes, 10 F.3d at 800.

## II. PLAINTIFF HAS NOT ESTABLISHED A PHYSICAL TAKING.

Shortly prior to trial, plaintiff asserted for the first time a claim for a physical taking based on the imposition of the Cease and Desist Order and the government's non-exclusive, consensual entry onto plaintiff's land. See Plaintiff's Pre-Trial Brief filed on October 18, 2004 [hereinafter Pl. Pre-Trial Br.] at 15, 17. Plaintiff's physical taking claim should be rejected. As a matter of law, the Consent Decree, at best, is a restriction on use, not a physical occupation. Further, the physical entry made by Mr. Steckler, a government agent, to monitor the restoration was non-exclusive, consensual, and transitory. Accordingly, it cannot form the basis for a physical taking. Finally, the fact that the Consent Decree reserved a limited right to the United States to enter the property is constitutionally irrelevant if that right was not exercised.

### A. The Consent Decree Regulates Use and Does Not Constitute A Physical Occupation.

The Consent Decree and its requirement that plaintiff restore his property is a restriction on the use of property and thus does not constitute a physical occupation of private property. In Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency, 535 U.S. 302 (2002), the Supreme Court drew a sharp line between regulatory restrictions, generally subject to an ad hoc, multi-factor analysis, and permanent physical occupations, subject to a per se test. The Court explained that the per se test is reserved for "relatively rare" cases in which the physical

occupation can be "easily identified." Id. By way of examples, the Court said that a physical invasion occurs "when a leasehold is taken and the government occupies the property . . . when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants . . . or when its planes use private airspace to approach a government airport." Id. at 322. By contrast, a regulatory restriction is at issue when "a government regulation . . . merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . bans certain private uses of a portion of an owner's property . . . or that forbids the private use of certain airspace." Id. at 322-23. Thus, the mere fact that a regulatory restriction might have physical impacts does not by virtue of that alone become transformed into a physical taking.

Prior to the Tahoe decision, the Court in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), explained that "[n]ot every physical invasion is a taking"; instead, it is the "permanence and exclusivity of a physical occupation that distinguish it from temporary limitations on the right to exclude." Id. at 435 n.12 (emphasis in original).

The Federal Circuit has also carefully noted the distinction between physical and regulatory takings. In Boise Cascade v. United States, 296 F.3d 1339 (Fed. Cir. 2002), the Federal Circuit found that an injunction prohibiting logging without a permit did not constitute a per se taking by the government, reasoning that the injunction

> did not take whatever remained of this putative property interest; it merely prevented [plaintiff] from logging its land without a permit, which--as a regulation imposed upon [plaintiff's] use of the property--is a restriction on private use of the land and not a per se taking by the government.

Id. at 1354. The court found that plaintiff's per se taking claim was "merely an attempt to convert a regulatory takings claim, governed by Penn Central . . . into a per se taking governed by the more generous rule of Loretto." Id. at 1354.

Under this guidance, the government action at issue here plainly involves a restriction on the use of property, not a permanent physical occupation. Specifically, the Consent Decree requires that plaintiff "will perform restoration in accordance with the wetlands restoration plan . . . ." P22 ¶ 4. The Consent Decree also enjoins plaintiff from "from discharging any pollutants (including dredge and fill material) into the approximately 30 acre wetland site . . . unless such discharge is in compliance with the [Clean Water Act]." P22 ¶ 2. Accordingly, by requiring plaintiff to restore his property and enjoining him from future Clean Water Act violations, the government only restricted plaintiff's ability to use his property. Clearly, the Consent Decree did not constitute a permanent physical occupation under Loretto. Rather, the Consent Decree was a restriction on the use of property of the type the Supreme Court distinguished in Loretto. Tahoe and, more recently, Boise Cascade, compel the conclusion that the plaintiff's per se physical occupation theory has no application in this case.

**B. Lewis Steckler's Entry to Observe Plaintiff's Compliance with the Restoration Plan was a Transitory Presence That Does Not Rise to the Level of a Physical Taking.**

Plaintiff also asserts a claim of a physical taking based on the two brief visits by Mr. Steckler to oversee compliance with the Consent Decree. Pl. Pre-Trial Br. at 15, 17. To the contrary, these brief visits cannot rise to the level of a physical taking.

The court in Boise Cascade addressed a similar issue as raised here. In that case, the court held that the government's limited and transient intrusion onto plaintiff's property to conduct owl surveys did not constitute a physical taking. 296 F.3d at 1357 (holding that the "extremely limited and transient nature of the intrusion in this case, coupled with its purpose, which was to discover information necessary to the adjudication of a case that Boise itself

initiated, preclude a finding that a taking occurred as a matter of law."). In reaching this decision, the court reasoned that:

> Under a plain reading of Loretto, Boise cannot claim that the government's brief intrusions onto its land to conduct owl surveys constitute a per se taking. Transient, nonexclusive entries by the Service to conduct owl surveys do not permanently usurp Boise's exclusive right to possess, use, and dispose of its property. The government's incursion into Boise's property is more in the nature of a temporary trespass--though, obviously, sanctioned by the district court and therefore not unlawful--rather than a permanent physical occupation or an easement of some kind.

Id. at 1355 (emphasis added) (stating that plaintiff "is incorrect to suppose that Hendler compels us to turn a transient invasion by owl surveyors into a per se taking under Loretto.").

Plaintiff's reliance on Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991), to support the proposition that temporary access by the government constitutes a taking is misplaced. There, the court found that the government's installation of nearly 20 groundwater monitoring wells constituted a physical taking. 952 F.2d at 1376. However, the Hendler court also noted that a physical taking is not established merely because a government action involves an "occupancy that is transient and relatively inconsequential . . . ." Hendler v. United States, 952 F.2d 1364, 1377 (Fed. Cir. 1991).

The visits to the property by Lewis Steckler on December 23 and 24, 1996, do not constituted a physical taking. Lewis Steckler visited plaintiff's property on December 23 and 24. See P23 and P24; Tr. 718, 719. These visits were conducted with express permission from plaintiff, and indeed, at plaintiff's request. See P23; Tr. 718. Mr. Steckler testified that he was called by plaintiff "to observe the excavator digging the trenches. . . kind of check and see if the plan was being completed the way it was designed. . . ." Tr. 718. Because these visits were transient, nonexclusive entries and did not permanently usurp plaintiff's right to posses,

use and dispose of the property, plaintiff cannot establish a physical taking under Loretto.

### C. The Reservation Of A Right Of Entry To Monitor Compliance With The Consent Decree Did Not Constitute A Physical Taking.

Nor did the government's reservation of a right of access to the property for a period of 18 months to verify restoration constitute a physical taking. Pl. Pre-Trial Br. at 15, 17.

Here, there is no physical occupation of plaintiff's property. Instead, the government's access to the property for a period of 18 months was mandated by a court order for the limited purpose of verifying that plaintiff had restored the property's wetland character as required by the Consent Decree. P22 at ¶ 9. Indeed, following the two isolated visits by Mr. Steckler, there is no evidence that this right of entry as allowed by the Consent Decree, was ever exercised other than on December 23 and 24. Here, as in Hendler, what matters is not what the government reserved the right to do, but what the government actually did. See Hendler v. United States, 175 F.3d at 1379.

## III. THE RELEVANT PARCEL IS THE 134 ACRES CONVEYED BY A SINGLE DEED AND USED AS PART OF A COMMON PLAN.

In evaluating whether a taking has occurred, it is necessary to first define the relevant parcel against which against which the impact of the government action will be measured. Forest Properties, Inc. v. United States, 177 F.3d 1360, 1365 (Fed. Cir.), cert. denied, 528 U.S. 951 (1999) ("This relevant parcel inquiry is critical because 'our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property.'") (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)).

This requires an examination of the "parcel as a whole:"

> Taking jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole. . . .

Tahoe-Sierra, 535 U.S. at 327 (emphasis added) (quoting Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 130-31 (1978)).

Several factors are relevant to the inquiry of what is the relevant parcel:

> The degree of contiguity, the date of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of the remaining lands, and no doubt many others would enter the calculus.

Ciampitti v. United States, 22 Cl. Ct. 310, 318 (1991); see also Forest Properties, Inc., 177 F.3d at 1365 ("[The relevant parcel inquiry] requires courts to focus on the economic expectations of the claimant with regard to the property . . . . Where the developer treats legally separate parcels as a single economic unit, together they may constitute the relevant parcel.").

More recently, in Appolo Fuels, Inc. v. United States, 381 F.3d 1338 (Fed. Cir. 2004), the Federal Circuit addressed the "parcel as a whole" as it applied to mining leases, finding that the relevant parcel was two leases, one purchased in 1989 and the other six years later in 1995, because they were acquired by plaintiff as part of a single unified plan. In making this determination, the court noted that plaintiff purchased one of the leases "as the first step in fulfilling its 'expect[ation] that [it] would ultimately acquire and mine all of the surface mineable coal within the Little Yellow Creek watershed." Id. at 1346 (citation omitted). Thus, the Circuit reasoned, "[u]nder our precedent, the purchase of these two leases as part of one unified mining plan is sufficient to include them in the relevant parcel." Id.

Here, plaintiff's "parcel as a whole" properly encompasses, at a minimum, the 134-acre

"Deeded Property" purchased by Mr. Brace on December 30, 1975. See D11(A). It is undisputed that both the Homestead Farm tract and the Murphy Farm tract were acquired at the same time and are contiguous (except for South Hill Road which divides the tracts). D34; Tr. 116-117; see also Brace, 48 Fed. Cl. at 274. Both parcels were acquired for the same purpose and as part of a common plan for the purposes of farming. Tr. 119.

## IV. PLAINTIFF CANNOT ESTABLISH A CATEGORICAL TAKING.

Plaintiff argues that the entry of the Consent Decree caused a categorical taking because he has been denied all economically viable use of the Murphy Farm tract. Pl. Pre-Trial Br. at 19-20. The Court, however, should reject plaintiff's categorical taking claim because plaintiff has too narrowly defined the relevant parcel, conflicting with Supreme Court precedent in Penn Central and Tahoe-Sierra. Here, the relevant parcel consists of, at a minimum, the 134 acre Deeded Property, consisting of the Homestead Farm tract and the Murphy Farm tracts. Because plaintiff has incorrectly defined the relevant parcel, and plaintiff's arguments ignore economic uses of the property which remain in its "after" condition, the requirement that there have been a "complete elimination of value" has not bee met. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 n.8 (1992).

### A. Compared Against the 134 Acre Relevant Parcel, Plaintiff Cannot Establish a Categorical Taking.

Plaintiff cannot establish a categorical taking under Lucas because the Consent Decree did not prohibit all economic use of the relevant parcel. As the Supreme Court has recently explained, the "parcel as a whole rule," see Lucas, 505 U.S. at 1017, is reserved for '"the extraordinary circumstances when no productive or economically beneficial use of land is permitted.'" Tahoe-Sierra, 535 U.S. at 330 (quoting Lucas, 505 U.S. at 1017) (emphasis in

original). Thus, "[a]nything less than a 'complete elimination of value,' or a 'total loss,' . . . would require the kind of analysis applied in Penn Central [the parcel as a whole rule]." Tahoe-Sierra, 535 U.S. at 330.

Thus, even if there has been interference with plaintiff's use of a portion of his property, compensation is not required if economic value remains in the property as a whole. In Deltona Corp. v. United States, 657 F.2d 1184, 1192 (Ct. Cl. 1981), the court followed Penn Central and found the denial of Deltona's 404 permit application did not constitute a taking because plaintiff's remaining land uses were "plentiful and its residual economic position very great." See also Jentgen v. United States, 657 F. 2d 1210, 1213 (Ct. Cl. 1981) (plaintiff's claim denied because it is one for diminution in value of the property rather than complete destruction of all economically viable uses). Indeed, "[i]n the case of a landowner who owns both wetlands and adjacent uplands, it would clearly be unrealistic to focus exclusively on the wetlands, and ignore whatever rights might remain in the uplands." Ciampitti v. United States, 22 Cl. Ct. at 318.

The logic of this approach is self-evident: a property owner who continues to have substantial value in the use of balance of its property is not deprived of fairness and justice simply because government action prevents optimum economic use of a small portion of the property.

Here, the government action in question has restricted plaintiff's ability to drain 30 acres of wetlands on the Murphy Farm tract. However, the evidence is undisputed, see infra, that economic value remains in the Murphy Farm tract. In addition, the relevant parcel includes the Homestead Farm tract property. With respect that property, the evidence is undisputed that it continues to be productive. Given the economic value remaining in the relevant parcel,

plaintiff's claim for a categorical taking under Lucas must be rejected.

**B. Even If The Relevant Parcel is Considered to be only the 65 Acre Murphy Farm Tract, There Has Been No Categorical Taking Because there Exists Other Economic Uses.**

Even were the Court to find that the relevant parcel is comprised of only the Murphy Farm tract, the existence of remaining viable economic uses precludes the finding of a categorical taking. The Consent Decree, upon which plaintiff bases his claim of a taking, only affects 30 acres of the acre Murphy Farm tract. P22 at ¶ 3. Even assuming the 30 wetland acres have no other economic use, a matter which defendant does not concede, the remaining acreage on the Murphy Farm tract has significant remaining economic uses.

Plaintiff's own evidence established significant "after" value for the Murphy Farm tract. Plaintiff's appraiser, Mr. Lignelli, testified that the most profitable use for the Murphy Farm tract in the "after" – with the Consent Decree in place – would be to utilize the 28 non-wetland acres as a single homesite which would then overlook the wetland area. Tr. 396, 450, 465, 479. So utilized, the "after" value of the property would be $140,000. Tr. 474.

In addition, the evidence at trial was clear that the upland areas of the Murphy Farm tract could clearly continue to be farmed in the "after" condition. Mr. Brace acknowledged that he had grown crops on the upland areas. Tr. 130-31, 356-57. He described one upland area as being 11-12 acres and the second as being 6 acres. Tr. 158. The various crops that were grown in the larger upland area, see D9, and the years, P33, was evidenced and undisputed. Indeed, defendant's appraiser, George Silver, observed evidence that a crop had recently been grown in the larger upland area when he first inspected the Murphy Farm tract in the spring of 2004. Tr. 799.

Plaintiff's contention that he cannot grow crops on the upland tract "because of the expansion of the Clean Water Act," Tr. 160, is legally in error as well. As a matter of law, uplands are not within the enforcement jurisdiction of Section 404 of the Clean Water Act. Tr. 513. Furthermore, Mr. Lapp testified that it has always been the government's position that the uplands are not subject to Section 404 of the Clean Water Act. Tr. 646-47. Indeed, plaintiff acknowledged that neither the EPA nor the Corps ever told him he could not farm the upland areas. Tr. 160-61.

There is also a producing gas well located on the Murphy Farm tract. Tr. 183, 184, 421-422. Leased by plaintiff's predecessor in interest, the well provides a monthly royalty income. Tr. 140, 84. While the monthly income is not large, it is sufficient to forestall the finding of a categorical taking. See e.g., Palazzolo v. Rhode Island, 533 U.S. 606, 631-32 (2001) (finding that plaintiff "failed to establish a deprivation of all economic value, for it is undisputed that the parcel retains significant worth for construction of a residence.").

Finally, the wetland area itself remains useful as pasture. Indeed, prior to plaintiff acquiring the property, the wetland acreage was also used by his father as pasture for a dairy operation. Tr. 118-20. The record is devoid of any evidence that the Clean Water Act or the Consent Decree would prohibit the use of the wetland acreage for pasture. See, for e.g., Tr. 618, 660.

Given these remaining economic uses, plaintiff cannot establish a categorical taking. Tahoe-Sierra, 535 U.S. at 330 ("Anything less than a 'complete elimination of value,' or a 'total loss,' the [Lucas] Court acknowledged, would require the kind of analysis applied in Penn Central."); Walcek v. United States, 303 F.3d 1349, 1355 (Fed. Cir. 2002) (holding that since the

landowner was able to develop 2.2 acres of a 13.2 acre parcel, the landowners were "not totally deprived of all economically viable use of their land, and . . . no categorical taking occurred").

## V. PLAINTIFF CANNOT ESTABLISH A REGULATORY TAKING.

The Supreme Court has recognized that the Fifth Amendment requires compensation for regulations that go "too far" and have the effect of taking a landowner's property. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). The Court has identified three factors of particular significance in the "ad hoc" takings inquiry: (1) the character of the governmental action; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant. See Penn Central Transportation Co., 438 U.S. at 124; Avenal v. United States, 100 F.3d 933, 937 (Fed. Cir. 1996).

### A. Plaintiff Cannot Establish That He Possessed Reasonable Expectations That He Could Drain the Murphy Farm Tract Without Complying with the Clean Water Act.

Plaintiff argues that the wetlands on his property were not regulated under the Clean Water Act at the time he purchased it, and therefore, it was reasonable for him to expect that he could drain the wetlands without a permit. Pl. Pre-Trial Br. at 22. Furthermore, plaintiff contends that because the government in 1961 assisted his father in developing a drainage plan for some of the fields in his farm, that therefore it was reasonable for plaintiff to expected that the Murphy Farm tract was not subject to the Clean Water Act. Pl. Pre-Trial Br. at 22.

To the contrary, plaintiff was on constructive notice of the statutory scheme in place when he purchased his property and the possibility that such restrictions might apply to his property. Nor are plaintiff's estoppel-like arguments factually or legally correct. As a threshold matter, the relevant time period for determining whether plaintiff's investment-

backed expectations were reasonable is when plaintiff acquired the property, not later events. Furthermore, Mr. Brace has never been provided either technical or financial assistance for the purpose of constructing drainage systems on the Murphy Farm tract. Indeed, the District Court for the Western District of Pennsylvania in United States v. Brace, No. 90-229 (W.D. Pa. 1992), rejected the same estoppel-type argument that plaintiff presents here.

**1. Plaintiff Cannot Establish That He Had Reasonable Investment-Backed Expectations In Draining the Wetlands.**

In order to establish a taking, plaintiff must prove that the government action has interfered with the investment-backed expectations he had when he acquired the property. See Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1179 (Fed. Cir. 1994). Here, plaintiff cannot establish that any expectations he may have had in being able to drain the Murphy Farm tract free from legal constraints imposed by the Clean Water Act were reasonable.

An investment-backed expectation "must be more than a 'unilateral expectation or an abstract need,"and "it must be reasonable". Ruckelshaus v. Monsanto Co., 467 U.S. at 1005-06. In those instances where a regulation limits the owner's use of his land, by inquiring into the claimant's investment-backed expectations, a court "limits recovery to owners who can demonstrate that they bought their property in reliance on the nonexistence of the challenged regulation," Creppel, 41 F.3d at 632. See also Concrete Pipe & Prods. of California, Inc.v. Construction Laborers Pension Trust for So. Calif., 508 U.S. 602, 645-646 (1993); Ruckelshaus 467 U.S. at 1005-06. The rationale of these decisions is quite obvious, for to hold otherwise would turn the government into an involuntary guarantor of the property owner's gamble that he could develop the land as he wished despite the existing regulatory structure. Ciampitti v. United

States, 22 Cl. Ct. 310, 321 (1991). Thus, the Court has rejected as "quite simply untenable" the contention that property owners "may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore believed was available for development. . . ." Penn Central, 438 U.S. at 130.

When a claimant has constructive and actual knowledge of federal restrictions on the exercise of its property rights, its claim of reasonable expectations to the contrary fails. Good v. United States, 189 F.3d 1355, 1362-63 (Fed. Cir. 1999). There, the Circuit noted that:

> While Appellant's prolonged inaction does not bar his takings claim, it reduces his ability to fairly claim surprise when his permit application was denied.

Id. at 1363.

The Clean Water Act was enacted in 1972, more than three years prior to plaintiff's acquisition of the Deeded Property. The cornerstone of the Act's regulatory scheme is the prohibition against the discharge of pollutants into "waters of the United States" except when in compliance with the various sections of the Act, in particular Section 404, 33 U.S.C. § 1344. See 33 U.S.C. §§ 1311, 1362 (6).

**2. It Is That The Enactment of The Clean Water Act, And Not Subsequent Agency Regulations, Which Informs A Plaintiff's Reasonable Investment-Backed Expectations.**

Plaintiff contends that when he purchased his property, he relied on regulations, which he contends excluded his property from the permitting requirement. Pl. Pre-Trial Br. at 22. To the contrary, the July 1975 regulations did include plaintiff's property within their ambit. Regardless, it was the passage of the Clean Water Act, and not the promulgation of subsequently-issued regulations, which, as a matter of law, served to inform plaintiff's reasonable investment-backed expectations. A review of the statutory and regulatory framework

of the Clean Water Act provides context for defendant's argument.

The Clean Water Act defines "navigable waters" as "waters of the United States, including the territorial seas," 33 U.S.C. § 1362(7), but does not expressly define "waters of the United States." The legislative history to the Act makes clear that Congress intended by this language to encompass the broadest possible constitutional interpretation. See S. Rep. No. 1236, at 99 (1972), reprinted in 1972 U.S. Code Cong. & Ad. News 3822.

On April 4, 1974, the Corps had promulgated regulations to establish a procedure for the submission of applications under Section 404 of the Clean Water Act. The Corps initially approached its jurisdiction under the Clean Water Act in a similar manner to its jurisdiction under the Rivers and Harbors Act ("RHA"),[4] issuing regulations which implemented both RHA Section 10 and CWA Section 404 and limited the Corps' jurisdiction to navigable waters as that term had been previously defined under RHA Section 10. 39 Fed. Reg. 12,115, 12,119 (1974). This definition excluded from coverage most wetlands that are generally non-navigable, and also excluded other isolated or shallow waters from Section 404's jurisdiction.

In response, environmental groups challenged these regulations, arguing that Clean Water Act jurisdiction extended beyond traditionally navigable waters. This legal issue was resolved in Natural Resources Defense Council v. Callaway, 392 F. Supp. 685 (D.D.C. 1975), where, relying on Congressional intent, the court invalidated the Corps' then-current regulations, finding their definition of "waters of the United States" to be too narrow. Id. at 686. In a terse, one-page opinion, the court invalidated the Corps' restrictive reading of the Act, declaring

"Congress by defining the term 'navigable waters' in [the CWA] to mean 'the

[4] Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 401-403.

> waters of the United States, including the territorial seas,' asserted federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution. Accordingly, as used in the [CWA], the term is not limited to the traditional tests of navigability."

Id. at 686. The court ordered the Corps to publish new proposed regulations within 15 days "clearly recognizing the full regulatory mandate" of the CWA. Id.

The Callaway court was not the only court to find that Congress had intended the CWA's reference to "waters of the United States" to be interpreted broadly. See Sun Enterprises, Ltd. v. Train, 394 F. Supp. 211, 223 (S.D.N.Y. 1975); United States v. Ashland Oil & Transp. Co., 364 F. Supp. 349 (W.D. Ky. 1973), aff'd 504 F.2d 1317, 1323-25 (6th Cir. 1974).

In response to Callaway, in July of 1975, the Corps issued new regulations which expanded the definition of navigable waters to include wetlands. 40 Fed. Reg. 31320 (July 25, 1975). Among the wetlands included within the definition were those like the ones at issue here that were contiguous or adjacent to other navigable waters. Id. at 31324.

It was the passage of the CWA, and not the promulgation of subsequently-issued regulations, which served to inform, plaintiff's reasonable investment-backed expectations. Any argument to the contrary

> assumes that the adverse effect of the 1962 Act did not become operative against [Plaintiff] – [Plaintiff] was not 'damaged' – until the Supreme Court some 25 years later so construed the Act. While the Supreme Court's pronouncement in 1986 might be relevant to fixing the time when the [Plaintiff] subjectively first knew what the Act meant, it is fundamental jurisprudence that the Act's objective meaning and effect were fixed when the Act was adopted. Any later judicial pronouncements simply explain, but do not create, the operative effect.

Catawba Indian Tribe v. United States, 982 F.2d 1564, 1570 (Fed. Cir. 1993) (emphasis added) (citing Chevron U.S.A. Inc. v. United States, 923 F.2d 830, 834 (Fed. Cir. 1991)). See also Ruckelshaus, 467 U.S. at 1008-10 (measuring reasonable investment-backed expectation against

the date of passage of the Act).

In addition to the enactment of the CWA and the issuance of regulations, several judicial decisions served to further inform plaintiff's expectations. As discussed, when plaintiff acquired the property in December, 1975, the term "waters of the United States" had already been judicially construed to reach all waters that could be regulated under the Commerce Clause. See Callaway, 392 F. Supp. at 686; Sun Enterprises, Ltd., 394 F. Supp. at 223; United States v. Ashland Oil & Transp. Co., 364 F. Supp. at 351, aff'd, 504 F.2d at 1323-25. Regardless of actual knowledge, plaintiff was on constructive knowledge of the Clean Water Act. See Dufau v. United States, 22 Cl. Ct. 156, 159 (1990) ("the rule of law is that '"everyone is charged with the knowledge of the United States Statues at Large'") (quoting C&L Construction Co. v. United States, 6 Cl. Ct. 797 (1984), aff'd, 790 F.2d 93 (Fed. Cir. 1986).

Here, plaintiff testified that he was aware of the Clean Water Act when he purchased the property in 1975, Tr. 353, but never contacted an attorney to determine the extent of his legal obligations under the Act. Tr. 355. Further, plaintiff took the risk that enforcement of the regulatory regime might become more stringent as time passed; that is, "that the standards and conditions governing the issuance of permits could change." Deltona v. United States, 657 F.2d at 1193. As the Federal Circuit noted in Good v. United States,

> [i]n light of the growing consciousness of and sensitivity toward environmental issues, [Plaintiff] must also have been aware that standards could change to his detriment, and that regulatory approval could become harder to get.

Id., 189 F.3d at 1362.

Indeed, the court in Appolo Fuels Inc. v. United States, 381 F.3d 1338 (Fed. Cir. 2004),

anticipated the argument plaintiff raises here. In that case, the court, quoting a previous decision, explained that "[t]he reasonable expectations test does not require that the law existing at the time of processing would impose liability. Rather, [t]he critical question is whether extension of existing law could be foreseen as reasonably possible." Id. at 1350 (internal citation and quotation omitted).

**3. The Wetland Character of the Property Was Clear.**

Nor can plaintiff reasonably claim that he was unaware of the wetland character of the site. In fact, Plaintiff testified that he never disputed that he had wetlands, (Tr. 157), and indeed, that he was able to identify wetlands without any assistance from the government. Tr. 157- 58. In the district court enforcement action, plaintiff stipulated that the 30 acres at issue here were wetlands. Brace, 41 F.3d at 120-121. Plaintiff also possesses a life-long familiarity with the property, which has been in the Brace family since the 1930's. Id. at 120, 152, 178. Plaintiff testified that he was generally familiar with the Murphy Farm tract from the time he was a boy. Tr. 176-77.

Moreover, the 1961 Soil Conservation Survey for Erie County prepared by the U.S. Department of Agriculture clearly identifies the area of jurisdictional wetlands as a "wildlife" area and, as such, to be left in its present condition, with the possibility of "constructing a dike and providing a pond or area for wild ducks." See P1 at 7-8, Tr. 314.

**4. Agricultural Assistance Provided by Government Agencies Cannot, As A Matter of Law, Create Reasonable Investment-backed Expectations That Protected Wetlands Could Be Drained.**

Plaintiff argues that because the government agencies provided technical and financial assistance in developing a cropping strategy for his farm, including a drainage plan for portions of his farm other than the Murphy Farm tract, that he could reasonably expect to drain wetlands

on the Murphy Farm tract without the need to comply with the Clean Water Act. Pl. Pre-Trial Br. at 22.

As a threshold matter, the measuring point of reference in determining whether plaintiff had reasonable investment backed expectations in developing his property is when plaintiff acquired the property, not later events. See Tahoe Sierra, 535 U.S. at 336. Accordingly, plaintiff's estoppel-like arguments are largely legally irrelevant.

Putting aside for the moment the legal defect in plaintiff's argument, the Court should reject plaintiff's estoppel argument for the simple reason that it lacks factual support. However, the 1961 Conservation Plan did not provide for the drainage of the Murphy Farm tract; rather, the drainage plans were for fields on the Homestead Farm tract or other parts of the Brace farm. Tr. 704-12. Indeed, plaintiff's own witness, Mr. Joseph Burawa, agreed that the drainage plan developed for Mr. Brace's father and used by Mr. Brace did not include any drainage plan for the Murphy Farm tract. Tr. 85, 87-89. Rather, the Conservation Plan, which plaintiff admits that he relied on, recommended using the portions of the Murphy Farm tract for hay crop, hayland, crop rotation, wildlife land and duck marsh.[5/] see P1 at 6; Tr. 705-06.

Further, while Mr. Brace did receive funding under the Emergency Conservation Program following a severe thunderstorm in 1984, (Tr. 712-15), this financial assistance was

---

[5] The wetland acreage is comprised of soil type identified as sloan silty clay loam. Tr. 737. This type of soil is found near flood plains and streams. Because it is a wet soil type, it is considered poor in terms of drainage. Id. Furthermore, because of its wetness, the USDA classified the soil type as 6W. Tr. 738. Mr. Steckler testified that normally the SCS would recommend that soils classified as 6W not be drained. ("recommend leaving that alone practically 100 percent of the time.") Id. Additionally, Mr. Steckler testified that "we would have to inform the landowner that permits would be needed to do any type of drainage work." Id.

limited to "restoring existing structures or cleaning off cropland . . . remove the gravel from the fields, clean out any ditches . . . to restore . . . how things were before the rain event." Tr. 714 ("[Mr. Brace] requested the grading, shaping, releveling or similar measures to restore cropland areas to their original scope before the flood, before the severe rain."). See also P5. This financial assistance did not involve the construction of new drainage systems. Indeed, the evidence does not indicate that the assistance provided to Mr. Brace under the Emergency Conservation Program was even for the Murphy Farm tract. Tr. 714-15.

Finally, plaintiff has already had his day in court on this issue. Plaintiff presented the identical factual arguments in the district court enforcement action, arguing the government was estopped from enforcing the Clean Water Act against him because he had been given technical and financial assistance for the purpose of draining some of the fields on his farm. The District Court addressed, and rejected, this argument. See D3.[6]

**B. The Character Of The Government Action Weighs In Favor Of The United States.**

Plaintiff argues that the character of the government action factor under Penn Central weighs in his favor because the government, in protecting wetlands, "did not act to prevent a nuisance, but rather to provide a benefit to the public." Pl. Pre-Trial Br. at 25. Then, repeating his

---

[6] The standard for establishing estoppel against the government is identical in the Third Circuit and the Federal Circuit. See, e.g., Zacharin v. United States, 213 F.3d 1366, 1371 (2000). The Federal Circuit has required that affirmative misconduct is a prerequisite for application of equitable estoppel against the government, as have every other circuit. Id. (citing Henry v. United States, 870 F.2d 634, 637 (Fed. Cir. 1989); Hanson v. Office of Personnel Management, 833 F.2d 1568, 1569 (Fed. Cir. 1987), Tefel v. Reno, 180 F.3d 1286, 1303 (11th Cir. 1999) (citing cases from other circuits)). Here, there is no evidence that any representative of the government gave plaintiff incorrect legal advice or engaged in any other affirmative misconduct regarding the scope of the Clean Water Act as applied to plaintiff's wetlands. See e.g., Tr. 741.

estoppel argument, plaintiff argues that the character of the government action favors plaintiff, arguing that the government first encouraged him to drain his property and then sued him for violating for Clean Water Act. Id. Plaintiff's argument is factually inaccurate and legally incorrect.

This Court should reject plaintiff's arguments. Plaintiff's argument incorrectly limits the "character of the government action" factor to an analysis of whether the government's regulation was designed to proscribe a nuisance, which conflicts with recent Federal Circuit jurisprudence.

Here, the character of the government action does not weigh in favor of a taking. Like the other Penn Central factors, the examination of the character of the government action is an "essentially ad hoc, factual" inquiry that considers "[t]he purposes served, as well as the effects produced" by the regulatory action in question. Palazzolo, 533 U.S. at 633-34 (O'Connor, J., concurring) (citing and quoting Penn Central, 438 U.S. at 124, 127).

The Federal Circuit's recent decision in Bass Enterprises Prod. Co. v. United States, 381 F.3d 1360 (Fed. Cir. 2004), has clarified the appropriate analysis for the "nature of the government action" factor. Reviewing the Supreme Court's decisions in Tahoe and Palazzolo, the Bass court found that the court's "recent decisions mark a return to the pre-Lucas evaluation of the "character of the Government actions" factor. Id. at 1370. Accordingly, the Federal Circuit stated that in evaluating the character of the government action, it therefore "consider[s] the purpose of the regulation and its desired effects in determining whether a taking has occurred." Id. By way of example, the Federal Circuit cited to Maritrans Inc. v. United States, 342 F.3d 1344, 1356 (Fed. Cir. 2003), as suggesting that a court should "'consider the purpose and importance of the public interest underlying a regulatory imposition' in its Penn Central analysis." Id (requiring the court to

inquire "into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented."). Applying this reasoning, the Bass court rejected plaintiff's contention that when determining the character of the governmental action, the analysis should be limited to whether the government regulation at issue was designed to proscribe a nuisance. Bass, 381 F.3d at 1369. Rather, the court held that it was not legal error to consider "the potential impact on the public when [evaluating] whether the BLM's delay is permitting drilling near a nuclear waste site constituted a taking." Id. at 1370.

Applying this analytical framework here, the character of the government action factor weighs in favor of the government. Wetlands serve important environmental functions and it is clear that the government action of protecting those wetlands in this case served an important public purpose. See, e.g., Florida Rock Indus., Inc. v. United States, 791 F.2d 893, 904 (Fed. Cir. 1986) (stating that "the preservation of wetlands bears a substantial relationship to the public welfare as perceived by the best lights of our time"); Deltona Corp., 657 F.2d at 1192-94. As this Court noted in Forest Properties, Inc. v. United States, 39 Fed. Cl. 56, 76 (1997), "[t]his nation clearly has a legitimate public welfare duty to preserve the nation's wetlands, and it is a worthy national goal." Accordingly, because the government action here was implemented to protect wetlands, and therefore serves an important public purpose, the nature of the government action weighs in favor of defendant.

### C. Weighing The Economic Impact Of The Regulatory Restriction On The Plaintiff Also Compels A Finding That There Has Been No Taking.

One of the Penn Central factual inquiries of "particular significance" is an evaluation of the economic impact of the regulatory restriction on the plaintiff. Penn Central, 438 U.S. at 124. In order to establish a taking, a plaintiff must demonstrate that he has been denied all or substantially

all economically viable use of its property. Bass Enterprises Prod. Co., 133 F.3d at 895 (citing Lucas, 505 U.S. at 1030-31); see also Penn Central, 438 U.S. at 138 n.36. The fact that economically viable uses of portions of the relevant parcel remain after the imposition of the regulatory restriction, however, can support a finding that no taking has occurred. Cf. Palazzolo, 533 U.S. at 632-32.

Here, defendant's valuation evidence established that, before application of the restriction against draining wetlands, the value of the relevant parcel[7] was $355,000. D12 at 69; Tr. 823. After applying the restriction that the 30 acres of wetlands on the Wetland tract could not be drained or filled, defendant's appraiser found the fair market value of the relevant parcel to be $305,000. D12 at 85; Tr. 823. Comparison of the two values yields a differential of $55,000, or only an approximately 14% diminution in value.

In the alternative, viewing the diminution under plaintiff's evidence, it must be concluded that plaintiff has not carried his burden to establish that the severity of the financial impact warrants the finding of a taking. Plaintiff's appraiser opined that in the "after" condition – with the Consent Decree in place – the most profitable use for the Murphy Farm tract would be to utilize the non-wetland area as a single homesite which could then overlook the wetland area. Tr. 396, 450, 465, 479. So utilized, the "after" value of the property would be $140,000. Tr. 474. When that value is compared to plaintiff's "before" value of $455,000, Tr. 380-81, the loss in

---

[7] As discussed supra, the relevant parcel here is the property acquired by plaintiff in D11(A), the December, 1975 deed by which plaintiff acquired the Homestead and Murphy Farm tracts comprising approximately 134 acres.

value is approximately 70%.[8] However, even a 70% loss is significantly less than the percentage diminution in those cases which have found a taking, as we now discuss.

### 1. In Order to Establish a Taking, a Plaintiff Must Show More Than Just a Loss of Some Value in the Property.

It is well settled that property can experience some reduction in value as a result of government action without a taking being found. Indeed, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." Pennsylvania Coal Co. v. Mahon, 260 U.S. at 413. Thus, mere diminution in property value, standing alone, will not establish a taking. Concrete Pipe & Prods. of California, Inc.t, 508 U.S. at 645; Penn Central Transp. Co., 438 U.S. at 131.

Nor is the fact that the governmental[9] action in question has caused a change in highest and best use, or most profitable use, determinative of the takings inquiry. Florida Rock Indus., 791 F.2d at 901. The fact a property owner is not permitted to reap as great a financial return from his property as he might have hoped will not itself establish a taking. See, e.g., MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 353 n.9 (1986); Deltona Corp., 657 F.2d at 1192; Jentgen,

---

[8] Of course, as we discuss infra, Mr. Lignelli's "before" value is based on his assumption that it was legally permissible and physically possible to develop the 58 acre Murphy Farm tract as a 125 unit subdivision. Tr. 386, 400, 414. Whether viewed as an assumption or a conclusion, Mr. Lignelli's conclusions with respect to the property's "before" value are factually unsupported and legally erroneous. See discussion infra.

[9] Here, of course, we are endeavoring to only value the effect of actions of the federal government. In large part, plaintiff's evidence did not distinguish between those restrictions attributable to the federal government and those emanating from state or local developmental restrictions. Tr. 176, 189-90, 487-88. Of course, the federal government is not required to compensate plaintiff for value lost as a result of regulatory restrictions imposed by state and local entities. See Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196 (Fed. Cir. 2004).

657 F. 2d at 1213.

### 2. The Value Lost Must Be Measured In Reference To Fair Market Value.

It is well established that the measure of just compensation in the case of a taking of real property is the difference in the fair market value of that property immediately before, and immediately after, the taking. United States v. Virginia Electric & Power Co., 365 U.S. 624, 632 (1961); Cloverport Sand & Gravel Co., Inc. v. United States, 6 Cl. Ct. 178, 188 (1984).

Fair market value is defined as:

> . . . the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would be sold by a knowledgeable owner willing but not obligated to sell to a knowledgeable purchaser who desired but is not obligated to buy.

D51 at 30. Accord United States v. Miller, 317 U.S. 369, 374 (1943); Snowbank Enterprises, Inc. v. United States, 6 Cl. Ct. 476, 484 (1984). As with all other aspects of the case, plaintiff has the burden of proof to establish the value of the property that was taken. Board of County Sup'rs of Prince William County, Va. v. United States, 116 F.3d 454, 457 (Fed. Cir. 1997); Stephenson v. United States, 33 Fed. Cl. 63, 81 (1994).

### 3. Here, Defendant's Evidence Establish There Was Insufficient Economic Impact to Establish a Taking.

In Walcek v. United States, 49 Fed. Cl. 248 (2001), the Federal Circuit considered the question of whether a 60% loss in value was sufficient economic impact to establish a taking:

> several Supreme Court decisions suggest that diminutions in value approaching 85 to 90 percent do not necessarily dictate the existence of a taking. See Euclid v. Ambler Realty Co., 272 U.S. 365 (1926) (no taking despite 75 percent diminution); Hadacheck v. Sebastian, 239 U.S. 394 (1915) (no taking despite 87.5 percent diminution). With one possible exception, this court has likewise relied on diminutions well in excess of 85 percent before finding a regulatory taking. See Loveladies Harbor, 21 Cl. Ct. 153, 160 (1990) (taking--99 percent), aff'd, 28 F.3d 1171 (Fed. Cir.1994); Bowles, 31 Fed. Cl. at 48-49 (taking--92-100 percent);

> Formanek, 26 Cl. Ct. 332, 340 (1992) (taking--88 percent). See also 1902 Atl. Ltd. v. United States, 26 Cl. Ct. 575, 579 (1992) (88 percent loss satisfies "economic impact" factor, although no taking found). [Footnote omitted.] Conversely, both the Supreme Court and the Federal Circuit have held that a percentage of value loss comparable to that found here is not indicative of a taking. See Concrete Pipe, 508 U.S. at 645 (no taking--46 percent diminution); Jentgen, 657 F.2d at 1213 (no taking--50 percent diminution). See also Ciampitti, 22 Cl. Ct. at 320 (no taking--25 percent diminution).

Id. at 258.

Defendant's appraiser, George Silver, found only an approximately 14% loss in value by virtue of the imposition of the prohibition against dredging and filling wetlands with respect to the 30 wetland acres on the Murphy Farm tract. In making the comparison, Mr. Silver first valued the Homestead and Murphy Farm tracts as a whole, assuming that the 30 acres of wetlands on the Murphy Farm tract had been drained and would successfully support row crops.[10] Tr. 796-97.

In the "after,", assuming that the 30 acres have been restored to wetland status and could not be drained, Tr. 808, the fair market value is $305,000. Tr. 809, 823, D12 at 83, 85. Accordingly, plaintiff has suffered only an approximately 14% diminution in value. Given that the relevant parcel in the "after" condition, continued to have more than 85% of its original value, plaintiff cannot establish that the economic impact of the regulatory restriction on the parcel as a whole is sufficient to establish a taking.

This 14% diminution in value is far less than the 91% reduction in value found not to be a categorical taking in Rith Energy, Inc. v. United States, 270 F.3d 1347, 1349 (Fed. Cir. 2001) or

---

[10] It should be noted that this "before" case assumption favors plaintiff inasmuch as plaintiff presented no expert testimony on the question of whether the 30 acres of wetland on the Murphy Farm tract could have been sufficiently drained to successfully support row crops. Indeed, even plaintiff's father's 1961 Conservation Plan never proposed installing drainage tile on the Murphy Farm tract. P1 at 6. 8; Tr. 706.

the 94% diminution in value found to be more than "a token interest" that left the property "economically idle" in Palazzolo, 533 U.S. at 631. In Maritrans Inc. v. United States, 342 F.3d 1344 (Fed. Cir. 2003), the Federal Circuit affirmed the lower court's finding that a 13% decline in value, when balanced with the character of the government action, did not compel the finding of a taking even though the plaintiff there was found to have had reasonable expectations. 342 F.3d at 1358.

**4. Plaintiff's Own Evidence Established that the Murphy Farm Tract Retained Significant Value in Its "After" Condition.**

Plaintiff's own evidence also supported significant "after" value for the Murphy Farm tract. Plaintiff's appraiser, Mr. Lignelli, testified that the most profitable use for the Murphy Farm tract in the "after" – with the Consent Decree in place – would be to utilize the 28 non-wetland acres as a single homesite which would then overlook the wetland area. Tr. 396, 450, 465, 479. So utilized, the "after" value of the property would be $140,000. Tr. 474. When that value is compared to plaintiff's "before" value of $455,000, Tr. 380-81, the loss in value is approximately 70%.[11/] However, even a 70% loss is significantly less than the percentage diminution evidenced in those cases which have found a taking. Such a percentage is far less than the 91% reduction in value found not to be a categorical taking in Rith Energy, Inc., 270 F.3d at 1349, or the 94% diminution in value found to be more than "a token interest" that left the property "economically idle" in Palazzolo, 533 U.S. at 631.

---

[11] Of course, as we discuss infra, Mr. Lignelli's "before" value is based on his assumption that it was legally permissible and physically possible to develop the 58 acre Murphy Farm tract as a 125 unit subdivision. Tr. 386, 400, 414. Whether viewed as an assumption or a conclusion, Mr. Lignelli's opinions with respect to the property's "before" value are factually unsupported and legally erroneous. See discussion infra.

Further, although ignored by plaintiff's appraiser, the evidence at trial was clear that the upland areas of the Murphy Farm tract could clearly continue to be farmed, even in the "after" condition. Mr. Brace acknowledged that he had grown crops on the upland areas. Tr. 130. He described one upland area as being 11-12 acres and the second as being 6 acres. Tr. 158. The various crops that were grown in the larger upland area, see D9, and the years, was presented in P33. In addition, Mr. Silver observed evidence that a crop had been grown the previous year when he first inspected the Murphy Farm tract in the spring of 2004. Tr. 799. Given that plaintiff grew crops on the upland areas as recently as 2003, Tr. 181-82, 799, well after the entry of the Consent Decree, his protestations that he is "afraid," see e.g., Tr. 158, of further Clean Water Act enforcement actions after the entry of the Consent Decree are not credible.

Finally, the evidence was undisputed that there is a gas well located on the Murphy Farm tract. Tr. 182, 183.

**5. Plaintiff's Determination of Highest and Best Use Was Not Supported by Evidence That Such a Use was Legally Permissible.**

Here, plaintiff did not carry its burden of proof to establish that the use of the Murphy Farm tract for a residential development was physically possible, legally permissible, and financially feasible. Indeed, rather than making the required determination that it was reasonably probable that the proposed residential development was legally permissible, Mr. Lignelli instead improperly adopted a "hypothetical condition." Tr. 400-02. Although he acknowledged that the developer of his "conceptual subdivision" would need to comply with all ordinances and special requirements, Tr. 397-98, he mad no effort to determine whether it was reasonably probable that such requirements could be met. Instead, he assumed that all permissions necessary to develop the 125 unit subdivision would be granted, Tr. 456, noting that if not, his conclusion that the Murphy Farm tract was worth $455,000 in the "before" condition would be "null and void." Tr. 400.

One of the first steps in forming an opinion as to the fair market value of property is a determination of the property's highest and best use. Snowbank Enterprises, Inc., 6 Cl. Ct. at 484-85 (citing Olson v. United States, 292 U.S. 246, 256-57 (1934)). The concept of highest and best use refers to the most profitable and probable use of the land. McLennan v. United States, 24 Cl. Ct. 102, 109-10 (1991) (citing Yaist v. United States, 17 Cl. Ct. 246, 258 (1989)). A highest and best use must be physically possible, legally permissible and financially feasible in a way that maximizes the value of the property. Tr. 792; D12 at 34; see Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153, 156 (1990).

Thus, the highest and best use selected by the appraiser must be a use which is legally permissible, which means that it must take into account federal, state and local regulatory restrictions, including applicable zoning regulations. See City National Bank of Miami v. United

States, 33 Fed. Cl. 224, 22 (1995), and citations therein; cf. McLennan v. United States, 24 Cl. Ct. 102, 109 (1991). If anything about the selected highest and best use is not legally permissible, then the appraiser must analyze the likelihood of obtaining the necessary legal permit or permission:

> If the appraiser concludes a highest and best use that will require a rezoning of the property, the probability of that rezoning must be thoroughly investigated, analyzed and reported. Likewise, if the appraiser's highest and best use conclusions will require other forms of government approval, the probability of obtaining those approvals must be investigated, analyzed, and reported.

*Uniform Appraisal Standards for Federal Land Acquisitions*, Interagency Land Acquisition Conference, Appraisal Institute/USDOJ at 17 (2000). Before it can be considered by the appraiser as an element which contributes to the value of the property, the appraiser must find that it is reasonably probable that the necessary change in zoning or other land use restriction will be obtained. See United States v. Certain Land in Baltimore County, State of Md., 209 F. Supp. 50, 54 (D. Md. 1962) (citing Rapid Transit Co. v. United States, 295 F.2d 465 (10th Cir. 1961); Westchester County Park Commission v. United States, 143 F.2d 688, 693 (2d Cir. 1944), cert. denied, 323 U.S. 726 (1944); United States v. Delano Park Homes, 146 F.2d 473, 474 (2d Cir. 1944); United States v. 50.8 Acres of Land, 149 F. Supp. 749, 752 (E.D.N.Y. 1957), aff'd, 259 F.2d 41 (2nd Cir. 1958)).

Here, Mr. Lignelli simply ignored the appraisal requirement that he make his own assessment of whether the three tests for highest and best use had been satisfied.[12/] With respect to

---

[12] Mr. Lignelli's attempt to rely on Mr. Hofius were also improper. While an appraiser can rely on the work of other experts in determining certain matters foundational to an appraisal, the appraiser must establish that his reliance on the expert's work is reasonable. *Uniform Appraisal Standards for Federal Land Acquisitions*, Interagency Land Acquisition Conference, Appraisal Institute/USDOJ at 81 (2000). At a minimum, this requires that Mr. Lignelli establish Mr.

each of those tests, the appraiser is supposed to find that it is reasonably probable that the factor can be met. Instead, Mr. Lignelli adopted a "hypothetical condition," Tr. 400, which in a unique application of the concept of bootstrapping, resulted in Mr. Lignelli assuming that which he was supposed to determine in the first place.

Indeed, plaintiff's did not establish that the necessary legal permissions and regulatory approvals could be obtained that would allow the construction of the proposed subdivision on the Murphy Farm tract. With respect to zoning, plaintiff did not establish that it was likely that Waterford Township would grant a variance to permit them to construct houses at a greater density than the one dwelling per acre permitted by the Murphy Farm tract's A-2 zoning. Tr. 399, 417-18.

Further, while admitting that it was essential that South Hill Road be paved in order for the lots in the "conceptual subdivision" to be saleable, Mr. Lignelli obtained no information which even suggested that Waterford Township would pave South Hill Road for the convenience of plaintiff's subdivision. Nor were any costs to pave that road included in the discounted cash flow constructed to support Mr. Lignelli's $455,000 valuation.[13/] Tr. 425-26.

Plaintiff also did not establish that it was reasonably probable that permission to construct houses in the 100 year flood plain adjacent to Elk Creek could be obtained. Tr. 419-20. Indeed, evidence presented by defendant suggested to the contrary. Tr. 810. Almost 13 acres of the 58-acre Murphy Farm tract is within the 100 year flood plain. P31 at 1. Further, the location of the

Hofius' expertise to make the statements that Mr. Lignelli relied upon. See e.g., id. at 81, note 353. Plaintiff's made no such showing here.

[13] Mr. Lignelli's valuation is also speculative due to mathematical errors. Defendant's appraiser, George Silver, testified that Mr. Lignelli's calculations appeared to be in error, and that the correct sum of his present value calculations was $410,000, not $455,000. Tr. 826-27. Plaintiff's did not recall Mr. Lignelli in their rebuttal case to explain the discrepancy.

flood plain, which includes and is adjacent to Elk Creek, crosses the parcel in a manner which would make development difficult. See D23, Vol. I., at A-28. Despite the existence of this flood plain and the local restrictions on building in that flood plain, Mr. Lignelli's valuation was predicated on the construction of houses within that flood plain and, indeed, many lots encompassed Elk Creek itself. See P31 at pull-out map immediately preceding p. 26.

Plaintiff also presented no evidence that the soils on the Murphy Farm tract would support the residential subdivision which Mr. Lignelli found to be the highest and best use for the property. Tr. 427. Particularly with respect to the 30 acres of wetlands, containing hydric and muck soils, the nature of the soils would be a key inquiry, see Tr. 810, which neither plaintiff nor his appraiser ever addressed.

With respect to construction of a water system and a sewer system, Mr. Lignelli undertook no investigation of what the components of that system would have to be, or whether it was likely that the permits to construct and operate such systems could be obtained. Indeed, on this issue, both Mr. Brace and Mr. Lignelli resorted to assumptions. Mr. Lignelli testified that he assumed water and sewer systems could be constructed. Tr. 423. Mr. Brace testified that he assumed adequate well water was available, Tr. 138, 193, although no other evidence other than Mr. Brace's speculations were offered. With respect to the sewer system, Mr. Brace testified without any support whatsoever that the sewer system could be placed in a tributary to Elk Creek. Tr. 138.[14/]

---

[14] It is not clear what Mr. Brace meant by such a statement. No evidence was presented that regulatory approval to do so was likely to have been obtained. Of course, it is difficult to conceive of under what circumstances regulatory authorities would consent to the placement of a sewer system within a State-regulated waterway, or even within the 100 year flood plain. Cf. Tr. 815-17.

With respect to the physically possible factor of the test for highest and best use, the "conceptual subdivision," Tr. 414, proffered by Mr. Lignelli was not physically possible to execute within the Murphy Farm tract. The valuation offered by Mr. Lignelli was premised on the required sewer and water treatment facilities being constructed on adjacent property, not on the Murphy Farm tract. Tr. 424-25. Accordingly, the development plan upon which Mr. Lignelli's valuation was based is not physically possible within the tract which plaintiff claims has been taken and which Mr. Lignelli purported to value.

## VI. INTEREST ON ANY JUST COMPENSATION AWARD SHOULD BE CALCULATED AT THE RATE PROVIDED IN THE DECLARATION OF TAKING ACT.

The proper measure of just compensation for a Fifth Amendment taking is the fair market value of the property at the time of the taking. Kirby Forest Indus. v. United States, 467 U.S. 1, 10 (1984). However, as the Supreme Court directs, where a period of time has elapsed between the date of a taking and the date of payment of just compensation, "the owner is not limited to the value of the property at the time of the taking" but is entitled to "such addition as will produce the full equivalent of that value paid contemporaneously with the taking." Seaboard Air Line Ry. Co. v. United States, 261 U.S. 299, 304, 306 (1923). See also United States v. Reynolds, 397 U.S. 14, 16 (1970).

Compensation for the delay in payment is added to the fair market value to ensure that an owner, although receiving compensation subsequent to the date of taking, still gets the "full monetary equivalent" of the property's fair market value on the date of the taking. Reynolds, 397 U.S. at 16. Simply stated, a property owner receiving just compensation after the date of taking should be in the same financial position as he would have been had he received payment on the

date of taking – no better, and no worse. Id. See also United States v. New River Collieries Co., 262 U.S. 341, 343 (1923); Seaboard, 261 U.S. at 304; Century Wrecker Corp. v. E.R. Buske Mfg. Co., 913 F. Supp. 1256, 1278, 1282 (N.D. Iowa 1996) (citing, inter alia, General Motors Corp. v. Devex Corp., 461 U.S. 648, 655 (1983), and numerous Federal Circuit cases). The "guiding principle of just compensation" establishes that the owner of property that has been taken "must be made whole but is not entitled to more." United States v. 564.54 Acres of Land, 441 U.S. 506, 516 (1979) (quoting Olson v. United States, 292 U.S. 246, 255 (1934)).

The most common means of compensating for the delay in payment is through the payment of interest. However, an award of interest should not be used as a way of compensating a property owner for consequential damages – in other words, for all possible value that it may have derived from its property if the taking had not occurred. See Seaboard, 261 U.S. at 304. It is well established that consequential damages are not part of an award of just compensation. See Omnia Commercial Co. v. United States, 261 U.S. 502, 510 (1923). Thus, interest is not intended to be a method to compensate for the loss of elements not related to fair market value, such as investment opportunities. As the Supreme Court repeatedly has stated, "the Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee him a return of his investment." Mitchell v. United States, 267 U.S. 341, 344-45 (1925).

Plaintiff contends that interest should be awarded at the "operating loan rate", which plaintiff describes as the rate at which farmers borrow money to operate their farms. Pl. Pre-Trial Br. at 31-32. This is because, reasons plaintiff, had Mr. Brace been paid the just compensation on the date of the take, "the money would have been used to decrease his operating costs for his farm." Id. at 32.

Plaintiff provides no specifics on what the interest rate is, or how the interest rate is calculated. Id. Presumably, however, the rate at which Mr. Brace can borrow for his operations is, among other things, directly related to his credit-worthiness. Thus, under the measure being proposed, a plaintiff who is a good credit risk would receive less just compensation than one who was a bad credit risk. Since there is no support in the caselaw for varying an award of just compensation based on the credit rating of the individual plaintiff, plaintiff's proposed operating loan rate should be rejected.

The Court of Federal Claims has most often applied one of several statutorily-created interest rates, with the Declaration of Taking Act, 40 U.S.C. § 258e-1, being the most commonly used. This rate was established by Congress to be an interest rate which provides an appropriate measure of just compensation. The Declaration of Taking Act, 40 U.S.C. §§ 258a, et seq., specifically includes a provision for the award of interest in condemnation actions. 40 U.S.C. § 258e-1, titled "Interest as part of just compensation," provides:

> (1) Where the period for which interest is owed does not exceed one year, interest shall be calculated for such period from the date of taking at an annual rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of 52 week United States Treasury bills settled immediately before the date of taking.
>
> (2) Where the period for which interest is owed is more than one year, interest for the first year shall be calculated in accordance with paragraph (1) and interest for each additional year shall be calculated on the combined amount of the principal (the amount by which the award of compensation exceeds the deposit referred to in the first section of this Act) and accrued interest at an annual rate equal the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of 52 week United States Treasury bills settled immediately before the beginning of each

> additional year.[15]
>
> The Director of the Administrative Office of the United States Courts shall distribute to all Federal Courts notice of the rates described in paragraphs (1) and (2).

40 U.S.C. § 258e-1 (2000) (emphasis added).

Several factors point to the appropriateness of applying the Declaration of Taking Act interest rate for prejudgment interest. First, and most obviously, this rate was specifically created to be applied in condemnation actions. While direct condemnations have certain procedural differences from inverse condemnations, the compensation calculus is identical. Hurley v. Kincaid, 285 U.S. 95, 103 (1932); Leonard v. Commissioner, 94 F.3d 523, 526 (9th Cir. 1996) ("eminent domain and inverse condemnation are two sides of the same coin"). See Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983); Flowers Mill Assocs. v. United States, 23 Cl. Ct. 182, 188 (1991); Schultz v. United States, 5 Cl. Ct. 412, 415 (1984). See also City of Oakland v. Oakland Raiders, 646 P.2d 835, 840 (Cal. 1982) ("condemnation and inverse condemnation . . . are merely different manifestations of the same governmental power, with correlative duties imposed upon public entities by the same constitutional provisions"); Marshall v. Department of Water & Power, 219 Cal. App. 3d 1124, 1138 (1990) ("An action for inverse condemnation 'is an eminent domain proceeding initiated by the property owner rather than the condemnor. The principles which affect the parties' rights in an inverse condemnation

---

[15] Under an amendment to the Declaration of Takings Act, which was enacted on December 21, 2000, the interest rate is now based upon "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar year preceding." Pub. L. 106-554, sec. 307, 114 Stat. 2763 (Dec. 21, 2000). Defendant has found no indication that this amendment is intended to be applied retrospectively. Accordingly, Defendant submits that this change in the Declaration of Takings Act interest rate should be applied in this case only to calculate interest after December 21, 2000.

suit are the same as those in an eminent domain action.'") (citations omitted).

This correlation was recognized by the Court of Federal Claims in a regulatory takings case, NRG Co. v. United States, 31 Fed. Cl. 659 (1994). In NRG, the Court defended the use of the Declaration of Taking Act 52-week Treasury bill ("T-Bill") rate in inverse condemnation proceedings:

> This court has a constitutional duty to award just compensation. The issue before the court is how best to calculate that compensation. Congress has considered this issue in an analogous context and the court, when determining how to meet its own obligations, certainly cannot be barred from considering and applying the lessons that Congress has learned from its own study of the just compensation issue.

Id. at 669. NRG and its predecessors make clear that there is a direct analogy between interest awarded in a direct condemnation action for just compensation and interest awarded in an inverse condemnation action for just compensation.

Second, as indicated in the statute, the T-Bill rates are regularly distributed to the federal courts. This provides the Court a level of ease and reliability which other rates do not provide. Moreover, T-Bill rates are routinely published in the press and are readily accessible to the public. United States v. Griffin, 782 F.2d 1393, 1395 (7th Cir. 1986). Third, courts have recognized the T-Bill rate as an appropriate tool for establishing a reasonable rate of return on an investment. See, e.g., Liriano v. Hobart Corp., 960 F. Supp. 43, 46 (S.D.N.Y. 1997) ("[Defendant's expert] correctly observed that the yields on current Treasury bills represented the market's determination of a reasonable rate of return on investment based on all information available--including historical data."); Datascope Corp. v. SMEC, Inc., 879 F.2d 820, 829 (Fed. Cir. 1989) (T-Bill rate "adequately compensate[s]" plaintiff), cert. denied, 493 U.S. 1024 (1990). Fourth, the Declaration of Taking Act provides a simple formula for calculating its rate: the average of the 52-week T-Bill

rate for the period prior to December 21, 2000, and the weekly average 1-year constant maturity Treasury yield for the period after December 21, 2000.

For these reasons, defendant submits that the interest component of plaintiff's award of just compensation should be determined in accordance with the Declaration of Takings Act.

## CONCLUSION

For the reasons set for above, plaintiff's claim for physical taking should be denied. Furthermore, the court should also deny plaintiff's claim for a categorical taking of his property pursuant to Lucas. Finally, plaintiff has failed to establish a regulatory taking under the Penn Central analysis.

Dated: April 21, 2005.

Respectfully submitted,

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources Division

s/ Susan V. Cook by s/ Sydney F. Cook
SUSAN V. COOK (FLORENTINE), Sr Atty
SYDNEY F. COOK, Trial Attorney
Natural Resources Section
Environment & Natural Resource Division
United States Department of Justice
Post Office Box 663
Washington, D.C. 20044-0663
202-305-0470; FAX: 202-514-8164
Email: susan.cook@usdoj.gov

Attorneys for Defendant

297062.4