**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 98-897 L |
| THE UNITED STATES, | ) | Hon. Francis M. Allegra |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPENING POST-TRIAL MEMORANDUM**

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources Division

SUSAN V. COOK (FLORENTINE), Sr. Atty
SYDNEY F. COOK, Trial Attorney
Natural Resources Section
Environment & Natural Resource Division
United States Department of Justice
Post Office Box 663
Washington, D.C. 20044-0663
202-305-0470; FAX: 202-514-8164
Email: susan.cook@usdoj.gov

Attorneys for Defendant

May 19, 2005.

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . 7

I. PLAINTIFF'S SUIT FOR A TAKING BASED ON THE APPLICATION OF CLEAN WATER ACT RESTRICTIONS TO THIS PROPERTY IS NOT TIMELY . . . . . . . . . . 7

II. PLAINTIFF HAS NOT ESTABLISHED A PHYSICAL TAKING . . . . . . . . . . 8

A. The Consent Decree Regulates the Use of the Property; It Does Not Constitute A Physical Occupation . . . . . . . . . . 8

B. Lewis Steckler's Entry to Observe Plaintiff's Compliance with the Restoration Plan And the government's reservation of a right to oversee the property Does Not Rise to the Level of a Physical Taking . . . . . . . . . . 10

III. THE RELEVANT PARCEL IS THE 134 CONTIGUOUS ACRES CONVEYED BY A SINGLE DEED AND USED AS PART OF A COMMON PLAN . . . . . . . . . . 11

IV. PLAINTIFF CANNOT ESTABLISH A CATEGORICAL TAKING . . . . . . . . . . 12

A. Compared Against the 134 Acre Relevant Parcel, Plaintiff Cannot Establish a Categorical Taking . . . . . . . . . . 12

B. Even If The Relevant Parcel is Considered To Be Only The Murphy Farm Tract, There Has Been No Categorical Taking Because Significant Economic Viability Remains . . . . . . . . . . 12

V. PLAINTIFF CANNOT ESTABLISH A *PENN CENTRAL* REGULATORY TAKING . . . . . . . . . . 13

A. Plaintiff Cannot Establish That He Possessed Reasoned Expectations That He Could Drain the Murphy Farm Tract Without Complying with Clean Water Act . . . . . . . . . . 13

B. The Character Of The Government Action Weighs

In Favor Of The United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C. Plaintiff Has Not Established That the Economic Impact of the Regulatory Restriction Compels the Finding of a Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

1. Plaintiff's Appraiser's Determination that the Highest and Best Use of the 58 Acre Murphy Farm Tract as a Residential Subdivision was Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. Plaintiff's Appraiser's "Before" Value Overstates the Value of the Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3. Plaintiff's Appraiser Mr. Lignelli "After" Valuation is Also in Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

4. Mr. Silver Properly Determined the Highest and Best Use of the 58 Acre Murphy Farm Tract was Agricultural . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5. The Murphy Farm Tract Retains Significant Value in the "After" Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

6. Plaintiff Did Not Establish a Taking of Any Part of the Homestead Farm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### CASES

Appolo Fuels Inc. v. United States,
381 F.3d 1338 (Fed. Cir. 2004) . . . . . . . . . . 14

Bass Enterprises Prod. Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 16, 17

Boise Cascade v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 9, 10, 11

Catawba Indian Tribe v. United States,
982 F.2d 1564 (Fed. Cir. 1993) . . . . . . . . . . 14

Dufau v. United States,
22 Cl. Ct. 156 (1990) . . . . . . . . . . 14

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir.), cert. denied, 528 U.S. 951 (1999) . . . . . . . . . . 11

Hendler v. United States,
175 F.3d 1374 (Fed. Cir. 1999) . . . . . . . . . . 11

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . . . . . . 12

Maritrans Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . 17

Natural Resources Defense Council v. Callaway,
392 F. Supp. 685 (D. D. C. 1975) . . . . . . . . . . 14

Palazzolo v. Rhode Island,
533 U.S. 606 (2001) . . . . . . . . . . 13

Penn Central Transp. Co. v. City of New York,
438 U.S. 104 (1978) . . . . . . . . . . passim

Rose Acre Farms, Inc. v. United States,
373 F.3d 1177 (Fed. Cir. 2004) . . . . . . . . . . 19

Ridge Line v. United States,

346 F.3d 1359 (Fed. Cir. 2003) . . . . . . . . . . 9

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984) . . . . . . . . . . 14

Sun Enterprises, Ltd. v. Train,
394 F. Supp. 211 (S.D.N.Y. 1975) . . . . . . . . . . 14

Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . passim

United States v. Ashland Oil & Transp. Co.,
364 F. Supp. 349 (W.D.Ky. 1973), aff'd, 504 F.2d 1317 (6th Cir. 1974) . . . . . . . . . . 14

United States v. Brace,
41 F.3d 117 (3rd Cir. 1994) . . . . . . . . . . passim

**STATUTES**

16 U.S.C. § 3822(e)(2)(G)(iii)(4) . . . . . . . . . . 6

Food Security Act of 1985,
16 U.S.C. § 3801 . . . . . . . . . . 6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 98-897 L |
| | ) | |
| THE UNITED STATES, | ) | Hon. Francis M. Allegra |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S OPENING POST-TRIAL MEMORANDUM**

## INTRODUCTION

Plaintiff Robert Brace is a farmer who owns in varying capacities approximately 600 acres of real property in Waterford Township, Erie County, Pennsylvania. He alleges that the entry of a Consent Decree, which, consistent with the requirements of the Clean Water Act, prohibited the dredging and filling of a 30 acre wetland site without a permit, has taken the wetland area and the larger tract on which it is located, known as the Murphy Farm tract. Both the Murphy Farm tract and another tract known as the Homestead Farm tract, were acquired by plaintiff on December 30, 1975, in a single deed.

In 1985-87, plaintiff began dredge and fill operations in the 30 acres of wetlands without a Section 404 permit, in violation of the Clean Water Act ("the Act" or "CWA"). Plaintiff was ordered by the Environmental Protection Agency ("EPA") and the U.S. Army Corps of Engineers ("Corps") to cease maintenance and operation of the drainage system on the 30 acres of wetlands and to restore the wetlands to their prior condition.

In 1990, after negotiations between the government and Mr. Brace failed to resolve the issue, the United States filed an enforcement action against plaintiff. The United States Court of

Appeals for the Third Circuit ultimately found that Mr. Brace violated the Clean Water Act when he drained the 30 acre wetland, and remanded the case to the district court to enter judgment in favor of the United States to determine the appropriate remedy. The parties then entered into a Consent Decree, which permanently enjoined the plaintiff from further violations of the Clean Water Act and ordered restoration of the affected 30 wetland acres. Plaintiff complied with the Consent Decree and then filed this lawsuit.

As a threshold matter, plaintiff's taking claim based on the imposition of the Consent Decree and its requirements should be rejected as untimely. Plaintiff's claim accrued six years prior to the filing of the Complaint. In the alternative, plaintiff has not established that the Consent Decree itself, as opposed to the Clean water Act, is the legal cause of the taking and has therefore failed to prove the requisite causation.

Alternatively, plaintiff's claim of a physical taking based on the Consent Decree is without merit. The nature of the governmental action at issue here clearly involves a restriction on <u>use</u>, not a physical occupation. Further, to the extent government agents entered the property to oversee the restoration, this presence was both consensual and of a transitory nature that does not, under relevant caselaw, rise to the level of a physical taking.

Plaintiff also asserts a claim for a categorical regulatory taking of his property. To the contrary, the 30 acres of regulated wetlands remain available for their historical use as pasture. Furthermore, the non-wetland acreage of the Murphy Farm tract, which is not affected by the Consent Decree, has been and may continued to be used for farming. Indeed, the evidence was undisputed that the upland areas of the Murphy Farm tract have been farmed as recently as 2003. Were the areas not being farmed, plaintiff's appraiser testified that the property had significant post-Decree economic value as a single homesite. Finally, a gas well on the tract also continues

to provide economic value. Regardless of the size of the relevant parcel, which plaintiff claims is only the Murphy tract and which defendant asserts also includes the Homestead Farm tract, the existence of these other economic uses prevents plaintiff from being able to successfully assert a categorical takings claim.

Plaintiff also cannot establish a regulatory taking of the restricted 30 acres under a Penn Central analysis. Because he purchased the property after the enactment of the Clean Water Act in 1972, plaintiff cannot establish that he possesses a reasonable investment-backed expectation in being able to drain his wetland acreage. Furthermore, the estoppel-like arguments advanced by plaintiff are factually incorrect and legally irrelevant. Mr. Brace has never been provided either technical or financial assistance for the purpose of draining the Murphy Farm tract. More importantly, the relevant time period for determining whether plaintiff's investment-backed expectations were reasonable is when plaintiff acquired the property, not at some later point in time.

Furthermore, pursuant to recent Federal Circuit precedent, the nature of the government action weighs in favor of the government when, as here, the regulation serves an important public purpose, such as protecting wetlands.

Finally, plaintiff's claim of a taking also fails because the application of the Consent Decree to this property did not result in sufficient economic impact to establish a taking. For the same factual reasons that doom plaintiff's categorical takings claim, plaintiff's claim of the denial of all meaningful economic use must be rejected.

## FACTUAL BACKGROUND

Robert Brace and his wife are the owners of a number of tracts of land totaling approximately 600 acres located in Erie County, Pennsylvania. United States v. Brace, 41 F.3d

117, 120 (3rd Cir. 1994). Among these 600 acres is an approximately 134 acre parcel of land which Robert Brace purchased from his parents, Charles and Mary Brace, in December 1975.[1] D11(A); hereinafter, the "Deeded Property." The Deeded Property lies along Greenley Road, and is bisected into northern and southern tracts by South Hill Road. The portion of the Deeded Property located to the north of South Hill Road, approximately 69 acres, has been referred to as the "Homestead Farm tract." The portion of the Deeded Property located to the south of South Hill Road, which includes a thirty-acre wetland area specifically at issue in this litigation, has been referred to as the "Murphy Farm tract," and is comprised of approximately 65 acres. See P1 at 7.

In 1961, the Soil Conservation Service ("SCS"), part of the U.S. Department of Agriculture, developed a "Soil and Water Conservation Plan" for plaintiff's father, Charles Brace. P1; Trial Transcript [hereinafter "Tr."] 704-06. This plan covered the entire farm, and identified which crops were appropriate for particular fields within the farm as well as which fields could be improved by the installation of drainage. P1 at 6, 8. At no time did any government representative ever provide plaintiff with any technical or financial assistance for the purpose of draining any portion of the Murphy Farm tract. Tr. 706. Indeed, plaintiff's own witness, Mr. Joseph Burawa, agreed that the Conservation Plan developed for Mr. Brace's father and used by Mr. Brace did not include any plan to drain the Murphy Farm tract. Tr. 85,

---

[1] It was not until the pre-trial briefing that plaintiff first asserted he had a "hand-shake" deal to purchase the property in the spring of 1975. At no point during Mr. Brace's testimony at the enforcement trial, nor during any of his declarations, nor in any brief filed in this litigation was the date of purchase alleged to be anything other than the date of the deed, December 1975. See Tr. at 142 -144. Plaintiff has offered no other proof that the property was purchased in the spring of 1975 except plaintiff's inconsistent and unsupported testimony at trial. Compare Pl.'s Pre-trial Brief at 5 ("Brace contracted to purchase the subject property in the spring of 1975") with Tr. 142, 146 (at trial the "contract" became a handshake deal).

87-89.[2]

Between 1985 and 1987, Brace, without obtaining a Clean Water Act permit, discharged dredged and fill material onto a 30 acre wetland site on the Murphy Farm tract. United States v. Brace, 41 F.3d 117, 121 (3d Cir. 1994). In 1987, the United States became aware of plaintiff's activities, and in 1987 and 1988 issued three administrative orders[3] directing plaintiff to cease

---

[2] Plaintiff mischaracterizes the evidence when he states that ASCS "provided technical assistance in mapping out a drainage system entailing portions of both the Homestead and Murphy Farms." See Plaintiff's Opening Post-trial Brief. at 7 [hereinafter Pl's Br.]. First, the ASCS only provides financial assistance; it does not provide technical assistance. See e.g., Tr. 12, 65. More importantly, plaintiff's statement is not consistent with the testimony proffered at trial:"[t]he drainage system is 99 percent located in the Homestead tract.. . . there is an outlet pipe that goes underneath South Hill Road. . . . This is for the purposes of outletting the drainage system." Tr. 708-709; see also Tr. 710 (explaining difference between outlets versus a drainage system).

The technical assistance Mr. Brace received on April 13, 1978 and March 20, 1979, and which plaintiff refers to in his Opening Post-trial Brief, was not for the purposes of draining the Murphy Farm. Tr. 711-712.

In addition, the funding Mr. Brace received under the Emergency Conservation Program following a severe thunderstorm in 1984, (Tr. 712-15), was limited to "restoring existing structures or cleaning off cropland . . . ." Tr. 714. This financial assistance did not involve the construction of new drainage systems, but only the maintenance of already existed systems. Indeed, the evidence does not indicate that the assistance provided to Mr. Brace under the Emergency Conservation Program was even for the Murphy Farm tract. Tr. 714-15.

Moreover, Mr. Burawa's testimony that it was his understanding that the Clean Water Act did not impose any restrictions on the assistance that his agency provided farmers is not legally relevant. Tr. 76. USDA does not have jurisdiction over the Clean Water Act. Second, Mr. Burawa is not qualified to testify to legal opinions. Indeed, Mr. Steckler testified in reference to SCS recommendations for draining wetlands, "Normally we would recommend leaving that alone practically 100 percent of the time. . . [if] it would be classified as wetlands, . . . we would have to inform the landowner that permits would be needed to do any type of drainage work." Tr. 738.

Plaintiff also concludes, without any support, that the "the flow of water across the Murphy Farm is an integral part of the Soil Conservation Service's plan because the Murphy Farm acts as the funnel through which the Homestead Farm drains." See Pl.'s Br. at 4. It appears that neither P1 nor P18, which plaintiff cites, addresses this point.

[3] During the summer 1988, after receiving the Cease and Desist Orders, plaintiff contacted the Agricultural Stabilization and Conservation Service ("ASCS") and requested that his property be granted the status of "commenced conversion from wetlands" prior to December 23, 1985. P15; Brace, 41 F.3d at 121. Eventually, the ASCS granted "commenced conversion" status as to

maintenance and operation of the drainage system on the property and to restore a 30 acre portion of the property to its prior wetland condition.[4] P9, P13, P16.

In 1990, the United States filed a Clean Water Act Section 404 enforcement action against plaintiff in the U.S. District Court for the Western District of Pennsylvania. Brace, 41 F.3d at 119, 121. In 1993, the district court entered judgment in favor of Brace, finding that plaintiff's activities were exempt from the permitting requirements of Section 404 because they were normal farming activities. Id. at 120, 122.

On appeal, the United States Court of Appeals for the Third Circuit reversed the district court, holding that the court incorrectly applied the farming exemption provision.[5] Id. at 129 ("Brace's drainage activities on the thirty-acre wetland site are not exempt from the CWA permit

---

a number of plaintiff's fields, including fields on the Homestead Farm tract, but not including any fields involving the wetland areas of the Murphy Farm tract. P15.

[4] Plaintiff again mischarertizes the facts when he states: "The impact of this debate on wetlands delineation is evident in the varying acreages alleged throughout the enforcement action underlying this case. See Pl.'s Br. at 16. There was no variance and there was no important debate. Rather, the Fish and Wildlife Service, in a letter dated June 16, 1987, expressly stated that 200 acres could be affected by Mr. Brace's unauthorized activities, nowhere does the government state that the 200 acres it is referring to are owned by plaintiff. See P6. The government's decision to prosecute Mr. Brace for Section 404 violations on the 30 acre site was a litigation decision. There was no debate over wetland delineation.

Plaintiff also mischaracterizes the law and facts when he states that: "The tension between agencies regarding wetlands, in this example between the Department of Agriculture and the EPA, is demonstrated by the fact that, 'In the summer of 1988, Brace approached the ASCS in order to gain the status of commenced conversion from wetlands. . . ." Pl.'s Br. at 18 (internal quotations omitted). The determination that a wetland has commenced conversion, pursuant to the Food Security Act of 1985, 16 U.S.C. § 3801 et seq, does not negate the need to obtain a permit under the 1972 Clean Water Act. Cf. 16 U.S.C. § 3822(e)(2)(G)(iii)(4). Obtaining a determination that the conversion of wetlands had begun prior to December 23, 1985, merely maintained a farmer's eligibility to apply for USDA benefits for his agricultural commodity.

[5] Plaintiff spends considerable time in his facts section discussing "normal farming activities." However, as the Third Circuit found, as a matter of law, this exemption does not apply to Mr. Brace's wetland activities, and thus, has no legal or factual relevance.

requirement under the "normal farming activities" or maintenance of drainage ditches exemptions. . . ."). The case was remanded to the district court "to enter judgment in favor of the United States and to assess upon further proceedings appropriate penalties for [Brace's] violations of the permit requirements. . . ." Id. at 130. The parties entered into a Consent Decree, which called for the payment of a fine and the restoration of the affected 30 acre wetland. P22 at ¶¶ 3, 4. Plaintiff complied with the Consent Decree and this lawsuit followed.

Trial in this matter was held January 11-14, 2005.

## ARGUMENT

### I. PLAINTIFF'S SUIT FOR A TAKING BASED ON THE APPLICATION OF CLEAN WATER ACT RESTRICTIONS TO HIS PROPERTY IS NOT TIMELY.

As a threshold matter, plaintiff's taking claim based on the imposition of the Consent Decree and its requirements should be rejected as untimely.

Because plaintiff's complaint was not filed until November 25, 1998, plaintiff has to establish that his cause of action accrued no earlier than November 25, 1992. Plaintiff alleges that his taking claim is based on the imposition of the Consent Decree. However, plaintiff's violation of the Clean Water Act was the source for the issuance of the Consent Decree, and the Consent Decree imposed no new requirements over and above the Clean Water Act. More significantly, the essential Clean Water Act restriction that was imposed here – that plaintiff cannot dredge and fill jurisdictional wetlands without a permit, was imposed on the Murphy Farm tract in 1987 when the first administrative order was issued. P9. Accordingly, plaintiff's cause of action accrued in 1987 when the first administrative order was issued. P9. Thus, plaintiff's cause of action for a taking of his property based on the application of the requirements of the Clean Water Act accrued no later than 1990, more than six years prior to the filing of the complaint. Accordingly, plaintiff's taking claim should be rejected as untimely.

## II. PLAINTIFF HAS NOT ESTABLISHED A PHYSICAL TAKING.

Plaintiff's physical taking claim based on the imposition of the Cease and Desist Order, including the reservation of a limited right of entry by the government, and the government's non-exclusive, consensual entry onto plaintiff's land, should be rejected. As a matter of law, the Consent Decree is, at best, a restriction on use, not a physical occupation. Further, the physical entry made by Mr. Steckler, a government agent, to monitor the restoration was non-exclusive, consensual, and transitory. Accordingly, it cannot form the basis for a physical taking.

### A. The Consent Decree Regulates the Use of the Property; It Does Not Constitute A Physical Occupation.

The Consent Decree and its requirement that plaintiff restore the 30 acres of wetlands is a restriction on the use of property, not a physical occupation. The Court in Tahoe-Sierra Preservation Council v. Tahoe Regional Planning Agency, 535 U.S. 302 (2002), described a physical occupation as something that can be "easily identified," as, for example, "when a leasehold is taken and the government occupies the property . . . when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants . . . or when its planes use private airspace to approach a government airport." Id. at 322. By contrast, a regulatory restriction is at issue when "a government regulation . . . merely prohibits landlords from evicting tenants unwilling to pay a higher rent . . . bans certain private uses of a portion of an owner's property . . . or that forbids the private use of certain airspace." Id. at 322-23. Thus, the mere fact that a regulatory restriction might have an observable physical impact on the property does not automatically convert it to a physical taking.

The Federal Circuit has also noted the distinction between physical and regulatory takings when it evaluated the effect of an injunction prohibiting logging without a permit, which the Circuit found

> merely prevented [plaintiff] from logging its land without a permit, which--as a regulation imposed upon [plaintiff's] use of the property--is a restriction on private use of the land and not a per se taking by the government.

Boise Cascade v. United States, 296 F.3d 1339, 1354 (Fed. Cir. 2002).

Under this guidance, the government action at issue here plainly involves a restriction on the use of property, not a physical occupation of property. Neither the government nor any authorized third party has physically occupied plaintiff's property. Nor has the government physically prevented plaintiff from occupying the property. Application of the precedents in Tahoe and Boise Cascade compel the conclusion that the plaintiff's per se physical occupation theory has no application in this case.[6][7]

**B. Lewis Steckler's Entry to Observe Plaintiff's Compliance with the**

---

[6] Plaintiff for the first time argues that the restoration plan resulted in the taking of a flowage easement because it "created a lake on the Murphy Farm where one had never existed." Pl.'s Br. at 26. Plaintiff's attempt to recharacterize its claim is not supported by the law or facts. First, Ridge Line v. United States, 346 F.3d 1359 (Fed. Cir. 2003), upon which plaintiff principally relies, is factually distinguishable and legally unpersuasive.

Most importantly, plaintiff's newly characterized claim of a flowage easement should be rejected because plaintiff did not offer any supportive scientific evidence. Creative brief writing after trial cannot substitute for scientific evidence establishing the necessary causation element. To the extent plaintiff is basing this argument on Mr. Brace's anecdotal observations, such is not sufficient to discharge plaintiff's burden of proof in a matter that is customarily the subject of expert testimony.

Finally, to the extent plaintiff is basing his argument on observations made during the site visit, such do not constitute evidence. As the government noted during the visit, testimony by the attorney was not appropriate. Moreover, the government disagrees with plaintiff's characterization of what the Court observed. Nonetheless, wetness on the property following the spring thaw is hardly representative of permanent, year round conditions.

[7] Plaintiff also raises for the first time in his Opening Post-trial Brief a claim for a taking of a conservation easement based on the requirement that the Consent Decree be recorded. However, the Consent Decree does no more than restrict uses already prohibited by the Clean Water Act, and thus, cannot be the source of a physical taking claim. Defendant's testimony established that the restrictions imposed upon the Murphy Farm tract by the Consent Decree were co-extensive with those imposed by the Clean Water Act. Tr. 619, 871-72. Interestingly, plaintiff admits that a taking of a conservation easement is a "restriction. . . on the use which may be made of real property. . . ." Pl's Br. at 32 (emphasis added).

**Restoration Plan And the Government's Reservation of a Right to Oversee the Property Does Not Rise to the Level of a Physical Taking.**

Plaintiff has recharacterized his physical taking claim based on the brief visits by a government agent, raised for the first time in his Pre-trial Brief, as a claim for a taking of an access easement. Regardless, the claim fails because of a lack of legal and factual support. Specifically, plaintiff asserts a claim for a taking of an access easement based on the government's reservation of a right of access to the property for a period of 18 months to verify restoration and Mr. Steckler's visit to observe the restoration of the wetland area. Pl.'s Br. at 27-28. To the contrary, neither of these actions are sufficient to establish a physical occupation by the government.

In Boise Cascade v. United States, 296 F.3d 1339 (Fed. Cir. 2002), the Federal Circuit addressed a similar issue. There, the plaintiff's claim that the government's entry on to the property to conduct owl surveys constituted a physical taking was rejected. Id. at 1357. The Circuit noted that it "is incorrect to suppose that Hendler compels us to turn a transient invasion by owl surveyors into a per se taking under Loretto." Id.

Here, any physical intrusions by the government were insufficient to establish a taking. Mr. Steckler's visits to the property were at plaintiff's request. Furthermore, the reservation of a right by the government to access the property for a period of 18 months was mandated by a court order for the limited purpose of verifying that plaintiff had restored the property's wetland and did not constitute a physical taking. P22 at ¶ 9. Other than the December 1996 visits by Mr. Steckler, plaintiff presented no evidence that the right of entry under the Consent Decree was ever exercised. Here, as in Hendler, what matters is not what the government reserved the right to do, but what the government actually did. Hendler v. United States, 175 F.3d 1374, 1379 (Fed. Cir. 1999).

## III. THE RELEVANT PARCEL IS THE 134 CONTIGUOUS ACRES CONVEYED BY A SINGLE DEED AND USED AS PART OF A COMMON PLAN.

In evaluating whether a taking has occurred, it is necessary to first define the relevant parcel against which the impact of the government action will be measured. Forest Properties, Inc. v. United States, 177 F.3d 1360, 1365 (Fed. Cir.), cert. denied, 528 U.S. 951 (1999) ("This relevant parcel inquiry is critical because 'our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property.'") (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)). Such an analysis requires an examination of the 'parcel as a whole' because

> [t]aking jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated.

Tahoe-Sierra, 535 U.S. at 327(quoting Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 130-31 (1978)).

Here, plaintiff's "parcel as a whole" properly encompasses, at a minimum, the 134-acre "Deeded Property" purchased by Mr. Brace on December 30, 1975. See D11(A). It is undisputed that both the Homestead Farm tract and the Murphy Farm tract were acquired at the same time and are contiguous (except for South Hill Road which divides the tracts). D34; Tr. 116-117; see also Brace, 48 Fed. Cl. at 274. In addition, the evidence is clear that Mr. Brace purchased these tracts for the purpose of continuing and expanding a farm operation. See Brace, 41 F.3d at 120.

## IV. PLAINTIFF CANNOT ESTABLISH A CATEGORICAL TAKING.

Plaintiff argues that the entry of the Consent Decree caused a categorical taking because it has denied him all economically viable use of the Murphy Farm tract. Pl.'s Br. at 33. The

Court, however, should reject plaintiff's categorical taking claim because plaintiff has too narrowly defined the relevant parcel. However, even if the Court were to evaluate plaintiff's claim solely with respect to the Murphy Farm tract, plaintiff cannot establish that there has been a "complete elimination of value." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 n.8 (1992).

**A. Compared Against the 134 Acre Relevant Parcel, Plaintiff Cannot Establish a Categorical Taking.**

Even after the regulatory restriction on dredging and filling the 30 acres of wetlands was imposed, plaintiff still retained significant economic viability in the gas well, the upland portions of the Murphy Farm tract and the Homestead Farm tract. Given the economic value remaining in the relevant parcel, plaintiff's claim for a categorical taking under Lucas must be rejected.

**B. Even If The Relevant Parcel is Considered To Be Only The Murphy Farm Tract, There Has Been No Categorical Taking Because Significant Economic Viability Remains.**

Even were the Court to find that the relevant parcel is comprised of only the Murphy Farm tract, the existence of remaining viable economic uses precludes the finding of a categorical taking. The Consent Decree, upon which plaintiff bases his claim of a taking, only affects 30 acres of the Murphy Farm tract. P22 at ¶ 3. Even assuming the 30 wetland acres have no other economic use, a matter which defendant does not concede, the remaining acreage on the Murphy Farm tract has significant economic uses.

First, plaintiff's own evidence established significant "after" value for the Murphy Farm tract. Plaintiff's appraiser, Mr. Lignelli, testified that the most profitable use for the Murphy Farm tract in the "after" – with the Consent Decree in place – would be to use the 28 non-wetland acres as a single homesite which would then overlook the wetland area. Tr. 396, 450, 465, 470, 479. Based on Mr. Lignelli's testimony, the "after" value of the property would be

$140,000. Tr. 474.

In addition, the upland areas of the Murphy Farm tract can continue to be farmed without violating either the Consnet Decree or the Clean Water Act even with the Consent Decree in place. Mr. Brace acknowledged that he has grown crops on the upland areas. Tr. 130-31, 356-57, P33, D34. Indeed, defendant's appraiser, George Silver, observed evidence that a crop had recently been grown in the larger upland area when he first inspected the Murphy Farm tract in the spring of 2004, Tr. 799. While plaintiff raises for the first time in his Opening Post-trial Brief that the 30 acres are "economically idle" because of area is "inundated with water," Pl.'s Br. at 34, this argument is not relevant to whether crops can be grown on the uplands.[8] See e.g., Tr. 730.

There is also a producing gas well located on the Murphy Farm tract. Tr. 183, 184, 421-422. Leased by plaintiff's predecessor in interest, the well provides a monthly royalty income. Tr. 140, 84. While the monthly income is not large, it is sufficient to forestall the finding of a categorical taking. See e.g., Palazzolo v. Rhode Island, 533 U.S. 606, 631-32 (2001) (finding that plaintiff "failed to establish a deprivation of all economic value, for it is undisputed that the parcel retains significant worth for construction of a residence.").

## V. PLAINTIFF CANNOT ESTABLISH A *PENN CENTRAL* REGULATORY TAKING.

### A. Plaintiff Cannot Establish That He Possessed Reasonable Expectations That He Could Drain the Murphy Farm Tract Without Complying with the Clean Water Act.

An investment-backed expectation "must be more than a 'unilateral expectation or an abstract need," and "it must be reasonable". Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005-

[8] Interestingly, Mr. Brace testified that he remembers that as a child, the Murphy Farm tract was wet. Tr. 178.

06 (1984). The Clean Water Act was enacted in 1972, more than three years prior to plaintiff's acquisition of the Murphy Farm and Homestead Farm tracts. Title to the property transferred in December 1975 and at that time the Corps' regulations included plaintiff's 30 acres of adjacent wetlands within its regulatory coverage. More importantly, however, it was the passage of the Clean Water Act, and not the later promulgation of regulations, which, as a matter of law, served to inform plaintiff's reasonable investment-backed expectations. See Catawba Indian Tribe v. United States, 982 F.2d 1564, 1570 (Fed. Cir. 1993) (emphasis added) (citing Chevron U.S.A. Inc. v. United States, 923 F.2d 830, 834 (Fed. Cir. 1991)).

When plaintiff acquired the property in December, 1975, the term "waters of the United States" had already been judicially construed to reach all waters that could be regulated under the Commerce Clause. See Natural Resources Defense Council v. Callaway, 392 F. Supp. 685, 686 (D. D. C. 1975) ; Sun Enterprises, Ltd. v. Train, 394 F. Supp. 211, 223 (S.D.N.Y. 1975); United States v. Ashland Oil & Transp. Co., 364 F. Supp. 349, 351 (W.D.Ky. 1973), aff'd, 504 F.2d 1317, 1323-25 (6th Cir. 1974). Regardless of actual knowledge, plaintiff was on constructive knowledge of the existence of the Clean Water Act. See Dufau v. United States, 22 Cl. Ct. 156, 159 (1990) ("the rule of law is that "'everyone is charged with the knowledge of the United States Statues at Large'") (quoting C&L Construction Co. v. United States, 6 Cl. Ct. 797 (1984), aff'd, 790 F.2d 93 (Fed. Cir. 1986).[9]

Here, plaintiff testified that he was aware of the Clean Water Act when he purchased the

[9] Here, the regulatory structure was in place at the time the property was acquired. But even if such were not the case, "[t]he reasonable expectations test does not require that the law existing at the time of processing would impose liability. Rather, [t]he critical question is whether extension of existing law could be foreseen as reasonably possible." Appolo Fuels Inc. v. United States, 381 F.3d 1338, 1350 (Fed. Cir. 2004) (internal citation and quotation omitted).

property in 1975, Tr. 353, but never contacted an attorney to determine the extent of his legal obligations under the Act. Tr. 355. Nor could he claim to have been misled by a government agency. The Department of Agricultural has never had jurisdiction over the Clean Water Act. Indeed, Mr. Lew Steckler testified that "we would have to inform the landowner that permits would be needed to do any type of drainage work." Tr. 738.

More importantly, Mr. Brace has never been provided either technical or financial assistance for the purpose of draining the Murphy Farm tract.[10] As the evidence showed at trial and defendant argued in its Opening Post-trial Brief, the 1961 Conservation Plan did not provide for the drainage of the Murphy Farm tract; rather, the drainage plans were for fields on the Homestead Farm tract or other parts of the Brace farm. Tr. 704-12.

Indeed, plaintiff inexplicably continues to advance arguments in his Opening Post-trial Brief that are factually wrong and contrary to both plaintiff's and defendant's evidence presented at trial. First, plaintiff claims in his Post-trial Brief that "[h]e was encouraged in his reasonable belief by ASCS's financial and technical assistance in accomplishing the drainage installation" is without merit. Id. at 48. Plaintiff's own witness, Mr. Joseph Burawa, however testified that the drainage elements of the Conservation Plan developed for Mr. Brace's father did not include any drainage plan for the Murphy Farm tract. Tr. 85, 87-89. Second, plaintiff claims that he it was reasonable to expect that he could "use the drainage plan created by his father and the SCS to make the subject property more productive . . . ." Pl.'s Br. at 48. However, evidence at trial showed that the Conservation Plan recommended using the Murphy Farm tract for hay crop, hayland, crop rotation, wildlife land and duck marsh. See P1 at 6; Tr. 705-06. It does not include

---

[10] The District Court for the Western District of Pennsylvania in United States v. Brace, No. 90-229 (W.D. Pa. 1992), rejected the same estoppel-type argument that plaintiff presents here.

any recommendation for drainage of the tract, wetland or otherwise.

Third, while Mr. Brace did receive funding under the Emergency Conservation Program following a severe thunderstorm in 1984, (Tr. 712-15), this financial assistance was limited to "restoring existing structures or cleaning off cropland . . . remove the gravel from the fields, clean out any ditches . . . to restore . . . how things were before the rain event." Tr. 714 ("[Mr. Brace] requested the grading, shaping, releveling or similar measures to restore cropland areas to their original scope before the flood, before the severe rain."). See also P5. This financial assistance did not involve the construction of new drainage systems. Indeed, the evidence does not indicate that the assistance provided to Mr. Brace under the Emergency Conservation Program was even for the Murphy Farm tract. Tr. 714-15.[11/]

**B. The Character Of The Government Action Weighs In Favor Of The United States.**

This Court should find that, under Federal Circuit precedent, the nature of the government action weighs in favor of defendant because protecting wetlands serves an important public purpose.

The Federal Circuit's recent decision in Bass Enterprises Prod. Co. v. United States, 381 F.3d 1360 (Fed. Cir. 2004), has clarified the appropriate analysis for the "nature of the government action" factor. Reviewing the Supreme Court's decisions in Tahoe and Palazzolo, the Bass court found that the court's "recent decisions mark a return to the pre-Lucas evaluation of the "character of the Government actions" factor. Id. at 1370. Accordingly, the Federal Circuit stated that in evaluating the character of the government action, it therefore "consider[s]

---

[11] As the government noted in it Opening Post-trial Brief, the measuring point of reference in determining whether plaintiff had reasonable investment backed expectations in developing his property is when plaintiff acquired the property, not later events. See Tahoe Sierra, 535 U.S. at 336. Accordingly, plaintiff's estoppel-like arguments are largely legally irrelevant.

the purpose of the regulation and its desired effects in determining whether a taking has occurred." Id. By way of example, the Circuit cited to Maritrans Inc. v. United States, 342 F.3d 1344, 1356 (Fed. Cir. 2003), as suggesting that a court should "'consider the purpose and importance of the public interest underlying a regulatory imposition' in its Penn Central analysis." Id (requiring the court to inquire "into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented.").

Applying this analytical framework here, the character of the government action factor clearly weighs in favor of the government. Because the government action here was implemented to protect wetlands, and therefore serves an important public purpose, the nature of the government action weighs in favor of defendant.[12]

### C. Plaintiff Has Not Established That the Economic Impact of the Regulatory Restriction Compels the Finding of a Taking.

#### 1. Plaintiff's Appraiser's Determination that the Highest and Best Use of the 58 Acre Murphy Farm Tract as a Residential Subdivision was Incorrect

As the government discussed in its opening brief, plaintiff's appraiser, Mr. Lignelli, did not properly determine the appropriate highest and best use for the Murphy Farm tract. Defendant's Opening Post-trial Brief at 35-39. Instead, Mr. Lignelli adopted a "hypothetical condition." Tr. 400-02. Although he acknowledged that the developer of his "conceptual subdivision" would need to comply with all ordinances and special requirements, Tr. 397-98, he

---

[12] Plaintiff argues in his Opening Post-trial Brief that because the government physically occupied plaintiff's property and because he was "forced to hand over a portion of his record title to his property," the character of the government action weighs against the government. Pl.'s Br. at 51. Such an analysis ignores the most recent instruction of Bass Enterprises. See supra.

made no independent determination of whether it was reasonably probable that subdivision requirements could be met. In the end, Mr. Lignelli assumed that which he was supposed to determine in the first place.

Nor does defendant's appraisal support plaintiff's selection of highest and best use apart from the extraction of simple data taken out of context. Pl.'s Br. at 55. Defendant's appraiser, Mr. Silver, did not testify that "these statistics suggest an increased demand for smaller household development." Pl.'s Br. at 55, citing Tr. 851. Rather, Mr. Silver noted that while households in Waterford Township may be getting smaller, that does not necessary mean that there is increased demand for smaller houses. He noted that the smaller house lots referenced by Mr. Lignelli were all found in the I-91 corridor where there is public water and sewer. People moving to Waterford

> "aren't looking for one-acre lots. They are looking for larger lots. I didn't see sales of one-acre lots in Waterford. I see sales of five, 10 and even larger lots ..."

Tr. 851-52. Indeed, "[i]ncome is what generates the size of a house." Tr. 852. In that extent, Mr. Lignelli supported Mr. Silver's finding of a demand for larger lots. See Tr. 470.

**2. Plaintiff's Appraiser's "Before" Value Overstates the Value of the Property**

Plaintiff's appraiser adopted an approach for his "before" valuation of the property designed to improperly inflate the value of the property. First, Mr. Lignelli adopted a discounted cash flow type of valuation, which accordingly to Mr. Lignelli's calculations[13/] resulted in a "before" value of the property of $455,000. Tr. 380-81. However, when the value of the property in the "before" condition is determined with reference to comparable sales, a far more accurate form of analysis, the result was $293,000. Tr. 433. Mr. Lignelli offered no convincing

---

[13] Defendant's appraiser, George Silver, was unable to duplicate Mr. Lignelli's calculations. After Mr. Lignelli's errors were corrected, Mr. Silver's correct total value based on the discounted cash flow analysis was $410,000, not the $455,000 that Mr. Lignelli testified to. Tr. 827-28. Mr. Lignelli declined the opportunity to explain the discrepancy. Tr. 429.

explanation for why the discounted cash flow ("residual") method of valuation was superior to one which directly compares the property to comparable sales. Id.

More significantly, Mr. Lignelli's "before" value was wholly based on assumptions as to legal permissibility, Tr. 457, that render his determination of highest and best use, as well as his ultimate value determination, suspect. Specifically, his valuation assumes all approvals, Tr. 456, and makes no allocation for any risk that necessary permits might not be obtained, Tr. 457. Indeed, he readily admitted that the marketplace would discount the price it would be willing to pay for the property to take into account the possibility that it might not be possible to obtain all necessary approvals. Tr. 458. Thus, as a matter of law, Mr. Lignelli's "before" value does not represent fair market value.

**3. Plaintiff's Appraiser Mr. Lignelli "After" Valuation is Also in Error**

Mr. Lignelli testified that in the "after" condition, the property has only "scant" value. Tr. 381. Mr. Lignelli's opinions as to the "after" value of the property were not supported by either the correct facts, nor the correct appraisal techniques.

First, Mr. Lignelli based his entire opinion as to the "after" value of the property on a brief letter, and limited conversations with, a non-witness of questionable expertise for the statements on which Mr. Lignelli relied. Tr. 394, 452. In large part, Mr. Lignelli's opinion that the property was of "scant value" in the after condition, Tr. 381, was based on what he understood to be regulatory risk. However, he readily admitted that he did not know, and Mr. Hofius did not make clear, whether that regulatory risk was federal, state or local in origin. Tr. 408, 487-88. Of course, restrictions imposed on wetland development by state and local entities cannot properly be attributable to the United States. See Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1196 (Fed. Cir. 2004).

Further, with respect to the federal regulatory program under the Clean Water Act, Mr. Lignelli assumed that mud runoff from the upland acreage into the 30 acres of wetlands would cause "legal consequences." Tr. 395. However, the testimony was clear and unrefuted that run off from the upland area would not likely to incur Clean Water Act liability. See e.g., Tr. 614-615. Indeed, if the actions being taken on the upland property were part of an established farming operation – which would be true of both of the upland areas on the Murphy tract – then any discharge from the upland areas would be protected from liability under the Clean Water Act by the farming exemption.[14] See e.g., Tr. 616-617. And, even if the activity occurring on the upland area was the construction of a house, sediment-laden runoff from that activity would be unlikely to result in Clean Water Act liability because the purpose of the activity would not have been to fill the wetland and convert it to dry land – the purpose would have been to build a house. See e.g., Tr. 616-617, 683.

Finally, Mr. Lignelli's "after" valuation opinion was oral only; it was not documented in his appraisal, Tr. 444-46, as would be the normal, and property appraisal practice.

**4. Mr. Silver Properly Determined the Highest and Best Use of the 58 Acre Murphy Farm Tract was Agricultural**

Plaintiff argues that the determination of defendant's appraiser that agriculture was the highest and best use for the property was incorrect. Pl.'s Br. at 60-64. To the contrary, Mr. Silver correctly rejected the possibility that the highest and best use of the property was a residential subdivision. See Tr. 793, 810-22.

**5. The Murphy Farm Tract Retains Significant Value in the "After" Condition**

[14] The farming exemption was not available to Mr. Brace to protect him from liability for dredge and fill activities in the wetland area because the wetland area was not part of an established farming operation. See e.g., Brace, 41 F.3d at 129. However, active farming of the two upland areas on the Murphy tract has occurred for years. Tr. 130; see also supra.

Plaintiff first argues that because the non-wetland acreage on the Murphy Farm tract would not be capable of themselves forming an economically viable farm, that therefore the tract has no value in the "after" condition. Pl.'s Br. at 58. However, it is common practice for farmers to acquire smaller parcels to add to their already-existing holdings. Tr. 873. Indeed, plaintiff has done just that himself over the years. Plaintiff started with this parcel in December, 1975. Tr. 124, D11(A), and added other land over the years, eventually amassing approximately 600 acres. Brace, 41 F.3d 117, 120.

Further, the evidence is undisputed that the upland areas on the Murphy Farm tract could be, and were, farmed. Mr. Brace himself admitted that he had grown crops on the upland areas. Tr. 130, 158. The various crops that were grown in the larger upland area, see D9, and the years, was presented, P33. In addition, Mr. Silver observed evidence that a crop had been grown the previous year when he first inspected the Murphy Farm tract in the spring of 2004. Tr. 799. Given that plaintiff grew crops on the upland areas as recently as 2003, Tr. 181-82, 799, well after the entry of the Consent Decree, his protestations that he is "afraid," see e.g., Tr. 158, of further Clean Water Act enforcement actions after the entry of the Consent Decree are not credible. And, in any event, no Clean Water Act enforcement nor Consent Decree contempt proceedings have been brought against plaintiff for growing crops in the upland area.

Next plaintiff argues that "the first parcel cannot be accessed without transgressing [sic] the wetlands." Pl.'s Br. at 58. Assuming what plaintiff means is that you cannot access the "first parcel" without crossing the wetlands, plaintiff does not explain which of the two upland areas he considers to be the "first parcel." In any case, there is no access problem with respect to either upland area on the Murphy Farm tract. One field is directly adjacent to South Hill Road. The other field, located in the southwest corner of the tract, is accessible via a road along the western

boundary of the property. Tr. 733. Further, plaintiff's record citations in support of its argument in this respect do not support plaintiff's argument. See Tr. 733 (Steckler; there is access by road, no mention of need to traverse wetlands); Tr. 773 (same); Tr. 867 (Silver; can't access one upland area directly from the other, but no support for proposition that either one of upland areas has no access).

Finally, as previously stated, in the "after" condition, the Murphy Farm tract retains significant value for a residential homesite. Plaintiff's appraiser, Mr. Lignelli, testified that the most profitable use for the Murphy Farm tract in the "after" – with the Consent Decree in place – would be to utilize the 28 non-wetland acres as a single homesite which would then overlook the wetland area. Tr. 396, 450, 465, 479. So utilized, the "after" value of the property would be $140,000. Tr. 474. The ability to use the parcel at issue for a single family homesite can be sufficient economic value to forestall the finding of a taking.

Nor is the property rendered undevelopable because of a fear that "runoff from the home, driveway or garden into the 30 acres [of wetlands] would violate the Consent Decree.[15] Pl.'s Br. at 58. To the contrary, the restrictions on plaintiff's property imposed by the Consent Decree do no more than duplicate the restrictions which otherwise apply to plaintiff's property – and all other wetland property within the United States – under the Clean Water Act. Tr. 619, 696. Further, apart from the required restoration work, the Consent Decree does not amount to a blanket prohibition – instead, like the Clean Water Act, it only prohibits certain activities unless a

---

[15] In discussing the question of runoff, plaintiff also alludes to "highly erodable soils" without explaining the significance of such soils to the argument being presented. Pl.'s Br. at 58. While some soils on the Murphy Farm tract are considered to be "highly erodible land [HEL]," this designation would prevent neither farming nor is not accurate. Tr. 173-174. Mr. Steckler agreed that the Murphy Farm has "highly erodible lands [HEL]." Tr. 717-718. While the SCS develops conservation plans for HEL, Mr. Brace nas never requested a HEL conservation plan for the Murphy Farm. Tr. 740.

permit has been obtained. Tr. 618-19.

The trial testimony cited in plaintiff's brief does not support its argument that someone who farmed or constructed a residence on one of the upland areas would risk violating the Clean Water Act. Pl.'s Br. at 58. Mr. Lapp, testifying for EPA, explained that soil, carried by water through a furrow onto a wetland would not be a violation of the Clean Water Act unless the draining of sediment-laden water was done for the express purpose of replacing wetlands with dry land. Tr. 669, 683. Indeed, if crops were grown in the upland area, and waters carried sediment off into the wetland, Mr. Lapp testified that would not violate the Clean Water Act. Tr. 615-16, 665, 669, 681-83. With respect to a question concerning pesticide runoff, Mr. Lapp indicated that area was covered by a different regulatory program in which he did not have expertise. Tr. 667. With respect to violations under Section 301 of the Clean Water Act (which is different from Section 404), Mr. Lapp explained that there is an exemption for established farming practices. Tr. 666-67.

Mr. Lapp explained that the Consent Decree itself did not prohibit activities within the wetland area. Instead, it, like the Clean Water Act on which it was based, only prohibited certain activities without first obtaining a permit. Tr. 619, 660.

**6. Plaintiff Did Not Establish a Taking of Any Part of the Homestead Farm**

Plaintiff argues that it has also established economic impact to the Homestead Farm as a result of the restoration of the wetlands on the Murphy Farm tract. Pl.'s Br. at 52 n.21, 64. In support of this allegation, plaintiff cites to what "the Court saw on its site visit ..."[16] Id.

---

[16] As the court discussed during trial, viewing wetlands in the "springtime after a thaw would be the time that you see the most likely amount of water table." Tr. 687. As the court itself recognized, such would be the extreme and not truly representative of the site's hydrologic characteristics. Id.

Plaintiff's attempt to elevate the site visit to the status of affirmative evidence for its case is improper. As stated previously, the government disagrees with plaintiff's characterization of what the court observed during the site visit, and indeed, no testimony describing what the court observed was offered at that time.

Plaintiff appears to be arguing that the restoration work on the Murphy tract has also impacted the Homestead Farm. Pl.'s Br. at 21. As Mr. Lapp explained at trial, the goal of the restoration plan was to restore the hydrologic balance to the wetland area. Tr. 610. Further, the extent of the impact of the restoration work was, in his expert opinion, confined to the 30 acre wetland area. Tr. 610-11, 659. For his part, Mr. Lapp indicated that if the landowner felt that the restoration work was making property outside the wetlands wetter, the EPA would have been happy to work with him to correct that. Tr. 611, 658-60, 662-3. However, based on his expert knowledge, he believed the restoration plan to have had only localized effect within the wetland area itself, and accordingly, would not see any reason to modify the restoration plan. Tr. 658-59, 664, 678. In any event, the evidence is undisputed that, prior to his testimony at trial, Mr. Brace never made any complaint to any federal representative concerning the impact of the restoration work.

## CONCLUSION

For the reasons set forth above, plaintiff's claim for physical taking should be denied. Furthermore, the court should also deny plaintiff's claim for a categorical taking of his property pursuant to Lucas. Finally, plaintiff has failed to establish a regulatory taking under the Penn Central analysis.

Dated: May 19, 2005.

Respectfully submitted,

KELLY A. JOHNSON
Acting Assistant Attorney General
Environment & Natural Resources Division

s/ Susan V. Cook by s/ Sydney F. Cook
SUSAN V. COOK (FLORENTINE), Sr Atty
SYDNEY F. COOK, Trial Attorney
Natural Resources Section
Environment & Natural Resource Division
United States Department of Justice
Post Office Box 663
Washington, D.C. 20044-0663
202-305-0470; FAX: 202-514-8164
Email: susan.cook@usdoj.gov

Attorneys for Defendant

299644.2