IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| Plaintiff, | ) | Civil Action No. 98-897 L |
| v. | ) | Hon. Francis M. Allegra |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S POST-TRIAL BRIEF**

Respectfully submitted,

Nancie G. Marzulla
Roger J. Marzulla
Defenders of Property Rights
1350 Connecticut Ave., N.W.
Suite 410
Washington, D.C. 20036
202-822-6770
202-822-6774 (facsimile)

Counsel for Plaintiff

Dated: May 19, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES....................ii

ARGUMENT....................1

## Cases

*Armstrong v. United States*, 364 U.S. 40 (1960) .......... 13

*Barnes v. United States*, 538 F.2d 865 (Ct. F. Cl. 1976) .......... 5

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) .......... 4, 11

*Dolan v. City of Tigard*, 512 U.S. 374 (1994) .......... 20

*Dynamics Corp. of Am. v. United States*, 766 F.2d 518 (Fed. Cir. 1985) .......... 21

*Eastern Minerals Int'l, Inc. v. United States,* 39 Fed. Cl. 621 (1997) .......... 21

*Florida Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21 (1999) .......... 14, 15, 18, 19

*Florida Rock Industries, Inc. v. United States***,** 18 F.3d 1560 (Fed. Cir. 1994) .......... 3, 18

*Forest Properties, Inc. v. United States*, 177 F.3d 1360 (Fed. Cir. 1999) .......... 7

*Good v. United States*, 189 F.3d 1355 (Fed Cir 1995) .......... 12

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991) .......... 4, 7

*Kansas v. Colorado*, 533 U.S. 1 (2001) .......... 23

*Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982) .......... 4

*Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994) .......... 8

*Miller v. United States*, 223 Ct. Cl. 352 (1980) .......... 21, 22

*Miller v. United States*, 620 F.2d 812 (Ct. Cl. 1980) .......... 24

*Monongahela Navigation Co. v. United States*, 148 U.S. 312 (1893) .......... 23

*NRG Co. v. United States*, 31 Fed. Cl. 659 (1994) .......... 22

*Palazzola v. Rhode Island*, 533 U.S. 606 (2001) .......... passim

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978) .......... 20

*Pettro v. United States*, 47 Fed. Cl. 136 (2000) .......... 21

*Pitcairn v. United States*, 212 Ct. Cl. 168 (1976) .......... 21, 22

*Pumpelly v. Green Bay Co.*, 80 U.S. 166 (1871) ..... 5

*Ridgeline, Inc. v United States*, 346 F.3d 1346 (2003) ..... 5, 6

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ..... 11

*Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564 (Fed. Cir. 1988) ..... 21

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302 (2002) ..... 13

*Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624 (2004) ..... 21, 24

*United States v. Brace*, 41 F.3d 117 (3d Cir. 1994) ..... 2, 19

*United States v. Causby*, 328 U.S. 256 (1946) ..... 20

*United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) ..... 11

*Walcek v. United States*, 49 Fed. Cl. 248 (2001) ..... 13

*Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411 (1994) ..... 20, 21

**Statutes**

16 Penn. Stat. §9701, §§ 9751-9759.1. ..... 5

28 U.S.C. § 2501 ..... 2

**Rules**

42 Fed. Reg. 37122 ..... 2

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ROBERT BRACE, | ) | |
| Plaintiff, | ) | Civil Action No. 98-897 L |
| v. | ) | Hon. Francis M. Allegra |
| UNITED STATES, | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S POST-TRIAL BRIEF**

Plaintiff responds to defendant's post-trial brief as follows:

1. Defendant asserts that, "plaintiff's cause of action to complain about the application of the requirements of the Clean Water Act to his property accrued no later than 1990, more than six years prior to the filing of the complaint herein." (Def.'s Br. at 7.) First, as Defendant has already conceded, this issue has been decided and is law of this case. (*See* Order of Dec. 16, 2002 stating, "The first [issue] involves whether this case was filed within the 6-year statute of limitations on Tucker Act suits in 28 U.S.C. §2501. Under *Palazzola v. Rhode Island*, 533 U.S. 606 (2001), a takings claim ripens once it becomes clear that the permissible use of the property is known to a reasonable degree of certainty. Here, the permissible uses of the property were not known to a reasonable degree until the consent decree in the Environmental Protection Agency enforcement action was entered in 1996, approximately 2 years before the complaint in this case was filed. … Accordingly, this court rules that plaintiff's complaint was filed within the statute of limitations period.")(*See* Def.'s Pre-trial Br. at 9 n.8 stating, "Defendant understands that these rulings are now law of the case, and for that reason does not reassert the arguments in this brief.)

Second, the facts fail to support this argument. Indeed, the district court in the underlying action held that Mr. Brace's activities were outside the reach of the Clean Water Act three years after Defendant claims that Mr. Brace's taking claims arose. *See United States v. Brace*, No. 90-229 (W.D. Pa. Dec. 16, 1993) (holding that Mr. Brace's land was exempt from all wetlands permitting requirements). That the Clean Water Act even applied to the Murphy Farm did not become certain until the Third Circuit's reversal in 1994 and certiorari was denied in 1995. *United States v. Brace*, 41 F.3d 117 (3d Cir. 1994), *cert. denied*, 515 U.S. 1158 (1995). The specific permissible uses of the Murphy Farm were not reasonably certain until the Consent Decree was entered in June of 1996. (Pl.'s Ex. 22.) Thus, at the earliest, the taking in this case ripened on June 25, 1996, when the consent decree was entered resolving the underlying enforcement action. The complaint in this case, which was filed on November 25, 1998, well within the 6-year statute of limitations on Tucker Act suits. *See* 28 U.S.C. § 2501.

In *Palazzola v. Rhode Island*, 533 U.S. 606, 607 (2001), the Supreme Court emphasized that a takings claim ripens only when it becomes clear that the permissible use of the property is known to a reasonable degree of certainty. The regulatory history of Clean Water Act prevented any reasonable degree of certainty regarding the permissible uses of the Murphy Farm prior to the signing of the consent decree. (Pls.' Post-trial Br. at 9-16.) *See* 42 Fed. Reg. 37122, 37122-33 (discussing the progression of Clean Water Act and the regulatory expansion from the "high water mark" to jurisdictional wetlands.).

Here, the manner in which the defendant applied the Clean Water Act to Mr. Brace's property created, rather then alleviated, uncertainty regarding the permissible uses of the Murphy Farm. Specifically, there were significant variations between the initial cease and desist orders

issued by the EPA and the Corps in 1987 and 1988, the complaint filed in the enforcement action in 1990 and the subsequent Consent Decree. (Pls. Exs. 9, 10, 12, 13, 15, 16 and 22.)

Similarly, the Corps of Engineers' 1990 letter refusing to consider plaintiff's Section 404 permit request did not trigger the statute of limitations because the letter merely indicated that the Corps would not consider such a request while the enforcement action was pending. (Pls. Ex. 20.) Defendant's argument that this letter "firmly removed" the possibility "that Mr. Brace might ultimately obtain a permit" is objectively incorrect because the Corps' letter did not address or foreclose the possibility that a permit could be issued upon the completion of the enforcement action. (Def.'s Br. at 16.) Nor did it address the possibility that no such permit would even be required. *See United States v. Brace*, No. 90-229 (W.D. Pa. Dec. 16, 1993).

Accordingly, even if this issue were not law of the case, Defendant's argument is without merit.

2. Defendant denies a physical taking occurred in this case, arguing that because "the Supreme Court drew a sharp line between regulatory restrictions, generally subject to an ad hoc, multi-factor analysis, and permanent physical occupations, subject to a per se test," the "Consent Decree, at best, is a restriction on <u>use</u>, not a physical occupation." (Def.'s Br. at 8.) Defendant's argument, however, goes to far, for virtually all physical takings are rooted in regulatory programs. See *Florida Rock Industries, Inc. v. United States*, 18 F.3d 1560, 1572 (Fed. Cir. 1994) ("The fact that the source of any particular taking is a regulation rather than a physical entry should make no difference—the nature of legal interests defining the property affected remains unchanged."); *Nolan v. California Coastal Comm'n*, 483 U.S. 825, 831 (1987) ("To say that the appropriation of a public easement across a landowner's premises does not constitute a taking of a property interest but rather (as Justice Brennan contends) 'a mere restriction on its

use' is to use words in a manner that deprives them of their ordinary meaning."); *Cienega Gardens v. United States*, 331 F.3d 1319, 1339 (Fed. Cir. 2003) ("Dispossession is not required for a regulatory taking. Nor is divesting title.").

The Consent Decree is not a mere restriction on use because it specifically mandates the permanent physical occupation of the Murphy Farm by a check dam and fill material. (Pls.' Ex. P22 Ex. A.) Specifically, it orders, "This dam shall be one and one-half (1 ½) feet high, four (4) feet long and as wide as the tributary bottom. The dam shall be constructed of concrete, gabions, or compacted rock," and, "The two surface ditches that run in a southwesterly direction into unnamed tributary B, as indicated on Attachment A, shall be filled in beginning at the mouth for a distance of at least twenty five (25) feet." *Id.* at ¶2, 3.

In *Loretto v. Teleprompter Manhattan CATV Corp*., 458 U.S. 419 (1982), the Court held that the physical occupation of a landlords property by cable TV equipment installed pursuant to a state statute constituted a physical taking. In disposing of the dissent's argument that "a taking of about one-eighth of a cubic foot of space is not of constitutional significance" the Court noted that the actual "displaced volume, then, [was] in excess of 1 1/2 cubic feet" and stated "whether the installation is a taking does not depend on whether the volume of space it occupies is bigger than a breadbox." The Court held, "When the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred." *Id.* at 426. Given the holding in *Loretto*, the permanent physical occupation of the Murphy Farm by a check dam and fill material are unquestionably physical takings for which the Defendant has a duty to pay just compensation. *See also Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991)(finding a physical taking for the placement of surveillance wells on the plaintiff's property and stating, "These surveillance

wells are at least as 'permanent' in this sense as the CATV equipment in *Loretto,* which comprised only a few cables attached by screws and nails and a box attached by bolts.”).

Defendant argument also fails because the Consent Decree mandated the conveyance of a conservation easement and an 18-month access easement. (Pls.’ Ex. P22) (Pl.'s Pos-trial Br. at 27-33.) *See, e.g., Nolan v. California Costal Commission*, 483 U.S. 825, 831 (1987); *Ridgeline, Inc. v United States*, 346 F.3d 1346, 1352-53 (2003) (“It is well established that the government may not take an easement without just compensation.). Of particular note, Mr. Brace was required to record the conveyance of those easements in the local land office. (Pl.’s Ex. P22.) With the exception of documents such as military discharge certificates, the section of the Pennsylvania code authorizing a county’s Recorder of Deeds to record documents addresses the recording of documents that convey or confirm interests in property. 16 Penn. Stat. §9701, §§ 9751-9759.1.

Finally, Defendant’s argument fails because the physical occupation of the Murphy Farm by a dam and fill material took a flowage easement. “Generally speaking, property may be taken by the invasion of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action.” *Barnes v. United States*, 538 F.2d 865, 870 (Ct. F. Cl. 1976) (Tr. 136, 359-60.) (discussing the resulting flooding) (Pl.’s Ex. P1, P34.)(photographs establishing that prior to the Consent Decree there was no lake) (Pl.’s Ex. P1.) (documenting the potential for, rather than existence of, a pond or lake). “A constitutional taking resulting from such flooding is not limited to instances of obvious overflowing of a river's banks. The just compensation clause of the Fifth Amendment has been found likewise applicable in cases of percolation or rising ground water.” *Id.*; *see also Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1871)(“[W]here real estate is actually invaded by superinduced additions of water, earth, sand,

or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution."). *See also Ridgeline, Inc. v United States*, 346 F.3d 1346, 1352-53 (2003) ("It is well established that the government may not take an easement without just compensation. Similarly, government actions may not impose upon a private landowner a flowage easement without just compensation." (citations omitted)).

3. To divert attention away from the physical presence of the earthworks, check-dam and lake on the Murphy Farm, Defendant selectively focuses instead on the frequency of Lewis Steckler's invasions of the Murphy Farm under the Consent Decree and attempts to cast those invasions as voluntary. (Def.'s Post-trial Br. at 11.)

This Court should not entertain Defendant's attempt to characterize Lewis Steckler's invasions as voluntary. This Court has already ruled that the Consent Decree was not consensual, and the defendant conceded that ruling is the law of this case. (*See* Order of Dec. 16, 2002 stating, "In the Court's view…the consent decree here was the product of 'coercion,' albeit proper coercion.") (*See* Def.'s Pre-trial Br. at 9 n.8 stating, "Defendant understands that these rulings are now law of the case, and for that reason does not reassert the arguments in this brief.) Moreover, Defendant's argument is factual inaccurate because under the Consent Decree Mr. Brace had no choice but to allow Mr. Steckler's invasions. (Pls. Ex. 22.) (Tr. at 133.) (Q Would you describe that decision to enter into a consent decree with the government as voluntary? A No, it was sure not. I mean, I tried and tried and tried to work the problem out, but, at this time, I was forced into doing something and trying to stay out of any more major problems than they already had me in.)

In pursuit of its argument that Mr. Steckler's visits were infrequent and therefore do not rise to the level of a taking, Defendant attempts to avoid the implications of *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991), by suggesting that its holding is based solely on a physical occupation theory. (Def.'s Post-trial Br. at 11.)( "[t]here, the court found that the government's installation of nearly 20 ground water monitoring wells constituted a physical taking") Defendant ignores that the *Hendler* court also found:

> The government behaved as it had acquired an easement not unlike that claimed in *Kaiser Aetna*. Pursuant to the easement, the government at its convenience drove equipment upon plaintiffs' land for the purpose of installing and periodically servicing and obtaining information from the various wells it had located there. *Kaiser Aetna* and *Nollan* would seem to leave little doubt that such activity, even though temporally intermittent, is not 'temporary.' It is a taking of the right to exclude for the duration of the period the wells are on the property and subject to the Government's need to service them.

*Hendler, 952* F.2d at 1378. Defendant engaged in analogous invasions of the Murphy Farm. (Pl.'s Ex. P22 ¶¶ 9, 12; Pl's. Ex. P23, P24.) Moreover, rather than merely behaving pursuant to an EPA order like it had acquired an easement, the defendant in this case affirmatively conditioned the resolution of the enforcement action on the conveyance of an access easement and the recording of that easement in the local land office. (Pls.' Ex. 22.)

4. Citing *Forest Properties, Inc. v. United States,* 177 F.3d 1360, 1365 (Fed. Cir. 1999), Defendant argues that the parcel as a whole is the combined acreage of the Murphy and Homestead farms stating, "It is undisputed that both the Homestead Farm tract and the Murphy tract were acquired at the same time and are contiguous (except for South Hill Road which divides the tracts). Both parcels were acquired for the same purpose and as part of a common plan for the purposes of farming." Defendant's approach treats relevant parcel case law as a rigid formula for avoiding takings liability. In doing so, Defendant fails to recognize the flexible nature of the relevant parcel determination. *See Loveladies Harbor, Inc. v. United States*, 28

F.3d 1171 (Fed. Cir. 1994)("Our precedent displays a flexible approach, designed to account for factual nuances.")

Under that flexible approach, the court in *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994), excluded land from the relevant parcel that was developed prior to the enactment of the regulatory scheme at issue. As the Federal Circuit stated, "The trial court concluded that land developed or sold before the regulatory environment existed should not be included in the denominator." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed. Cir. 1994); *See also Cane Tennessee, Inc.*, 62 Fed.Cl. 703 (2004) ("In *Loveladies Harbor,* the Federal Circuit affirmed the trial court's relevant parcel determination noting that "[t]he relevant parcel ... coincided with the area covered by the [mining] permit only because the remainder of plaintiff's property was either developed before the imposition of the federal regulatory scheme or was required by the state to remain undeveloped wetlands.")

Defendant fails to recognize the fact that this case is analogous to *Loveladies Harbor*. Specifically, Defendant fails to take into account that the evidence clearly established that the Homestead Farm was already a developed row crop farm when the Clean Water Act was enacted. (Tr. at 118, 316-19) (Pl.'s Ex. P1.)(detailing field uses) Accordingly, following *Loveladies Harbor*, the Homestead Farm should be excluded from the relevant parcel because it was developed prior to the enactment of the Clean Water Act.

Moreover, Defendant's conclusion that the Homestead Farm should be included in the relevant parcel improperly fails to take into account that: (1) the Murphy and Homestead farm are historically distinct farms; (2) the farms have a history of distinct agricultural uses; (3) the farms were enumerated separately in the deed; and, (4) the Third Circuit determined that the farms had had not been integrated. (*See* Pl.'s Post-trial Br. at 37-40.)

4. Defendant's asserts that "the evidence at trial was clear that the upland areas of the Murphy Farm tract could clearly continue to be farmed in the 'after' condition." (Def.'s Post-trial Br. at 16.) The question for this Court, however, is not whether it is physically possible to grow crops on the remaining upland areas but whether it is economically practicable to do so. The evidence in this case unequivocally established that it is not possible to economically farm the remaining upland areas. (Tr. at 867, 872-73.) Defendant's own appraiser acknowledged that neither upland area alone nor both combined could be farmed at a profit. *Id.* In fact, he testified that the combined acreage of the Murphy and Homestead Farms was in the gray area with respect to economic viability. (Tr. at 791.) While Defendant's appraiser referenced a practice in the region of farming multiple holdings he did not offer any testimony that the remaining upland areas of the Murphy Farm were suitable for that purpose. (Tr. at 791.) Specifically, there is no evidence in the record suggesting that parcels as small as the remaining uplands on the Murphy Farm can be economically farmed in conjunction with other parcels. Similarly, there is no evidence that those parcels are geographically suitable for such use.

Defendant also argues that the wetland area itself remains useful as pasture. Setting aside Defendant's diaphanous distinction between the discharge of topsoil into navigable waters that resulted in the underlying enforcement action in this case and Defendant's proposed discharge of manure into the same navigable waters, this argument still lacks merit. Specifically, like the defendant's argument regarding farming, its argument regarding the use of the wetlands as pasture fails to recognize the difference between use and economic use. (Tr. at 118.) (Mr. Brace's parent's use of the Murphy Farm as a diary operation reached the point "they couldn't make a living with 50 or 60 head of dairy cows.") In short, the defendant's argument ignores the unrefuted evidence in this case clearly establishing that the conversion of the Murphy Farm from

a diary operation to a row crop farm was necessitated by the inability to economically utilize the Murphy Farm as pasture. Tr. 118, 119, 124, 316-19.)

Defendant's final argument against a categorical taking is that Mr. Lignelli conceded that the remaining parcel—with the consent decree in place—could be used for a single-family residence with a value of $140,000. (Def.'s Post-trial Br. at 16.) This argument fails because it misstates the testimony of Mr. Lignelli. Mr. Lignelli did not testify that the property with the consent decree could be used for a single family home valued at $140,000, rather in response to a hypothetical question he indicated that if it could be used the value would be in the neighborhood of $140,000 without the consent decree. (Tr. at 474.) (Mr. Lignelli testified, "Okay. If *unaffected by the consent decree* or any extraordinary regulatory pressures or limitations one could take roughly the number of $5,000 per acre times 28 acres and you come up with a value of $140,000.")(emphasis added). Moreover, Mr. Lignelli went on to indicate that given the consent decree and unknown regulatory risk the value of this hypothetical single-family home option would be "scant." (See Tr. at 474 -490.) In addition, Mr. Ligenlli testified, "given the uncertainty as to how to develop the 28 acres, I've concluded that it's of scant value in that somebody would want a deep discount to take on such a project." (Tr. at 396.)

On top of mischaracterizing the evidence, Defendant's argument is flawed at a more basic level. Specifically, in determining fair market value Defendant's position assumes a buyer lacking common sense. In asserting that the remaining 28 acres are worth $140,000 (28 x $5,000) Defendant ignores the fact that the upland parcels are not contiguous. In addition, the defendant ignores the fact that the 16-acre parcel lies across a wetland from the 12-acre home-site and cannot be accessed without transiting the wetland. Accordingly, Defendant's position unreasonably assumes a residential housing market in which buyers are willing to purchase not

only the site on which they intend to build a home but also a separate non-contiguous parcel that cannot be accessed without transiting a wetland.

5. Defendant erroneously argues that there has not been a regulatory taking because each of the *Penn Central* factors weighs against a taking. Assuming *arguendo* that Defendant had not physically taken Mr. Brace's property and deprived it of all economically beneficial use, Mr. Brace would still be entitled to recover just compensation for a partial taking under the *ad hoc Penn Central* test.

**Reasonable Investment-Backed Expectations**

Mr. Brace possessed reasonable investment-backed expectations at the time he purchased the Murphy Farm. (*See* Pl.'s Br. at 43-50.) Defendant does not address nor attempt to distinguish its destruction of those expectations from those cases in which the government's destruction of the property owner's reasonable investment backed expectations established a Fifth Amendment taking. *See, e.g., Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1005 (1984) ("It is to the last of these three factors [reasonable investment-backed expectations] that we now direct our attention, for we find that the force of this factor is so overwhelming . . . that it disposes of the taking question regarding those data."); *United Nuclear Corp. v. United States*, 912 F.2d 1432, 1437 (Fed. Cir. 1990) ("Contrary to the ruling of the Claims Court, we hold that the Secretary's refusal to approve the mining plan seriously interfered with United's investment-backed expectations by destroying them."); *Cienega Gardens v. United States*, 331 F.3d 1319, 1345-53 (Fed. Cir. 2003) (abrogating the plaintiffs' prepayment right was such an unexpected change that it destroyed the plaintiffs' reasonable investment-backed expectations).

Defendant, however, argues that the date of the enactment of the Clean Water Act undermines any claim to reasonable investment backed expectations. Specifically, Defendant

argues that, "it was the passage of the Clean Water Act, and not the promulgation of subsequently issued regulations, which, as a matter of law, served to inform the plaintiff's investment-backed expectations." (Def.'s Post-trial Br. at 20.) The proposition that the mere enactment of a regulatory scheme is sufficient to extinguish reasonable expectations for all future use of property, however, is a proposition flatly rejected by the Supreme Court in *Palazzolo v. Rhode Island*, 533 U.S. 606, 627 (2001) ("Were we to accept the State's rule, the post enactment transfer of title would absolve the State of its obligation to defend any action restricting land use, no matter how extreme or unreasonable. A State would be allowed, in effect, to put an expiration date on the Takings Clause. This ought not to be the rule. Future generations, too, have a right to challenge unreasonable limitations on the use and value of land.").

Defendant also incorrectly characterizes evidence and discussion of the regulatory expansion of the Clean Water Act as estopple like arguments that are legally irrelevant and previously disposed of by the district court. Defendant, however, fails to recognize that this discussion is not an estopple argument but rather evidence that Mr. Brace's subjective investment-backed expectations were objectively reasonable.

In support of its argument that Mr. Brace lacked any reasonable investment-backed expectation, the defendant relies on *Good v. United States*, 189 F.3d 1355 (Fed Cir 1995). As an initial matter, *Good* is factually distinguishable. Unlike the property in this case, the property at issue in *Good*, even under the narrowest interpretation of "navigable waters," was within the plain language of the Clean Water Act itself. In fact the sales contract stated, "The Buyer recognizes that certain lands covered by this contract may be below the mean high tide line and that as of today there are certain problems in connection with the obtaining of State and Federal permission for dredging and fill operations." *Id.*

More importantly, the Supreme Court has soundly rejected the defendant's interpretation of *Good* in *Palazzolo v. Rhode Island,* 533 U.S. 606 (2001). In *Palazzolo* the Court states, "A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." Similarly, addressing the regulatory expansion of the Clean Water Act, this Court rejected a similar argument in *Walcek v. United States*, 49 Fed. Cl. 248 (2001)("It does not seem reasonable to impute to plaintiffs, at the time they purchased the property in 1971, an interpretation of the Clean Water Act that the Corps itself initially eschewed and did not adopt until at least 1975 (and arguably 1977).")

**Economic Impact**

Contrary to the Defendant's position, the economic impact of the defendant's actions on the Murphy Farm weighs in favor of a regulatory taking. Defendant sidesteps this conclusion by improperly focusing solely on the percentage of diminution and then asserting that there has been no regulatory taking because the economic impact of Defendant's actions was merely a diminution in value. (Def.'s Post-trial Br. at 30.)(stating "even a 70% loss is significantly less than the percentage diminution in those cases which have found a taking.") Defendant ignores that the underlying purpose of the economic impact analysis is to distinguish between mere diminution of value and the defendant "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Moreover, Defendant fails to heed the Supreme Court's warning against the adoption of mathematically precise formula. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302 (2002)("Indeed, we still resist the temptation to adopt *per se* rules in our cases involving partial regulatory takings, preferring to examine "a

number of factors" rather than a simple "mathematically precise" formula.”) In fact the adoption of mathematical formula arguably aggravates the denominator problem, a problem about which the Supreme Court continues to express discomfort. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001) (“This contention asks us to examine the difficult, persisting question of what is the proper denominator in the takings fraction. Some of our cases indicate that the extent of deprivation effected by a regulatory action is measured against the value of the parcel as a whole, but we have at times expressed discomfort with the logic of this rule, a sentiment echoed by some commentators.”)(citations omitted). Stated simply, the question for this Court is not what percentage the property’s value has decreased but whether the decrease in value is substantial in light of whether the burden shifted to the property owner is one that ought to be born by the public as a whole.

Defendant’s argument also fails because it is internally flawed. Specifically, Defendant’s assertion that the plaintiff’s evidence indicates the reduction in value is only 70% is based on a mischaracterization of Mr. Lignelli’s testimony. As previously discussed Mr. Lignelli did not testify that in the after condition the remaining 28 acres have a value of $140,000. Rather, he specifically indicated that the $140,000 value was in the absence of the Consent Decree or regulatory risk. (Tr. at 474.)

Assuming *arguendo* that Defendant was correct in its calculation that the plaintiff’s evidence established a 70% reduction in value, the inherent weakness of Defendant’s position is apparent in *Florida Rock, Inc. v. United States*, 45 Fed.Cl. 21 (1999). With respect to diminution in value in general the court in *Florida Rock, inc. v Untied States* stated:

> The notion that the government can take two thirds of your property and not compensate you but must compensate you if it takes 100% has a ring of irrationality, if not unfairness, about it. If the law said that those injured by tortious conduct could only have their estates compensated if they were killed, but

> not themselves if they could still breathe, no matter how seriously injured, we would certainly think it odd, if not barbaric. Yet in takings trials, we have the government trying to prove that the patient has a few breaths left, while the plaintiffs seek to prove, often at great expense, that the patient is dead. This all-or-nothing approach seems to ignore the point of the Takings Clause.
>
> As the Supreme Court explained in *Armstrong v. United States*, the Takings Clause is triggered by regulation which forces "some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." The present case puts the *Armstrong* principle to the test and goes to the heart of Justice Holmes' formulation of regulatory takings.
>
> Florida Rock has suffered a severe, but only partial, destruction of its property value when its parcel is viewed as a whole. It suffered a deprivation of all of its traditional common law right to its subsurface estate, as well as all economically viable use of the surface of its property. Its reasonable investment-backed expectations have been severely frustrated. Nevertheless, Florida Rock still has property rights in the encumbered parcel, albeit far fewer than it originally possessed.

*Florida Rock, Inc. v. United States*, 45 Fed.Cl. 21 (1999). In addition, the court noted:

> Here, the court must apply all three parts of the *Penn Central* test, recognizing that diminution in value is but one element of the calculation… For the 98 acres, this amount is a 73.1% diminution in value. The court does not rely on the magnitude of this diminution in value alone, however, to determine the severity of the economic impact to plaintiff resulting from permit denial.

*Id.* The court then looked at reciprocity of advantage, alternative uses and recoupment of investment and determined that Florida Rock, Inc. suffered a taking. *Id.*

*Florida Rock, Inc.* therefore undermines Defendant's contention by establishing that the reduction in value in this case is on par with a reduction in value that has been found to be a taking. More importantly, *Florida Rock, Inc.* undermines Defendant's exclusive focus on percentages of diminution because the court in *Florida Rock, Inc.* clearly treated diminution as only one facto to be read in conjunction with others.

Defendant's assertion that it's evidence establishes a mere 17% reduction in value is flawed. First, Defendant utilized the wrong parcel (denominator) in calculating the reduction.

Second, Defendant included 7 acres sold off in the 1880's. Third, Defendant's highest and best use is, by its own admission, not independently profitable. (Tr. at 855.) Fourth, Defendant relied on historical rather than potential use in determining highest and best use. (Tr. at 791.) Fifth, Defendant elected agriculture as the highest and best use despite a subdivision less than 6 miles away and the fact that no subdivision had ever been turned down by local government. (Tr. at 793 and 856.) Sixth, Mr. Silver was instructed to assume that the 30 acres could be drained for row crops rather than instructed to make his own determination regarding highest and best use. (Tr. at 796.) Finally, Mr. Silver did not verify his comparable sales. (Tr. at 855.)

On a related note, in a footnote Defendant asserts that Mr. Lignelli's appraisal is speculative due to mathematical errors and claims that Mr. Silver testified that, "Mr. Lignelli's calculations appeared to be in error, and that the correct sum of his present value calculations was $410, 000, not $455,000. Plaintiff's [sic] did not recall Mr. Lignelli in their rebuttal case to explain the discrepancy." (Def.'s Post-trial Br. at 37.) Stated simply there was no need to recall Mr. Lignelli because Defendant mischaracterizes the testimony of Mr. Silver.[1]

---

[1] The relevant testimony was as follows:

Q And why is that? Why would you not use it?

A Because the discounted cash flow, any discounted cash flow analysis, there are just numerous, numerous judgment calls that have to be made by the appraiser: the absorption period, the discount rate, the cost, input cost, the timing of these costs. All these judgment calls and any one of them can lead to various -- a change in one can lead to various different conclusions.

Q Well, I assume you have had an opportunity to look at the appraisal of the Murphy farm tract that was performed by Mr. Lignelli?

A Yes, I did.

Q And he utilized a form of, or did utilize a discounted cash flow analysis, correct?

A That's correct.

Q Did you review his calculation to determine if they were mathematically correct?

A I did.

Q And specifically which calculations did you review?

A The discount rates he used over the 12-year period.

Q And by that you're referring to which? The present value calculations?

A Yes.

Q And what was the output from these present value calculations?

A When I first looked at them, I couldn't figure out what discount rate he was using because they all came up with a different rate.

Q And what was Mr. Lignelli's sum total from these present value calculations?

Mr. Silver did not offer an opinion regarding the accuracy of Mr. Lignelli's calculations. Moreover, in stark contrast to Mr. Lignelli who testified that he was absolutely certain[2] of his results, Mr. Silver did not offer an opinion that his calculation was correct. Rather, after acknowledging that discounted cash flow analysis is complicated in that "there are just

---

A Two hundred and fifty-five thousand, or excuse me, 455,000.
Q And did you attempt to duplicate these mathematical calculations?
A Yes, I did. I didn't know what he did. He told me here, or he testified that he used a mid-year calculation.
Q A mid-year convention?
A Yes. And I still couldn't calculate the same number.
Q What number did you get?
A Four hundred and ten thousand.

[2] Mr. Lignelli testified on cross as follows:
Q Explain to me how you did these calculations?
A The cashflow, negative or positive, is applied to a present value, its present worth of a dollar, using the midyear convention and the product of each year is added and then rounded.
Q So looking at Year 1 we have a negative cashflow presumably because of the cost of developing the first parts of the subdivision?
A Yes, and it's typical that subdivisions do not yield the realize of positive cashflow until the second, third, or fourth years.
Q So we have a negative $449,207?
A Yes.
Q We're multiplying it by the present worth factor?
A Yes.
Q Of .9245?
A Yes.
Q Where did that factor come from?
A That's from a financial calculator.
Q From a calculation that you did or from a table?
A Well, they are in tables, but it's from what I did using the midyear convention formula.
Q Using the?
A Midyear convention formula.
Q Now, I've tried doing these calculations and my numbers don't quite come out to yours. Could you try this calculation for me and see if you can explain where the .9245 came from?
A Well, again, that's the value of a dollar one year at 17 percent.
Q You're absolutely positive that's correct?
A Yes.
Q I'm going to give you an opportunity to recalculate it, if you want?
A Well, no. I already did it. I don't have the formula, I have it posted on my wall. You convert from end of year to midyear.
Q Why would we use midyear?
A Because it best reflects the cashflow in that it's inaccurate to assume that the cashflows would be generated at the end of the year, whereas, they're generally generated evenly throughout the year, mostly toward the first and second quarters when people by lots.
Q Now, when we're doing a discounted cashflow analysis, there's a number of variables that are going into this, aren't there?
A Yes.

numerous, numerous judgment calls that have to be made by the appraiser: the absorption period, the discount rate, the cost, input cost, timing of these costs," Mr. Silver merely testifies that he was unable to reach the same result. One less than charitable characterization of this testimony is that Mr. Silver simply admitted to his own incompetence. More charitably, Mr. Silver simply utilized either a different variable or formula for determining the present value factor to be used. If the defendant questioned Mr. Lignelli's assumptions or the formula he used for calculating the present worth factor it should have cross-examined him on those assumptions and required him to produce that formula rather than mischaracterize the testimony of its own witness.

**Character of the Government's Action**

The character of Defendant's action in this case also weighs in favor of a taking. Defendant, however, argues that, "because the government action here was implemented to protect wetlands, and therefore serves an important public purpose, the nature of the government action weighs in favor of the defendant." (Def.'s Post-trial Br. at 28.) This argument lacks merit because it over simplifies the issue by failing to acknowledge that the Fifth Amendment was designed to protect individuals from legitimate exercises of government power. *Florida Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21 (1999). As the Federal Circuit has stated:

> That the purpose and function of the regulatory imposition is relevant to drawing a line between mere diminution and partial taking should not be read to suffest that when the Government acts in pursuit of an important public purpose, its actions are excused from liability. To hold so would eviserate the plain language of the Takings Clause, and would be inconsistent with Supreme Court guidance.

*Florida Rock Indus., Inc. v. United States, 18 F.3d 1560, 1571 (Fed. Cir. 1994).*

*Florida Rock, Inc.* illustrates that an analysis of the character of the government's action is concerned with more than whether the public is benefited by the government actions. *Florida Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21 (1999). Rather the analysis of the character of

the government's action also looks at the impact the regulation has on the property rights of the plaintiff. Addressing a similar taking occasioned by the application of the Clean Water Act to the plaintiff's property, the court in *Florida Rock, Inc.* stated:

> The final prong of the *Penn Central* test, the character of the government action, does not here argue against a taking, but rather for one; to benefit the public. Florida Rock's bundle of property rights was severely diminished: "the government, under the guise of regulation, cannot take from a property owner the core economic value of the property, leaving the owner with a mere shell of shambled expectations." *Hendler v. United States*, 952 F.2d 1364, 1373 (1991). Although it is true that not every strand in the bundle was cut, *see Loretto*, 458 U.S at 435 ("the government does not simply take single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand"), the thin handful which remains little resembles the full sheaf once held by Florida Rock. It strains the court's sense of logic to suggest this well-pruned parcel is still whole. Florida Rock's property, post-regulation, is different in kind, not merely degree, from its pre-regulation property, and this argues for a compensable taking. The government might as well have physically occupied the property, leaving Florida Rock the option of visiting its land for recreation, or selling it.
>
> The court finds that Florida Rock suffered a taking of property as defined by the Fifth Amendment to the Constitution. The Takings Clause was designed to protect individuals and compensate them for very legitimate exercises of government power. The due process clause of the Fifth Amendment protects individuals from illegitimate exercises of such power.

*Florida Rock Indus., Inc. v. United States*, 45 Fed. Cl. 21, 41 (1999)

In this case, like *Florida Rock, Inc*., Defendant's action left the Murphy Farm a shell of shambled expectations. The property was purchased with the intent of draining that property and developing it into a row crop farm. *United States v. Brace*, 41 F.3d 117, 120 (3rd Cir. 1994); (Tr. at 124.) Post regulation, however, the 30 acres of jurisdictional wetlands cannot be drained or farmed. (Pl.'s Ex. 22.) In addition, given the boundaries of the delineated wetlands the remaining upland parcels cannot be economically used. (Tr. at 733, 773, 867, 868; Pl.'s P32.) Stated simply, the character of the government's actions in this case weighs in favor of a taking regardless of how laudable the Clean Water Act's goals because "[a] strong public desire to

improve the public condition [will not] warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Dolan v. City of Tigard,* 512 U.S. 374, 385 (1994).

Addressing the character of the government's action, the Supreme Court has also stated, "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, *see, e.g., United States v. Causby,* 328 U.S. 256 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 123 (1978)(parrallel citation ommited).

Assuming *arguendo* that the defendant did not in fact physically take portions of the Murphy Farm, the defendant's action certainly have all the characteristics of a physical invasion. As a result of the Consent Decree, the Murphy Farm is to this day occupied by a check dam and fill material. (Pl.'s Ex. 22.) Those permanent physical invasions resulted in permanent surface flooding and ground water inundation. In fact, as established by the aerial photos in evidence, until the physical occupation of the Murphy Farm by the mandated check dam and fill material the southern portion of the Murphy Farm had not been under a lake like that observed by this Court during the site visit. (*See, e.g.,* Pl.'s Ex P1, P34.) Accordingly, the defendant's physical invasions of the Murphy Farm and reduction of that property to a shell of its expectations cause the character of the government's action to weigh in favor of a regulatory taking.

6. Defendant's argument that that the appropriate rate of interest in this case is that found in the Declaration of Takings Act has already been rejected in other cases before this court. (Def.'s Br. at 1, 15-21.) S*ee Whitney Benefits, Inc. v. United States,* 30 Fed. Cl. 411, 414 (1994) ("Full compensation, then, requires that a [property owner] whose award has been delayed be compensated for his inability to utilize his money.") (citing *ITT Corp. v. United States*, 17 Cl. Ct.

199, 240 (1989)); *See also Tulare Lake Basin Water Storage Dist. V. United States*, 61 Fed. Cl. 624 (2004).

The proper rate of interest to achieve just compensation is a question of fact to be determined within the "sound discretion" of the Court. *See Pettro v. United States,* 47 Fed. Cl. 136, 154 (2000) (citing *Studiengesellschaft Kohle v. Dart Indus., Inc.*, 862 F.2d 1564, 1580 (Fed. Cir. 1988)). Accordingly, while it applies to so-called "quick take" condemnation actions filed in the United States District Courts, the statutory rate of interest advocated by the defendant does not apply to taking claims brought in this Court under the Tucker Act. S*ee Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 414 (1994) (holding that full compensation is only achieved when the plaintiff is "compensated for his inability to utilize his money."); *Eastern Minerals Int'l, Inc. v. United States,* 39 Fed. Cl. 621, 631 n.13 (1997) (refusing to apply rate from 40 U.S.C. § 258e-1 in favor of tax overpayment rate for just compensation in takings case), *rev'd on other grounds,* 271 F.3d 1090 (Fed. Cir. 2001). In addition, even if it wished to do so, Congress cannot constitutionally limit the amount of just compensation (including interest) to be awarded in a particular case. *See Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985); *Miller v. United States*, 223 Ct. Cl. 352, 405 (1980) (reversing application of statutory interest rate because it did not take into account prevailing interest rates on various investments).

Moreover, the infirmity of using statutory interest rates, the low-yield Treasury Bill rate in particular, is that these formula look at the interest question from the point of view of the government which takes the property, rather than that of the owner whose property is taken. As this Court said in *Pitcairn v. United States*, 212 Ct. Cl. 168 (1976):

> The just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner and not of the condemnor. In other words, just compensation in the constitutional sense is what the owner has lost, and not what the condemnor has gained. The yield on a

> series of hypothetical Government bonds is not relevant in ascertaining the injury plaintiff has suffered. It measures compensation only according to the point of view of the taker without reference to that of the owner since he is hardly likely to be able to borrow money at the rates the Government can.

*Id*. at 193 (citations omitted). The goal then is to identify a rate "which would put a property owner 'in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation.'" *NRG Co. v. United States*, 31 Fed. Cl. 659, 667-68 (1994) (quoting *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 10 (1984)).

In an effort to achieve some uniformity among just compensation litigants, for some time this Court's predecessor used Moody's Composite Index of Yields on Long Term Corporate Bonds (Moody's Index) as a reference point for calculating appropriate delay damages. *See, e.g., Miller v. United States*, 223 Ct. Cl. 352, 404 (1980) ("This court has previously established in *Pitcairn v. United States*, [212 Ct. Cl. 168 (1976)] and *Tektronix, Inc. v. United States,* [213 Ct. Cl. 257 (1977)] the rates of interest to be paid on just compensation claims for the years 1947 through 1975. These rates were fixed based on the trends indicated by Moody's Composite Index of Yields on Long Term Corporate Bonds."). While this history improperly sought uniformity at the expense of a particularized determination of just compensation, it is instructive because it approached compensation from the point of view of the landowner rather than the condemnor.

There is no evidence in this case remotely suggesting that had Mr. Brace received payment at the time of the taking he would have invested that sum in low-yield Treasury Bills. Therefore, there is no factual basis on which this Court can conclude that Treasury Bill rates (rather than some other rate of interest) adequately and justly compensates plaintiffs for nearly a decade in delayed payment. Accordingly, this Court is free to utilize its discretion to determine the appropriate rate of interest that Mr. Brace should be awarded because the United States Supreme Court has consistently held that the determination of just compensation, including the proper rate

of interest, "is a judicial function and not a legislative question." *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 327 (1893). The Supreme Court explained that "[i]t does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation." *Id.* at 327.

In this case the court should award interest at the operating loan rate, or the rate which farmers borrow money to operate their farms. *See Kansas v. Colorado*, 533 U.S. 1, 13 (2001) ("[T]he economic consequences of Colorado's breach could best be remedied by an interest award that mirrors the cost of any additional borrowing the farmers may have been forced to undertake in order to compensate for lost revenue."). Should the be disinclined to allow Mr. Brace to present evidence of specific operating loan rates during the relevant time period, then the Court should award interest at the Moody's Composite Index of Yields on AAA Bonds (Moody's Index) rate. Like the low yield T-bill rate advocated by the defendant, the Moody's Index rate is: (1) routinely published and readily available to the public and the court; (2) constitutes an appropriate tool for estimating reasonable rates of return on an investment; and, (3) provides a simple formula for calculating interest.

The Moody's Index rate[3] is preferable to the T-Bill rate because it reflects the rate of return reasonably prudent investors, such as Mr. Brace, would have achieved during the relevant period. Awarding interest in this case based on this readily identifiable interest rate for an investment available to individual investors would properly place the risk of fluctuating interest rates on the defendant where it properly belongs. See *Miller v. United States*, 620 F.2d 812 (Ct.

[3] According to Moody's Investors Services, these yields are as follows for years 1996 through 2004: 7.8 percent in 1995, 7.7 percent in 1996, 7.5 percent in 1997, 7.5 percent in 1997, 6.9 percent in 1998, 7.4 percent in 1999, 8.0 percent in 2000, 7.6 percent in 2001, 7.1 percent in 2002, 6.2 percent in 2003 and 6.1 percent in 2004. *See* Moody's Corporate Bond Yield Averages, Long-Term Annual Averages 1980-2004, http://www.bondmarkets.com/story.asp?id=86; *see also* Moody's Corporate Bond Yield Averages, Long-Term Annual Averages, 1980-2004, http://www.mbrservices.info/Research/C3.shtml.

Cl. 1980); *See also Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624 (2004). More importantly, this rate properly reflects interest from the economic point of view of Mr. Brace rather than the defendant who elected not to fulfill its duty of just compensation at the time of the taking.

Respectfully submitted,

/s Nancie G. Marzulla
Nancie G. Marzulla
Defenders of Property Rights
1350 Connecticut Ave., N.W.
Suite 410
Washington, D.C. 20036
202-822-6770
202-822-6774 (facsimile)

Counsel for Plaintiff

Dated: May 19, 2005